# IN THE UNITED STATES COURT OF INTERNATIONAL TRADE

## BEFORE THE HONORABLE M. MILLER BAKER, JUDGE

_____

| | |
|---|---|
| INDUSTRIAL PESQUERA SANTA PRISCILA S.A. and SOCIEDAD NACIONAL DE GALAPAGOS, C.A.,<br><br>_Plaintiffs,_<br><br>v.<br><br>UNITED STATES,<br><br>_Defendant,_<br><br>and<br><br>AD HOC SHRIMP TRADE ACTION COMMITTEE and AMERICAN SHRIMP PROCESSORS ASSOCIATION,<br><br>_Defendant-Intervenors._ | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)    Court No. 25-00029 |

_____

**PLAINTIFFS' MEMORANDUM OF POINTS AND AUTHORITIES
IN SUPPORT OF THEIR RULE 56.2 MOTION FOR JUDGMENT
ON THE AGENCY RECORD**

Respectfully submitted,

/s/ Warren E. Connelly
Warren E. Connelly
Jarrod M. Goldfeder
Kenneth N. Hammer
TRADE PACIFIC PLLC
700 Pennsylvania Avenue, SE
Suite 500
Washington, D.C. 20003
(202) 223-3760

Counsel for Industrial Pesquera Santa
Priscila, S.A. and Sociedad Nacional
de Galapagos, C.A.

Dated: August 22, 2025

# <u>TABLE OF CONTENTS</u>

<u>Page</u>

I.   RULE 56.2(c) STATEMENT…………………………………………... 1

    A.   The Administrative Determination Sought to Be Reviewed…………………………………………………………... 1

    B.   Issues Presented for Review………………………………… 2

    II.   SUMMARY OF ARGUMENT……………………………… 2

III.  STATEMENT OF FACTS……………………………………… 7

    A.   The Preliminary Phase of the Investigation……………..…… 7

        1.   The Commission Did Not Issue Questionnaires to Shrimp Fishermen in Its Preliminary Phase…………. 7

        2.   Testimony of the Ecuadorian Respondents at the Preliminary Phase Staff Conference…………………… 8

        3.   Post-Conference Brief of the Ecuadorian Respondents………………………………………………... 9

        4.   The Commission's Preliminary Determination Did Not Address the Condition of Domestic Shrimp Fishermen ………………………………………………… 11

    B.   The Final Phase of the Investigation………………………… 12

        1.   The Draft Questionnaire for Shrimp Fishermen……. 12

        2.   Ecuadorian Respondents' Comments on the Draft…. 14

        3.   The Ecuadorian Respondents' Pre-Hearing Brief…... 16

IV.  ARGUMENT…………………………………………………..……… 20

    A.   The Statute Required the Commission to Find that the Shrimp Fishermen Segment of the Domestic Industry Incurred Material Injury by Reason of Subject Imports….. 20

i

Page

B.     Substantial Evidence Established that the Sole Cause of
Any Material Injury Incurred by Domestic Shrimp
Fishermen Was the Dramatic Fuel Cost Increase in
2022 and 2023 ……………………………………….....… 22

C.     The Commission Abused Its Discretion in Failing to
Request that Shrimp Fishermen Report the Volume of
Diesel Fuel that They Purchased During the POI ……..… 28

D.     The Commission Unlawfully Failed to Respond to the
Ecuadorian Respondents' Analysis of the Adverse Effects
of Diesel Fuel Cost Increases on Shrimp Fishermen……... 35

E.     Substantial Evidence Did Not Support the Commission's
Rationale for Finding that Shrimp Fishermen Incurred
Material Injury by Reason of Subject Imports……….…... 38

V.     CONCLUSION………………………………………….. 46

# TABLE OF AUTHORITIES

Page

## Cases

*Altx, Inc. v. United States*, 26 CIT 709 (2002)……………………………… 34

*Bonney Forge Corp. v. United States*, __ CIT __,
    560 F. Supp. 3d 1303 (2022)……………………………………………… 37

*Borlem S.A. v. United States*, 913 F. 2d 933 (Fed. Cir. 1990)…………. 41

*CS Wind Viet. Co. v. United States*, 832 F.3d 1367
    (Fed. Cir. 2016)………………………………………………………… 36

*Diamond Sawblades Manufacturers Coalition v.
United States*, 32 CIT 134 (2008)…………………………………… 37

*Hynix Semiconductor, Inc. v. United States*, 30 CIT 1208,
    431 F. Supp. 2d 1302 (2006)……………………………………… 38

*Mitsubishi Electric Corp. v. United States*, 12 CIT 1025,
    700 F. Supp. 538 (1988)……………………………………………… 33

*New Am Keg v. United States*, Ct. No. 20-00008,
    Slip Op. 21-30, 2021 WL 1206153, 13 (Mar. 23, 2021)………….. 36

*OCP S.A. v. United States*, Slip op. 25-51, Consol.
    Court no. 21-00219, 2025 WL 1837257 (Apr. 22, 2025)………….. 41

*Tropicana Products, Inc. v. United States*, 31 CIT 548,
    484 F. Supp. 2d 1330 (2007)……………………………………… 37

*Universal Camera Corp. v. NLRB*, 71 S. Ct. 456 (1951)……………….. 36

*USX Corp. v. United States*, 11 CIT 82, 655 F. Supp. 487 (1987)…….. 34

**<u>Statutes</u>**

19 U.S.C. § 1671(a)(2)…………………………………………………….... 20

19 U.S.C. § 1677(4)(A)…………………………………………………..… 3, 20

**<u>Administrative Determinations</u>**

*Frozen Warmwater Shrimp From Ecuador: Final Negative*
    *Determination of Sales at Less Than Fair Value,*
    89 Fed. Reg. 85,508 (Oct. 28, 2024)………………………………...… 7

*Frozen Warmwater Shrimp From Indonesia and Ecuador;*
    *Termination of Investigations,* 89 Fed. Reg. 88,061
    (Nov. 6, 2024)………………………………………………………… 7

*Frozen Warmwater Shrimp From Ecuador, India, Indonesia,*
    *and Vietnam,* 89 Fed. Reg. 102,163 (Dec. 17, 2024)……………….. 1

## I.    RULE 56.2(c) STATEMENT

### A.    The Administrative Determination Sought to Be Reviewed

The Plaintiffs, Industrial Pesquera Santa Priscila, S.A. ("Santa Priscila") and Sociedad Nacional de Galapagos, C.A ("Songa") (collectively, "the Ecuadorian respondents"), contest the final determination of the United States International Trade Commission in the countervailing duty investigation of Frozen Warmwater Shrimp From Ecuador, India, Indonesia, and Vietnam. The Commission's final determination appears in *Frozen Warmwater Shrimp From Ecuador, India, Indonesia, and Vietnam*, 89 Fed. Reg. 102,163 (Dec. 17, 2024) Appx001354. The confidential final Views of the Commission ("Final Views") appear in Appx001265-001353. The public versions of the Final Views and the Final Staff Report appear in USITC Pub. 5566 (Dec. 2024), captioned *Frozen Warmwater Shrimp from Ecuador, India, Indonesia, and Vietnam*, Investigation Nos. 701-TA-699-700 and 702 and 731-TA-1660 (Final). Appx001356-001708.

**B.    Issues Presented for Review**

1.    *Did the Commission abuse its discretion by failing to request that domestic shrimp fishermen provide the volume of the diesel fuel that they purchased during each of the five periods comprising the period of investigation.*

2.    *Did substantial evidence support the Commission's finding that domestic shrimp fishermen were materially injured by subject imports from Ecuador, India, Indonesia and Vietnam despite the fact that diesel fuel price increases during the period of investigation were the sole cause of any deterioration in their financial condition during the period of investigation.*

## II.    SUMMARY OF ARGUMENT

The Ecuadorian respondents raise a single challenge, which is whether substantial evidence supported the Commission's finding that the shrimp fishermen segment of the domestic industry was materially injured by subject imports from the four investigated countries.

To reach an affirmative final material injury determination, the law requires that substantial evidence demonstrate that subject imports have caused material injury to the domestic industry "as a whole." 19 U.S.C. § 1677(4)(A).

The domestic shrimp industry contains two segments: (1) shrimp fishermen (aka "shrimpers") who harvest live shrimp from the waters of the Gulf of Mexico and South Atlantic; and (2) shrimp processors that purchase what the shrimpers catch and then process that shrimp, freeze it, and package it in a manner suitable for sale to wholesalers, distributors, retailers, restaurants, and end users.

The statute required the Commission to find that both the shrimp fishermen segment and the shrimp processor segment of the domestic industry suffered material injury by reason of subject imports. Otherwise, the Commission, as a matter of law, could not find that the domestic industry "as a whole" had suffered such injury. However, the sole cause of any injury to the shrimp fishermen segment during the period of investigation ("POI") was the soaring price of diesel fuel in 2022 and 2023 compared to the price in 2021.

The POI in the final phase of the investigation covered the three full years of 2021-2023, plus the "interim periods" of January-March 2023 and January-March 2024. Diesel prices escalated from $2.44 per gallon in January 2021 to a high of $5.39 per gallon in June 2022 before declining to $3.72 per gallon at the end of March 2024. USITC Pub. 5566 at Table V-1. Appx001572. These price increases, which all shrimp fishermen had to pay, accounted for the entire decline in profitability that domestic shrimp fishermen suffered in both 2022 and 2023 compared to 2021, a year in which they were extremely profitable.

As such, the Commission erroneously found that subject imports caused material injury to the domestic industry "as a whole," as the law requires, because diesel fuel price increases were the entire cause of material injury to the shrimp fishermen.

The Ecuadorian respondents made concerted efforts during both the preliminary and final phases of the Commission's investigation to obtain information that would establish the factual importance and the legal significance of diesel fuel price increases that more than doubled during the POI. Diesel fuel was the "largest production cost" that shrimp fishermen incurred. Final Views at 52. Appx001314.

4

The Ecuadorian respondents repeatedly asked the Commission to require shrimp fishermen to provide the number of gallons of diesel fuel that they purchased during each of the five periods comprising the entire POI so that they could calculate the aggregate impact of diesel price increases on the shrimp fishermen segment. The Commission denied this request, which constituted an abuse of agency discretion.

Moreover, by refusing to seek directly relevant evidence that would have allowed all parties, as well as the Commission, to analyze the effects of diesel fuel price increases, the record did not contain substantial evidence that supported the Commission's finding that the domestic industry "as a whole" suffered material injury by reason of subject imports.

## **GLOSSARY**

| **Abbreviation** | **Term** |
|---|---|
| AHSTAC | Ad Hoc Shrimp Trade Action Committee |
| ASPA | American Shrimp Processors Association |
| Commission | U.S. International Trade Commission |
| Ecuadorian respondents | Industrial Pesquera Santa Priscila, S.A. and Sociedad Nacional de Galapagos, C.A. |
| EIA | U.S. Energy Information Administration |
| Final Views | Final Phase Views of the Commission |
| Preliminary Views | Preliminary Phase Views of the Commission |
| Santa Priscila | Industrial Pesquera Santa Priscila, S.A. |
| Shrimper | A shrimp fisherman |
| Songa | Sociedad Nacional de Galapagos, C.A. |
| USSC | U.S. Shrimpers Coalition |

## III.  STATEMENT OF FACTS

The American Shrimp Processors Association ("ASPA") filed countervailing duty petitions against frozen warmwater shrimp producers and exporters located in Ecuador, India, Indonesia, and Vietnam, as well as antidumping petitions against Ecuador and Indonesia, on October 25, 2023.[1] The two Ecuadorian respondents, Santa Priscila and Songa, which were the two largest Ecuadorian shrimp producers and exporters during the POI, entered appearances at the start of the preliminary phase of this investigation and fully participated in both the preliminary and final phases thereafter.

### A.  The Preliminary Phase of the Investigation

#### 1.  The Commission Did Not Issue Questionnaires to Shrimp Fishermen in Its Preliminary Phase

In its preliminary determination, the Commission acknowledged that:

---

[1] The Commerce Department found that Ecuadorian exporters had not engaged in dumping. *See Frozen Warmwater Shrimp From Ecuador: Final Negative Determination of Sales at Less Than Fair Value*, 89 Fed. Reg. 85,508 (Oct. 28, 2024). That event led the Commission to issue the notice captioned *Frozen Warmwater Shrimp From Indonesia and Ecuador; Termination of Investigations*, 89 Fed. Reg. 88,061 (Nov. 6, 2024). Appx059839.

> the record of these preliminary phase investigations contains
> no information on fresh warmwater shrimp harvesters,
> which are part of the domestic industry, with the exception
> of landings data, and limited information on imports of fresh
> warmwater shrimp.  We intend to collect such information in
> any final phase of these investigations and <u>invite the parties
> to comment on the best way of doing so in their comments on
> the draft questionnaires.</u>

Views of the Commission ("Preliminary Views") at 30, n.95.

Appx021393. (Emphasis added.)

## 2. Testimony of the Ecuadorian Respondents at the Preliminary Phase Staff Conference

At the November 15, 2023 Staff Conference, the Ecuadorian

respondents stated the following in light of the Commission's failure at

the start of the investigation to request injury-related information from

shrimp fishermen:

> {W}e need to know what the impact on domestic processor
> and shrimper profitability has been with respect to
> dramatically higher fuel costs, interest rates, inventory
> carrying costs, labor costs, and transportation costs to
> customers. It is not enough to simply ask processors and
> shrimpers if they have been affected by these significant
> economic factors. It could well be that if compelled to
> quantify their impact, the conclusion would be that subject
> imports have had an insignificant impact on profitability
> compared to all of the other headwinds that the domestic
> industry has concededly faced.

8

We will have more to say about what's required in our
post-conference brief, but just this listing alone illustrates
how much further investigation needs to be done.

Staff Conf. Tr. at 134-135 (Connelly).  Appx055282-055283.

### 3.  Post-Conference Brief of the Ecuadorian Respondents

In their Post-Conference Brief (at Exhibit 2), Ecuadorian

respondents provided the monthly prices of diesel fuel that the U.S.

Energy Information Administration ("EIA") released on November 13,

2023. Appx055639-055643. The EIA updated the pricing information in

that release in the version that the Commission reported in USITC Pub.

5566 at Table V-1. Appx001572.  The EIA's updated release stated that,

in January 2021, the price of No. 2 diesel fuel was $2.44 per gallon, but

the price spiked to $5.39 per gallon by June 2022. In every month of

2022, 2023, and 2024 the price of diesel fuel exceeded the price in

January 2021 by at least $1.00 per gallon and frequently was more than

double that price.

For this reason, the Ecuadorian respondents claimed that "The

Commission could not evaluate the accuracy of the petitioners' claim

that domestic shrimp fishermen had incurred material injury by reason

of subject imports unless it had first issued preliminary phase

questionnaires that captured, with specificity and quantitative precision, the impact of all of the economic factors that the domestic industry has conceded adversely affected their profitability during the POI." Ecua. Resps.' Post-Conf. Br. at 3. Appx055599.

### 4. The Commission's Preliminary Determination Did Not Address the Condition of Domestic Shrimp Fishermen

The Commission's Preliminary Views ignored the significant hole in the record concerning the impact of diesel fuel price increases and failed even to acknowledge that the Ecuadorian respondents had identified a material deficiency that required further investigation. In apparent recognition of this deficiency, the Commission stated that:

> the record of these preliminary phase investigations contains no information on fresh warmwater shrimp harvesters, which are part of the domestic industry, with the exception of landings data, and limited information on imports of fresh warmwater shrimp, in Appendix E of the report. In any final phase of the investigations, we intend to collect such information and invite the parties to comment on the best way of doing so in their comments on the draft questionnaires.

Preliminary Views at 19, n.53. Appx056567.

The Commission also stated that:

> although we have defined the domestic industry to include both fishermen and U.S. processors, data concerning fishermen were not collected in the preliminary phase of these investigations, with the exception of landings data. We therefore rely on questionnaire data from U.S. processors as the information available on the domestic industry's performance.

*Id*. at 41, n.152. Appx056589.

11

## B.  The Final Phase of the Investigation

### 1. The Draft Questionnaire for Shrimp Fishermen

The Commission's standard practice is to issue draft questionnaires to interested parties for comment in all antidumping and countervailing duty investigations. The Commission's invitation to interested parties in its preliminary determination "to comment on the best way" of collecting information from shrimp fishermen "in their comments on the draft questionnaires" constituted the Ecuadorian respondents' only formal opportunity to request the information needed to rectify what would otherwise have a constituted fatal omission from the final phase record.

Despite the repeated insistence of the Ecuadorian respondents during the preliminary phase that information should be sought in the final phase concerning the impact of significant diesel fuel price increases, and despite the Commission's invitation that the "parties comment on the best way of doing so," the draft fishermen's questionnaire did not seek the information necessary to permit the parties to evaluate the effect of soaring diesel fuel prices on shrimp

12

fishermen. *See* Draft U.S. Farmers'/Fishermen's Questionnaire.
Appx056877-056890.

Instead, the draft questionnaire asked shrimp fishermen to report
only their total "fuel and oil" operating expenses in 2021, 2022, 2023,
and the first calendar quarter of both 2023 and 2024. *See* Section III-1
of draft questionnaire. Appx 056887. However, without requiring
shrimp fishermen to provide the number of diesel gallons that they
purchased in each of those periods, it was impossible to calculate the
per gallon price increase they incurred and the resulting total cost
increase that they incurred after the "base year" of 2021.

Shrimp fishermen eventually submitted 388 questionnaire
responses. Final Views at 5. Appx001267. The Ecuadorian
respondents, had the Commission collected the requested purchase
volume information from those 388 fishermen, could have calculated the
total financial impact of the increased diesel price on each shrimp
fisherman by first determining the average per gallon price that each
shrimp fisherman paid in each POI period. Next, we could have
determined the increase in that average price in each succeeding period
of the POI. Then, we could have calculated the total impact on each

13

fisherman (and then on the entire shrimp fishermen segment) by multiplying the average price increase in 2022 and 2023 compared to the average price in 2021 multiplied by the volume that each shrimp fisherman purchased in each period.

## 2. Ecuadorian Respondents' Comments on the Draft

After the Ecuadorian respondents determined that the draft final phase questionnaire did not seek the information that they needed for a full and fair record, they requested a single addition to the U.S. Farmers'/Fishermen's Questionnaire. Specifically, they asked the Commission to request on the finalized version of the questionnaire the "Number of gallons of fuel and oil purchased" in each of the five POI periods. The rationale for this essential request was as follows:

> At the start of the final phase POI, i.e., on January 4, 2021, according to data published by the DOE's Energy Information Administration, the price of No. 2 diesel fuel was $2.640 per gallon. By June 2022, that price had risen to $5.703 per gallon. In December 2023, the price remained high at $4.092 per gallon. The Commission should determine (and the Respondents are entitled to know) the extent to which the enormous increase in diesel fuel prices during the POI caused shrimp fishermen to incur material injury and reduced days at sea.
>
> The current draft asks shrimp fishermen to report their total "Fuel and oil" operating expenses in each year of the POI and in the two interim periods. However, this

14

information is insufficient to allow the Commission and the Respondents to evaluate the impact of dramatically increased diesel fuel price increases over the POI. Accordingly, the Commission should add the following line at the bottom of Table III-1 for each of the five listed periods:

Number of gallons of fuel and oil purchased.

Inclusion of this request in Table III-1 will allow the Commission and the Respondents to calculate the extra fuel cost that shrimpers have incurred during the POI. For example, assume that a fisherman used 100,000 gallons of fuel in 2021. If the average price of this fuel was $2.50 per gallon, then the total fuel cost in 2021 was $250,000. Next, assume that this fisherman used 80,000 gallons of fuel in 2022 at $4.50 per gallon. The price increase between 2021 and 2022 was $2.00 per gallon. Multiplied by 80,000 gallons yields an increase in cost of $160,000. This increase could completely or at least significantly account for any decline in profitability shown in operating income (or loss) or net income (or loss) reported in Table III-1 during the POI.

However, without knowing the number of gallons purchased, it is not possible to evaluate the impact of documented diesel fuel price increases during the POI. In other words, this information is essential to allow a thorough investigation of the impact of concededly enormous diesel fuel price increases on shrimpers.

Ecua. Resps.' Comments on Draft Final Phase Questionnaires at 9-10.

Appx057177-057178.

The Commission refused to revise the questionnaire to reflect this essential request. In contrast, the Commission made five changes to the fishermen's draft questionnaire in response to the comments filed by

15

the Ad Hoc Shrimp Trade Action Committee, which was a trade
association that represented the shrimp fishermen segment of the
domestic industry. *See* AHSTAC Comments on Draft Questionnaires at
2-12. Appx057005-057015. It also made three changes to this
questionnaire in response to the comments filed by the U.S. Shrimpers
Coalition ("USSC"), which also represented shrimp fishermen. *See*
USSC Comments on Draft Questionnaires at 1-3. Appx057191-057193.

### 3. The Ecuadorian Respondents' Pre-Hearing Brief

The first paragraph of the Ecuadorian respondents' Pre-Hearing
Brief stated that:

> The Commission has made it impossible for the
> Ecuadorian shrimp industry, represented here by its two
> largest producers, Industrial Pesquera Santa Priscila S.A.
> and Sociedad Nacional de Galapagos C.A. . . . to obtain a fair
> and impartial hearing. Fairness was only possible if the final
> phase questionnaires sought the information needed to cure
> the critical defects and omissions in the preliminary phase
> record. We repeatedly identified these defects and omissions
> in our: (1) testimony at the preliminary conference; (2) Post-
> Conference Brief; and (3) Comments on the draft final phase
> questionnaires.

Appx043944.  We further stated that:

> The flawed record compiled in the Commission's
> preliminary phase might be excused due to the compressed
> statutory time limit. However, the Commission's failure in
> the final phase to dig thoroughly into the domestic industry's

16

allegations was inexplicable and unlawful. There is no doubt
that inclusion in the final phase record of the information
that the Ecuadorian Respondents requested, but that the
Commission refused to request, would materially affect its
analysis.

*Id.* at 3. Appx043946.

Nevertheless, the Ecuadorian respondents tried to estimate the

impact of diesel fuel price increases on shrimp fishermen in 2022 and

2023 compared to 2021 by using the diesel fuel consumption data

provided by a shrimp fisherman, Mr. Anthony Garcia, for a single

fishing trip that one of his boats took in 2023. Staff Conf. Tr. at 34.

Appx055183. By assuming that Mr. Garcia's testimony was

representative of all shrimp fishermen, we were able to estimate the

total increased cost of fuel that all shrimpers incurred between 2021

and 2022 as $20,633,703. We also estimated the increased cost of fuel

that they incurred between 2021 and 2023 as $10,307,445.[2] Ecua.

Resps.' Pre-Hear. Br. at 8-9. Appx043951-043952.

---

[2] We were unable to calculate the impact of the increased diesel fuel
cost for Interim 2024 because the shrimpers' questionnaire did not
request the number of fishing days for that period.

We used 2021 as the "base year" for measuring the impact of fuel cost increases because shrimpers earned a substantial total operating profit exceeding $8.1 million in that year. Pre-Hear. Rept. at Table F-14, page F-11. Appx043931. Their operating profit margin in that same year was 6.2%.[3] *Id*. These results were among the highest ever reported by shrimp fishermen so there was no possibility that subject imports had caused them to incur material injury in that year. Not surprisingly, none of the three trade associations representing domestic industry interests, i.e., ASPA, AHSTAC, and USSC, alleged that the shrimpers suffered material injury by reason of subject imports in 2021.

However, the 388 shrimpers then reported a <u>total</u> operating loss of $2,195,000 in 2022 and a <u>total</u> operating loss of $1,771,000 in 2023. *Id*.

_____

[3] The Commission conducted unfair trade investigations of frozen warmwater shrimp from various countries on two prior occasions. *See* USITC Pub. 3748 (January 2005) (antidumping) and USITC Pub. 4429 (October 2013) (countervailing duty). The "base year" in the former investigation was 2001, and the operating profit margin of shrimp fishermen in that year was 1.4%. *See* USITC Pub. 3748 at page F-8. The "base year" in the latter investigation was 2010, and the operating profit margin of shrimp fishermen in that year was 3.2%. *See* USITC Pub. 4429, Views of the Commission at 31. Thus, compared to the result in the two previous investigations, in 2021, shrimper profit margins were at or near an historic high.

Thus, we concluded that the increased diesel fuel costs that they incurred in 2022 and 2023 were solely responsible for their reported overall operating losses in those two years because they exceeded those losses by $18.4 million in 2022 and by $8.5 million in 2023.[4]

Nevertheless, this analysis did not persuade the Commission to seek the volume-related information that we repeatedly requested even though the Commission had adequate legal authority and more than adequate time to do so. Moreover, this information was readily available from each shrimper because, as the Ecuadorian respondents pointed out, the fact that shrimpers had to compile their total cost of fuel and oil during the POI necessarily meant that they would have had to review each invoice showing the volume that they purchased in each transaction. *See* Ecua. Resps.' Pre-Hear. Br. at 8. Appx043951.

---

[4] The vessels of each reporting shrimper could have consumed more (or less) fuel per day than the vessel owned by the petitioner's witness, Mr. Garcia. However, our calculations were probative considering the absence of any other record evidence concerning daily fuel consumption and, even after any slight adjustments, demonstrated that increased fuel costs were the sole cause of material injury to the shrimper segment of the industry. Had the Commission just asked each shrimper to report the gallons of diesel fuel purchased during the POI, we could have made exact calculations on a shrimper-by-shrimper basis.

Neither the Commission nor the two trade associations that represented shrimp fishermen, i.e., AHSTAC and USSC, ever disagreed with the Ecuadorian respondents that the purchase volume data was readily available and easily obtainable from records that the shrimpers would have needed to review in order to report their total fuel and oil costs during the POI.

## IV.   ARGUMENT

### A. The Statute Required the Commission to Find that the Shrimp Fishermen Segment of the Domestic Industry Suffered Material Injury by Reason of Subject Imports

To reach an affirmative determination in a countervailing duty investigation, the statute requires that the Commission determine that "an industry in the United States is materially injured . . . by reason of imports of that merchandise." 19 U.S.C. § 1671(a)(2). The statute defines the term "industry" as "the producers as a whole of a domestic like product or those producers whose collective output of a domestic like product constitutes a major proportion of the total domestic production of the product."  19 U.S.C. § 1677(4)(A).

The Commission stated that "we define a single domestic like product consisting of frozen warmwater shrimp, coextensive with the

20

scope, and <u>out-of-scope fresh warmwater shrimp</u>." Final Views at 25.
Appx001287. (Emphasis added.) The Commission's inclusion of "out-of-
scope fresh warmwater shrimp" within its "domestic like product"
definition was intended to include the "fresh" shrimp that shrimp
fishermen landed on their boats.

As a result of this definition, the Commission stated that "Because
we have defined the domestic like product to include fresh warmwater
shrimp, the fishermen that harvest warmwater shrimp produce the
domestic like product and are consequently part of the domestic
industry." *Id*. at 26.  Appx001288.

The consequence of this definition was that the Commission, to
satisfy the statutory requirement that it find that the domestic industry
"as a whole" had suffered material injury by reason of unfairly traded
imports, was required to find that both segments of the domestic
industry, i.e. shrimp fishermen and shrimp processors, had suffered
material injury:

> We examine the data pertaining to the domestic
> industry's performance separately for the two primary
> segments of the domestic industry, U.S. shrimp fishermen
> and U.S. shrimp processors, as the Commission did in prior
> investigations involving shrimp.

21

*Id.* at 70. Appx001332. (Footnote omitted.) Accordingly, the Commission separately examined the "indicia of injury" pertaining to both the shrimp fishermen segment and the processor segment before it (wrongly) concluded that the domestic industry "as a whole" had suffered material injury by reason of subject imports.

Nevertheless, the Commission did not disagree in its Final Views with the Ecuadorian respondents' assertion that "it is impossible as a matter of both law and fact for the Commission to satisfy the statutory requirement that it find that subject imports caused material injury or threat to the domestic industry "<u>as a whole</u>" without finding that shrimp fishermen had been materially injured by subject imports. Ecua. Resps.' Pre-Hear. Br. at 10. Appx043953. (Emphasis in original.)

**B. Substantial Evidence Established that the Sole Cause of Any Material Injury Incurred by Domestic Shrimp Fishermen Was the Dramatic Fuel Cost Increase in 2022 and 2023**

The Ecuadorian respondents provided an analysis in their Post-Hearing Brief (at 1-4) using the extremely limited amount of record information available to them that demonstrated that diesel fuel cost increases were the sole cause of material injury suffered by the shrimper segment. Appx045835-045838.  We started our analysis with

the evidence that the shrimpers earned record or near-record profits in 2021 and could not possibly have suffered material injury from subject imports in that year. Then, we held constant all revenue and expense information that the shrimpers reported for 2021, except for the diesel fuel price increases that they incurred in 2022 and 2023. By doing this, we were able to isolate the effect of diesel fuel cost increases during the POI.

We first assumed that, but for increased volumes of subject imports sold at allegedly low dumped and subsidized prices in 2022 and 2023, the domestic shrimp fishermen could have repeated their strong financial performance in 2021 in both 2022 and 2023. Thus, if they could repeat their performance in 2022 and 2023 as they did in 2021, then they would spend the same number of days fishing in 2022 and 2023 as they did in 2021 instead of having to tie up their boats and thereby reduce the number of their fishing days, as they claimed.

If they fished the same number of days in those two years, then they would have consumed the same amount of fuel in 2022 and 2023 as they did in 2021. Moreover, they would have been able to charge the same prices, incur the same operating expenses, and thereby earn the

23

same operating profits in 2022 and 2023 as they did in 2021. Fishermen were able to charge an average of $3.66 per lb. in 2021 for their catch and allegedly had fuel-related operating expenses in 2021 of $1.03 <u>per pound</u>, not per gallon. Preh. Rept. Appx043901.

However, the fatal flaw in the Commission's reliance on this $1.03 per pound figure for fuel expense in 2021 was that it was the result of dividing the reported "net sales quantity" of fishermen (36,023,000 lbs.) by the reported "Operating expenses: Fuel and oil" ($37,128,000). *Id*. However, fishermen did not pay an average of $1.03 <u>per gallon</u> for diesel fuel in 2021 because the EIA reported that the price of diesel fuel rose from $2.44 per gallon in January 2021 to $3.36 per gallon in December 2021. USITC Pub. 5566 at Table V-1. Appx001572.

Thus, the Commission's failure to use the correct (per gallon, not per pound) metric to evaluate the effect of diesel fuel price increases during the POI fatally infected the Commission's analysis of the impact of subject imports on shrimp fishermen. That is because average daily fuel consumption does not vary based on the number of pounds that shrimpers catch. In other words, a shrimper is going to consume the

24

same number of gallons of fuel on any given fishing day regardless of the number of pounds of shrimp that they catch on that day.

Nevertheless, the Commission stated that fishermen's diesel prices "increased by 8.5 percent from 2021 to 2022 {but} dropped sharply by 27.2 percent in 2023 for an overall decrease of 21.1 percent from 2021 to 2023." Final Views at 85-86. Appx001347-001348. This conclusion irrationally ignored the undisputed evidence concerning diesel prices that the EIA compiled, which showed that diesel prices substantially exceeded $4.00 per gallon in 10 months of 2022 and substantially exceeded $3.50 per gallon in 11 months of 2023. USITC Pub. 5566 at Table V-1. Appx001572.

As just noted, the only way for the Commission to conclude that diesel fuel price increases were not the cause of material injury to the shrimpers was to irrationally calculate the <u>ratio</u> of fuel expenses to net sales quantity. That is why the Commission expressed the alleged price effect in dollars per pound, not in dollars per gallon.

However, this ratio had nothing to do with the prices that fishermen actually paid for diesel fuel or the impact of those prices on their financial condition. Accordingly, the Ecuadorian respondents, in

25

their own analysis, relied on the EIA's officially reported prices of diesel fuel, rather than the irrelevant per pound, ratio-derived, figures that the Commission used, to determine the impact of diesel fuel prices on fishermen during the POI.

Our analysis concluded that, even if domestic shrimp fishermen had replicated in 2022 the number of their fishing days in 2021, as well as incurred the same revenues and non-fuel related expenses in 2022 that they reported in 2021, the 55% average increase in the diesel fuel price between 2021 and 2022 would have turned a significant operating profit into an even more substantial operating loss. In other words, the diesel fuel cost increase would have been the sole cause of this estimated operating loss because we held constant in 2022 the very profitable operating results that they reported for 2021. Appx045835-045838.

The same conclusion followed for 2023 versus 2021, although the additional average fuel price increase between those two years would have been $0.89 per gallon ($3.92 per gallon average price in 2023 vs. $3.03 per gallon average price in 2021). Thus, the average diesel price increased by 29% in 2023 compared to 2021 ($0.89 ÷ $3.03 = 29%). As a

result, the total fuel cost increase in 2023 compared to 2021 would have equaled 29% x $37,128,000 = $10,767,120. *Id.*

Here again, the operating profit in 2021 became an estimated operating loss in 2023 even if all non-diesel fuel operating results were kept constant (the $8,128,000 operating profit in 2021 minus the fuel cost increase in 2023 of $10,767,120 yielded an operating loss of $2,639,120).

As explained above, the Ecuadorian respondents repeatedly contended, without objection from the Commission, that it could not reach an affirmative final determination without first determining that shrimp fishermen were materially injured by subject imports. However, our analysis demonstrated that, even if the shrimp fishermen's sales volumes, sales prices, total revenues, total operating expenses, and fishing days had not declined in 2022 and 2023 compared to 2021 due, as the Commission found, to the impact of alleged subject imports, the shrimp fishermen would have incurred a huge loss in both 2022 and 2023. Thus, it could not be the case that subject imports were the cause of any injury to the domestic shrimp fishermen.

27

In other words, <u>where a significant profit in 2021 turns into a</u> <u>significant loss solely due to the 55% increase in the price of diesel fuel</u> <u>in 2022 and the 29% price increase in 2023</u>, the statutory requirement cannot be met that the domestic industry "as a whole" suffer material injury from subject imports.

Of course, the Ecuadorian respondents' analysis could have been further refined had the Commission required each shrimp fisherman to report the diesel fuel gallons that they purchased during the POI. Despite the inexcusable absence of this information, the Ecuadorian respondents' record-based analysis of the adverse effect of increased diesel prices on shrimper profitability was not contradicted by the Commission. Rather, it ignored this analysis in its Final Views.

## C. The Commission Abused Its Discretion in Failing to Request that Shrimp Fishermen Report the Volume of Diesel Fuel that They Purchased During the POI

It was critical for each shrimp fisherman to provide the volume of diesel fuel that they purchased in the POI so that the Commission could evaluate the effect of substantial price increases in 2022 and 2023. We repeatedly asked the Commission to request this single piece of

information from the shrimpers. The Commission brushed off our

request, stating that:

> Ecuadorian Respondents contend that the Commission failed
> to develop an adequate record for these investigations
> because it did not adopt <u>all of the questions</u> proposed in their
> comments on the Commission's draft final phase
> questionnaires. In considering the questions proposed by
> parties in their comments on the draft questionnaires,
> however, the Commission <u>must weigh the likely probative</u>
> <u>value of the information those requests would elicit against</u>
> <u>the burden</u> that including those requests in the
> questionnaire would impose on responding parties.
> Furthermore, the Commission <u>must evaluate different, often</u>
> <u>conflicting, requests</u> from the comments of other interested
> parties on the same issues. With respect to each issue
> identified by the Ecuadorian Respondents, the Commission
> collected sufficient data to analyze the issue.
>
> *Diesel Fuel*. The Commission collected data from U.S.
> fishermen concerning their costs of fuel and oil, and
> gathered publicly available data on the price of diesel fuel in
> the Gulf Coast region. Ecuadorian Respondents <u>were able to</u>
> <u>present their principal argument in their posthearing brief</u>
> <u>regarding diesel fuel costs based on the record data that the</u>
> <u>Commission presented in the prehearing report.</u>

Final Views at 88-89. Appx001350-001351. (Emphasis added.) This

explanation is not supported by substantial evidence for the following

reasons.

First, we submitted just one proposed question for the shrimp fishermen, not more than one, as the Commission's reference to "all of the questions" suggests.

Second, the Commission's suggestion that it considered the additional burden on fishermen in asking them to provide their diesel fuel purchase volumes has no record basis. The Commission has never explained why such a burden existed, and it never responded to the Ecuadorian respondents' assertion that fishermen necessarily had to review their volume-related information in order to compile their total cost of purchasing diesel fuel for their questionnaire responses.

Third, the Commission appeared to rely on the testimony of ASPA's witness, who stated, without providing supporting evidence, that:

> In terms of diesel volume, the Commission did collect data on the cost of diesel fuel for fishermen. It would have been onerous to also ask for the gallons. That doesn't seem necessary; everyone knows what the price of diesel is and {they} can figure that out if they want to.

Hearing Tr. at 103 (Drake). Appx058373. This was a classic attempt to mislead since no one (not "everyone") knew the volume of diesel fuel that any of the 388 shrimp fishermen purchased during the POI.

Fourth, no record evidence supports the Commission's suggestion that it considered the "likely probative value" of obtaining the information necessary to evaluate the impact of diesel fuel price increases on shrimp fishermen by requesting volume-related information through a single addition to the fishermen's questionnaire.

Fifth, no interested party submitted a "conflicting request" in their comments on the draft questionnaires concerning diesel fuel purchase volumes, as the Commission erroneously suggested.

Sixth, the Commission failed to acknowledge that its response to all the comments on the draft fishermen's questionnaire was biased against the Ecuadorian respondents because the Commission made six changes to the fishermen's questionnaire at the request of AHSTAC, which was the trade association that represented shrimp fishermen throughout the investigation. *See* AHSTAC Comments on Draft Questionnaires at 2-12. Appx057005-057015.

Seventh, the Commission also made three changes to the fishermen's questionnaire at the request of the U.S. Shrimpers Coalition ("USSC"), which also represented the interests of domestic shrimp fishermen. *See* USSC Comments on Draft Questionnaires at 1-2.

31

Appx057191-057193. Ironically, the USSC stated that it needed the Commission to adopt its three requested changes (which it did) because "This information is necessary to give the Commission a complete picture of the impact of subject imports on U.S. fishermen, which are the essential foundation of the domestic industry." *Id*. at Appx057193. The Commission agreed.

Eighth, the Commission stated that Ecuadorian respondents "were able to present their principal argument in their posthearing brief regarding diesel fuel costs based on the record data that the Commission presented in the prehearing report." Final Views at 89. Appx001351. That statement was nonsense since our post-hearing brief continued to criticize the Commission's failure to request the diesel fuel volumes that shrimpers purchased during the POI. We called this omission "inexcusable." Post-Hear. Br. at 3. Appx045837.

Ninth, even assuming, without basis, that the Ecuadorian respondents "were able to present their principal arguments in their posthearing brief," the Commission never responded to the analyses that we provided using the extremely limited amount of information available to us.

32

Finally, the Commission's rejection of the Ecuadorian respondents' request made a mockery of the Commission's prior invitation to interested parties to "comment on the best way" of obtaining information from shrimp fishermen since the preliminary phase record "contains no information on fresh warmwater shrimp harvesters, which are part of the domestic industry, with the exception of landings data." Preliminary Views at 19, fn. 53. Appx021382.

In similar situations, this court has ordered a remand directing the Commission to obtain and consider information which it had previously failed to acquire. For example, in *Mitsubishi Electric Corp. v. United States*, 12 CIT 1025, 700 F. Supp. 538, 564 (1988), the court remanded an affirmative Commission determination on the ground that:

> where the ITC actively precludes itself from receiving relevant data or takes no effort to seek relevant data contrary to § 1677(4)(D), which directs the ITC *shall* assess domestic production where available data exists and where that data is reasonably available for the ITC to collect and consider, then such actions will be found to be contrary to law.
>
> ***
>
> The Court recognizes had the ITC requested and considered this reasonably available data and then, under its statutory discretion, found such information irrelevant or unreliable, then evidence on the record would exist in order for the

33

Court to properly review the determination. The best information available could have also been considered by the ITC had the responding parties been uncooperative or unable to produce requested information. *See* 19 U.S.C. § 1677e(b). But here, the information, while reasonably available, was not requested.

Accordingly, the Court holds the ITC's failure to seek reasonably available data concerning subassembly production (*i.e.,* available data permitting the separate identification of production) was contrary to law and did establish a lack of thoroughness in its investigative duties where § 1677(4)(D) is concerned.

Similarly, in *Altx, Inc. v. United States*, 26 CIT 709 (2002), the

court held that:

> Evaluating the domestic industry "as a whole," however, is not a license to ignore information that would give context and meaning to the data it is analyzing in assessing the domestic industry's performance. Indeed, the statutory directive to analyze the industry "as a whole" compels an evaluation of all material factors raised by the parties that would render a more accurate reading of the health of the industry. Therefore, if the Commission determines to discount a particular factor that bears on the relevant financial indicators, it must give substantial evidence to support its reasoning. The court finds that the Commission has failed to do so.

*See also USX Corporation v. United States*, 11 CIT 82, 655 F. Supp. 487

(1987):

> The court repeatedly has held that ITC must acquire all obtainable or accessible information on the economic factors necessary for its analysis. {Citations omitted.} Although ITC

34

is not required to amass every conceivable shred of relevant data in order to comply with the requirements of the law, the absence of information necessary for a thorough analysis may render a determination unsupported by substantial evidence. *Kenda Rubber Industrial Co., Ltd. v. United States*, 10 CIT 120, 630 F. Supp. 354, 358 n.4 (1986).

For all these reasons, the Commission abused its discretion in failing to include the single question that we repeatedly asked to be included in the fishermen's questionnaire. As such, the Commission's finding that subject imports caused material injury to the shrimp fishermen segment of the domestic industry lacked substantial evidence.

### D. The Commission Unlawfully Failed to Respond to the Ecuadorian Respondents' Analysis of the Adverse Effects of Diesel Fuel Cost Increases on Shrimp Fishermen

The Commission's Final Views did not respond to or address the uncontradicted analyses of the impact of diesel fuel cost increases in the Ecuadorian respondents' Pre-Hearing and Post-Hearing Briefs.[5] These

---

[5] Tellingly, no party representing domestic shrimp fishermen or domestic processors, i.e., ASPA, AHSTAC, and the USSC, submitted Final Comments that either rebutted or found fault with the Ecuadorian respondents' analysis of the impact of diesel fuel price increases on domestic fishermen. *See* Final Comments of the Ecuadorian Respondents (at 1): ("Despite having the opportunity in their hearing testimony and their own Post-Hearing Briefs to rebut our

35

analyses were the product of the argument that the Ecuadorian respondents advanced throughout both the preliminary and final stages of the investigation, i.e., that diesel fuel cost increases were the sole cause of material injury to domestic fishermen.

Through this omission, the Commission failed to consider record evidence that "fairly detracts" from the evidence that the agency relied upon. *See, e.g., Universal Camera Corp. v. NLRB*, 71 S. Ct. 456, 488 (1951) ("The substantiality of evidence must take into account whatever in the record fairly detracts from its weight."); *see also* CS *Wind Viet. Co. v. United States*, 832 F.3d 1367, 1373 (Fed. Cir. 2016); *Gerald Metals, Inc. v United States*, 132 F.3d 716, 720 (Fed. Cir. 1997).

In addition, this court has held that "Not addressing conflicting evidence on the record fails the substantial evidence test because it does not consider record evidence contrary to Commerce's determination." *New Am Keg v. United States*, Ct. No. 20-00008, Slip Op 21-30, at 35, 2021 WL 1206153 at 13 (Mar. 23, 2021) (quoting *Camau Frozen Seafood*

---

analyses, both ASPA and AHSTAC declined to do so because they recognized the accuracy of our analyses.")  Appx059869.

*Processing Imp. Exp. Corp. v. United States*, 37 CIT 1116, 929 F. Supp. 2d 1352, 1356 (2013).

See also *Bonney Forge Corp. v. United States*, __ CIT __, 560 F. Supp. 3d 1303 1310 ("A decision by Commerce cannot be supported by substantial evidence if there is no indication that Commerce considered essential arguments or evidence in making its final determination."); *Coalition of American Flange Producers*, __ CIT __, 448 F. Supp. 3d 1340, 1351 (2020) ("Commerce is obligated to respond to those arguments made by interested parties that bear on issues material to Commerce's determination."); *Diamond Sawblades Manufacturers Coalition v. United States*, 32 CIT 134, 150 (2008) ("Without further elucidation as to the Commission's definition of a 'price/volume tradeoff,' the court is unable to find that the ITC has provided a 'reasoned explanation' for its finding in this regard."); *Tropicana Products, Inc. v. United States*, 31 CIT 548, 484 F. Supp. 2d 1330, 1347 (2007) ("In sum, the Commission's determination is not supported by substantial evidence when the record as a whole is considered. Instead, its decision is arbitrary and capricious because it did not address many important issues relating to the effects of the short supply of domestic

37

oranges upon the domestic industry."); *Hynix Semiconductor, Inc. v. United States*, 30 CIT 1208, 431 F. Supp. 2d 1302, 1317 (2006) ("An affirmative determination does not rest on substantial evidence when the ITC fails to analyze compelling arguments that purport to demonstrate the comparatively marginal role of subject imports in causing that injury.")

As in the above-cited decisions, the Commission's failure to address the significant causation issue that the Ecuadorian respondents raised renders its final determination unsupported by substantial evidence.

### E. Substantial Evidence Did Not Support the Commission's Rationale for Finding that Shrimp Fishermen Incurred Material Injury by Reason of Subject Imports

The Commission's rationale for rejecting the Ecuadorian respondents' claim that diesel fuel cost increases were the sole cause of any material injury that shrimp fishermen suffered during the POI was as follows:

> Respondents argue that an increase in the cost of diesel fuel was the cause of any injury to U.S. shrimp fishermen. As noted, the record shows that cost of diesel fuel in the Gulf Coast increased during the first half of the POI, but then declined during the second half of the POI, with some fluctuations. While U.S. fishermen's fuel and oil

operating expenses increased by 8.5 percent from 2021 to 2022, they dropped sharply by 27.2 percent in 2023, for an overall decrease of 21.1 percent between 2021 and 2023. Similarly, the fishermen's unit value for its fuel and oil expenses declined by 18.9 percent from 2021 to 2023, increasing from $1.03 per pound in 2021 to $1.18 per pound in 2022, and then declining to $0.84 per pound in 2023.

> If, as respondents claim, the fuel and oil cost was the most important driver of any injury to the fishermen, then there should have been a major improvement in their financial condition in 2023 given the sharp decline in their fuel and oil cost. Instead, the fishermen experienced an operating loss that year, with their worst operating ratio (negative 2.4 percent) of the POI, as their net sales AUV declined by a much greater amount than the unit value of their fuel and oil expenses. Thus, the fishermen's injury was not caused by their fuel and oil expenses, but rather by their falling prices as a result of subject imports.

Final Views at 85-86. Appx001347-001348.

This rationale does not constitute or rely upon substantial evidence for the following reasons.

First, the Commission mischaracterized the trend in diesel fuel prices between 2021 and 2023 by using an invalid ratio of total fuel costs to total sales revenue. There is no question that those prices rose significantly during the POI, as demonstrated by the EIA's compilation of weekly diesel fuel prices. For example, the price of diesel fuel in January 2021 was $2.44 per gallon. As of January 2022, that price was

39

$3.46 per gallon. As of January 2023, the price was $4.28 per gallon.

USITC Pub. 5566 at Table V-1. Appx001572. Thus, every shrimper

experienced a significant price increase in both 2022 and 2023

compared to 2021. Diesel prices more than doubled in six months of

2022 compared to January 2021. *Id.*

For that reason, the Staff Report that accompanied the

Commission's Final Views characterized the "diesel fuel price spike" as

follows:

> Prices of diesel fuel, which affect the activity of shrimp
> fishermen and therefore the availability of U.S. shrimp,
> declined slightly at the beginning of the COVID-19 pandemic
> but began to increase in late 2020. In early 2022, diesel
> prices began to climb more rapidly and, in June of that year,
> reached a 15-year high. Diesel fuel prices have since
> generally declined but remain above historical averages. In
> addition, diesel fuel prices increased in July, August, and
> September 2023 (see part V).

USITC Pub. 5566 at Table III-3. Appx001505.

Seen in this light, the Commission's attempted minimization of

the impact of significant fuel cost increases is not supported by

substantial evidence. The Commission focused on the "unit value" for

the fishermen's "fuel and oil expenses," but, as noted above, the way the

Commission calculated this value for each year was by using a ratio of

40

fuel expense to sales value. That "per pound" ratio is irrelevant to the measurement of the per gallon amount and the total amount of the fuel cost increases that fishermen incurred. As noted in *Borlem S.A. v. United States*, 913 F. 2d 933, 941 (Fed. Cir. 1990) ("A decision based on inaccurate data provides a sound reason for a court to order reconsideration to correct a determination based on those data, whether the Commission knows of the incorrect data or not.")[6]

The arbitrariness of the Commission's analysis is illustrated by the misleading claim that fuel and oil operating expenses declined to $0.84 per pound in 2023 from $1.03 per pound in 2021. The fuel cost, measured on a "per pound" basis does not address the increase or decline in the fuel price <u>per gallon</u>, which is the only metric that can be used to measure the diesel price increase's impact on shrimp fishermen.

Equally misleading was the Commission's claim that fishermen experienced a "sharp decline in their fuel and oil cost" in 2023. Diesel prices did decline in 2023 compared to 2022, but the actual price of

---

[6] *See also OCP S.A. v. United States,* Slip op. 25-51 at 37, Consol. Court no. 21-00219, 2025 WL 1837257 (Apr. 22, 2025) ("When the Commission becomes aware of a possible flaw in a timely manner, it has a duty to investigate.")

diesel fuel in 2023 was still far above the price in 2021 according to the official EIA monthly statistics.

Had the Commission asked shrimpers to provide the volume of diesel fuel that they purchased in each POI period, the Ecuadorian respondents could have provided the following type of analysis for both 2022 and 2023.

First, the average price per gallon of diesel fuel increased from $3.034 per gallon in 2021 to $4.947 per gallon in 2022, which equaled an increase of $1.93 per gallon.  USITC Pub. 5566 at Table V-1. Appx001572. The total number of fishing days in 2023 was 51,351 days. *Id*. at Table F-13. Appx001701. Thus, the 388 fishermen fished for an average of 132 days (51,351 total fishing days ÷ 388 fishermen = 132 days per fisherman). The fisherman, Robert Garcia, testified at the Staff Conference that he took a 62-day fishing trip that ended in November 2023 during which his boat consumed 15,000 gallons of diesel fuel. Thus, his boat consumed 242 gallons of diesel fuel per day beginning sometime in September (15,000 gallons ÷ 62 days = 242

gallons consumed per day).[7] The average price of diesel fuel in 2022 was $4.947 per gallon. The average price of diesel fuel in 2021 was $3.034 per gallon. Thus, Mr. Garcia likely incurred an increased cost of $1.91 per gallon between 2021 and 2022.

Mr. Garcia does not appear to have filed a questionnaire response for any of the shrimp boats that he owned. Therefore, we necessarily assume that his company's financial experience equaled the average experience of all 388 reporting fishermen. In 2022, the average fisherman had an operating loss of $5,657 ($2,195,000 total reported operating loss for all 388 fishermen ÷ 388 fishermen = $5,657 loss per fisherman in 2023). USITC Pub. 5566 at Table C-1, page C-5. Appx 001673.

If Mr. Garcia fished for the average number of days reported by all fishermen in 2022, then he fished for 132 days. Since his boat consumed 242 gallons per day, his <u>increased</u> cost of diesel fuel in 2022 compared to 2021 equaled 132 fishing days x 242 gallons consumed per day x $1.91

---

[7] This is the only record information concerning the volume of diesel fuel purchased by a shrimp fisherman to the best of our knowledge.

per gallon increased fuel cost = $61,013 total increased cost of fuel for Mr. Garcia between 2021 and 2022.

This increase is over 10 times larger than the average loss of $5,657 reported by the average shrimp fisherman in 2022. In other words, the diesel fuel price increase between 2021 and 2022 is the entire cause of the estimated operating loss that he suffered.

The same result obtains when comparing shrimper performance between 2021 and 2023. The total number of fishing days in 2023 was 47,857 days. *Id*. at Table F-13. Appx001701. Thus, the 388 fishermen fished for an average of 123 days (46,857 total fishing days ÷ 388 fishermen = 123 days per fisherman). As noted above, Mr. Garcia's shrimp boat consumed 242 diesel fuel gallons per day.  The average price of diesel fuel in 2023 was $3.915 per gallon. The average price of diesel fuel in 2021 was $3.034 per gallon. Thus, Mr. Garcia likely incurred an increased cost of $0.881 per gallon between 2021 and 2023.

Since we have been unable to locate in the record a fishermen's questionnaire response filed by Mr. Garcia or his company, we again assume that his company's financial experience was the same as the average experience of all 388 reporting fishermen. In 2023, the average

fisherman had an operating loss of $4,564 ($1,771,000 total reported operating loss for all 388 fishermen ÷ 388 fishermen = $4,564 loss per fisherman in 2023). If Mr. Garcia fished for the average number of days reported by all fishermen in 2023, then he fished for 123 days. Since his boat consumed 242 gallons per day, his increased cost of diesel fuel compared to 2021 equaled 123 fishing days in 2023 x 242 gallons consumed per day x $0.881 per gallon increased fuel cost in 2023 compared to 2021 = $26,224 total increased cost of fuel between 2021 and 2023.

This increase is over five times larger than the loss reported by the average shrimp fisherman in 2023. In other words, here again, the diesel fuel price increase between 2021 and 2023 is the entire estimated cause of the operating loss that the average shrimp fisherman suffered.

If the Commission had asked fishermen to report the diesel gallons that they purchased during the POI, then the Ecuadorian respondents could have refined their conclusions by performing a shrimper-by-shrimper analysis of the fuel price increases that each shrimper suffered. However, with a materially deficient record, the above analysis is more than adequate to warrant a remand on the

ground that the Commission's analysis of the impact of subject imports on domestic shrimp fishermen was not supported by substantial evidence.

## V.    CONCLUSION

To avoid examining the impact of diesel fuel price increases on fishermen, the Commission used a misleading analysis and ignored the correct way to measure that impact, which the Ecuadorian respondents provided in their pre-hearing and post-hearing briefs, as well as herein. For all the foregoing reasons, this Court should find that the Commission did not support with substantial evidence its conclusion that shrimp fishermen suffered material injury by reason of subject imports.

For that reason, it should remand the case with an instruction that the Commission determine the amount of diesel fuel cost increases incurred by shrimp fishermen and the resulting impact of those increases on their financial condition during the POI. To reach this determination, the Court should require the Commission to reopen the record so that the Commission can obtain from the previously reporting shrimp fishermen the volume of diesel fuel that they each purchased

during each period of the POI along with the total price that they paid for every gallon purchased during each period of the POI. Interested parties should then be afforded an opportunity to submit comments on the submitted information and any conclusions that the Commission reaches concerning the results of the remand.

Respectfully submitted,

/s/ Warren E. Connelly
Warren E. Connelly
Jarrod M. Goldfeder
Kenneth N. Hammer
TRADE PACIFIC PLLC
700 Pennsylvania Avenue, SE
Suite 500
Washington, D.C. 20003

Counsel for Industrial Pesquera Santa
Priscila, S.A. and Sociedad Nacional
de Galápagos, C.A.

Dated: August 22, 2025

<u>CERTIFICATE OF COMPLIANCE</u>

Undersigned counsel hereby certifies that the foregoing

Memorandum of Points and Authorities complies with the 10,000-word

limitation in the Court's June 5, 2025 Scheduling Order.  This

Memorandum contains 8,861 words according to the word count

function used in the word processing software used to prepare this

Memorandum.

The undersigned further certifies that no form of artificial

intelligence was used to prepare this Memorandum.

<u>/s/ Warren E. Connelly</u>
Warren E. Connelly

Dated: August 22, 2025