*NON-CONFIDENTIAL DOCUMENT*

# UNITED STATES COURT OF INTERNATIONAL TRADE
# BEFORE THE HONORABLE M. MILLER BAKER, JUDGE

| | |
|---|---|
| INDUSTRIAL PESQUERA SANTA PRISCILA S.A. and SOCIEDAD NACIONAL DE GALÁPAGOS, C.A.,<br>*Plaintiffs,*<br><br>v.<br><br>UNITED STATES,<br>*Defendant,*<br><br>and<br><br>AD HOC SHRIMP TRADE ACTION COMMITTEE and AMERICAN SHRIMP PROCESSORS ASSOCIATION,<br>*Defendant-Intervenors.* | No. 25-00029-MMB |
| SEAFOOD EXPORTERS ASSOCIATION OF INDIA,<br>*Plaintiff,*<br><br>v.<br><br>UNITED STATES,<br>*Defendant,*<br><br>and<br><br>AD HOC SHRIMP TRADE ACTION COMMITTEE and AMERICAN SHRIMP PROCESSORS ASSOCIATION,<br>*Defendant-Intervenors.* | No. 25-00031-MMB |

*NON-CONFIDENTIAL DOCUMENT*

SHRIMP COMMITTEE OF THE
VIETNAM ASSOCIATION OF SEAFOOD
EXPORTERS AND PRODUCERS,
　　　　　　　*Plaintiff,*

v.

UNITED STATES,
　　　　　　　*Defendant,*

and

AD HOC SHRIMP TRADE ACTION
COMMITTEE and AMERICAN SHRIMP
PROCESSORS ASSOCIATION,
　　　　　　　*Defendant-Intervenors.*

No. 25-00032-MMB

## DEFENDANT-INTERVENORS AMERICAN SHRIMP PROCESSORS ASSOCIATION'S AND AD HOC SHRIMP TRADE ACTION COMMITTEE'S JOINT MEMORANDUM IN OPPOSITION TO MOTIONS OF PLAINTIFFS FOR JUDGMENT ON THE AGENCY RECORD

Nathaniel Maandig Rickard
Zachary J. Walker
Anjelika D. Jani

**PICARD KENTZ & ROWE LLP**
1155 Connecticut Ave., NW
Suite 700
Washington, DC 20036
(202) 331-5040
nrickard@pkrllp.com
*Counsel to AHSTAC*

Dated:  January 9, 2026

Roger B. Schagrin
Elizabeth J. Drake
Nicholas C. Phillips*

**SCHAGRIN ASSOCIATES**
900 Seventh Street, N.W.
Suite 500
Washington, D.C.  20001
(202) 223-1700
rschagrin@schagrinassociates.com
*Counsel for ASPA*

*Admitted only in New York. Practice limited
to matters before federal courts and agencies.

*NON-CONFIDENTIAL DOCUMENT*

# TABLE OF CONTENTS

I.  STATEMENT PURSUANT TO RULE 56.2 ................................... 3

   A.  Administrative Determinations Under Review ................. 3

   B.  Issues Presented and Summary of Argument ..................... 3

II.  STATEMENT OF FACTS .................................................. 4

III.  ARGUMENT ............................................................. 4

   A.  Standard of Review .................................................. 4

   B.  Additional Argument ............................................... 4

     1.  The Commission Properly Included Frozen Raw Shrimp and Frozen Cooked Shrimp in the Same Domestic Like Product ............ 5

     2.  The Commission's Volume Determination Was Reasonable ....... 9

     3.  The Commission Reasonably Found Adverse Price Effects ....... 11

     4.  The Commission Reasonably Found Imports Had a Significant Adverse Impact ..................................................... 15

     5.  The Commission Reasonably Found Supply Constraints Could Not Explain the Injury the Domestic Industry Suffered ................. 16

     6.  The Commission Reasonably Found That Competition Was Not Attenuated ......................................................... 20

     7.  The Commission Reasonably Found Injury to the Fishing Segment of the Industry .............................................. 23

  IV. CONCLUSION .......................................................... 27

*NON-CONFIDENTIAL DOCUMENT*

# <u>TABLE OF AUTHORITIES</u>

## Cases

*Altx, Inc. v. United States*, 167 F. Supp. 2d 1353 (Ct. Int'l Trade 2001) .............................................................................................14

*Jeld-Wen, Inc. v. United States*, 567 F. Supp. 3d 1344 (Ct. Int'l Trade 2022) ...........................................................................................6

*Loper Bright Enters. v. Raimondo*, 603 U.S. 369 (2024)..................13, 14

*Valeo N. Am., Inc. v. United States*, 404 F. Supp. 3d 1303 (Ct. Int'l Trade 2019) ...........................................................................6

*Valeo N. Am., Inc. v. United States*, 823 F. App'x 937 (Fed. Cir. 2020)...6

## Statutes

19 U.S.C. § 1677(4)(A) ...................................................................13

19 U.S.C. § 1677(7)(C)(ii) ..............................................................14

## Other Authorities

*Frozen Warmwater Shrimp from Brazil, China, India, Thailand, and Vietnam*, Inv. Nos. 731-TA-1063-1064 and 1066-1068, USITC Pub. 4688 (Second Review) (May 2017) .......................................17

*Frozen Warmwater Shrimp from China, India, Thailand, and Vietnam*, Inv. Nos. 731-TA-1064 and 1066-1068 (Third Review), USITC Pub. 5432 (June 2023) .................................................17

*Frozen Warmwater Shrimp from Ecuador, India, Indonesia, and Vietnam*, Inv. No. 701-TA-699-700 and 702 and 731-TA-1660 (Final), USITC Pub. 5566 (Dec. 2024) ......................................*passim*

*Certain Frozen or Canned Warmwater Shrimp and Prawns from Brazil, China, Ecuador, India, Thailand, and Vietnam*, Inv. Nos. 731-TA-1063-1068 (Final), USITC Pub. 3748 (Jan. 2005)...................5, 6, 8, 26

*NON-CONFIDENTIAL DOCUMENT*

## GLOSSARY

| Term | Definition |
|------|------------|
| ASPA | American Shrimp Processors Association |
| AHSTAC | Ad Hoc Shrimp Trade Action Committee |
| AUV | Average unit value |
| Commission | U.S. International Trade Commission |
| POI | Period of investigation |

*NON-CONFIDENTIAL DOCUMENT*

Defendant-Intervenors, the American Shrimp Processors Association ("ASPA") and the Ad Hoc Shrimp Trade Action Committee ("AHSTAC"), oppose the Motions for Judgment on the Agency Record filed by the following groups of plaintiffs: (1) Industrial Pesquera Santa Priscila S.A. and Sociedad Nacional de Galapagos, C.A. ("Ecuadorian Respondents"), (2) Seafood Exporters Association of India ("Indian Respondents"), and (3) Shrimp Committee of the Vietnam Association of Seafood Exporters and Producers ("Vietnamese Respondents"). *See* Ecuadorian Pls. Mem. of Points & Auth. in Supp. of the Mot. for J. on the Agency R. (Aug. 22, 2025), Ct. No. 1:25-cv-00029-MMB (ECF No. 36-2) (hereinafter "Ecuadorian Resp. Br."); SEAI Mem. in Supp. of Mot. for J. on the Agency R. (Aug. 22, 2025), Ct. No. 1:25-cv-00031-MMB (ECF No. 35-2) (hereinafter "Indian Resp. Br."); VASEP Mem. in Supp. of Mot. for J. on Agency R., (Aug. 22, 2025), Ct. No. 1:25-cv-00032-MMB (ECF No. 39) (hereinafter "Vietnamese Resp. Br.).

While the Court's scheduling order permits Defendant-Intervenors to file a separate response brief in the Vietnam appeal (Case No. 25-00032), for efficiency's sake we are filing one consolidated response brief in all three appeals. *See* Rule 56.2 Notice (June 5, 2025),

*NON-CONFIDENTIAL DOCUMENT*

Ct. No. 1:25-cv-00029-MMB (ECF. No. 33), Ct. No. 1:25-cv-00031-MMB (ECF No. 31), and Ct. No. 1:25-00032-MMB (ECF No. 35) (hereinafter "Rule 56.2 Notice"). *See also* Order Striking Defendant Intervenors' Briefs, Ct. No. 1:25-cv-00029-MMB (ECF. No. 45), Ct. No. 1:25-cv-00031-MMB (ECF No. 45), and Ct. No. 1:25-00032-MMB (ECF No. 49).

As reviewed in more detail below, the final determinations of the United States International Trade Commission ("the Commission") in the countervailing duty investigations on imports of frozen warmwater shrimp from Ecuador, India, and Vietnam are supported by substantial evidence and in accordance with law. This Court should therefore affirm the final determinations in their entirety.

Defendant-Intervenors concur with and hereby endorse and incorporate by reference the arguments made by Defendant in its response brief. Def. Public Response in Opposition to Mot. for J. on the Agency R. (Nov. 24, 2025), Ct. No. 1:25-cv-00029-MMB (ECF No. 42), Ct. No. 1:25-cv-00031-MMB (ECF No. 41), and Ct. No. 1:25-00032-MMB (ECF No. 46) (hereinafter "Def. Br."). Consistent with the instructions in the Court's Rule 56.2 notices to avoid the repetition of arguments in

2

NON-CONFIDENTIAL DOCUMENT

earlier-filed briefs, we focus below on highlighting a few additional points that further support sustaining the Commission's determination.

## I.    STATEMENT PURSUANT TO RULE 56.2

### A. Administrative Determinations Under Review

Plaintiffs seek review of the Commission's affirmative determinations in the countervailing duty investigations of frozen warmwater shrimp from Ecuador, India, and Vietnam. Notice of the determinations was published in the *Federal Register* on December 17, 2024. Appx1354. The Commission's Views for these investigations are contained in *Frozen Warmwater Shrimp from Ecuador, India, Indonesia, and Vietnam*, Inv. No. 701-TA-699-700 and 702 and 731-TA-1660 (Final), USITC Pub. 5566 (Dec. 2024), Appx1355-Appx1708.[1]

### B. Issues Presented and Summary of Argument

Defendant-Intervenors hereby incorporate by reference and endorse the statements of the United States regarding the issues presented and summary of argument contained in the Response Brief of the United States. Def. Br. at 2 – 13. In addition, Defendant-

---

[1] Citations to the Commission's confidential views ("Views") are to Appx1265-Appx1353 and citations to the confidential staff report ("CSR") are to Appx1000-Appx1264.

*NON-CONFIDENTIAL DOCUMENT*

Intervenors highlight certain other relevant considerations supporting the Commission's determinations in the Argument section below.

## II.    STATEMENT OF FACTS

Defendant-Intervenors hereby incorporate by reference and endorse the statement of facts contained in the Response Brief of the United States. Def. Br. at 13 – 23.

## III.    ARGUMENT

### A. Standard of Review

Defendant-Intervenors hereby incorporate Defendant's statement of the standard of review by reference. Def. Br. at 23 – 26.

### B. Additional Argument

As noted above, Defendant-Intervenors concur with and hereby endorse and incorporate by reference the arguments made by Defendant in its response brief. We focus below on highlighting a few additional points that further support sustaining the Commission's determination.

*NON-CONFIDENTIAL DOCUMENT*

1. <u>The Commission Properly Included Frozen Raw Shrimp and Frozen Cooked Shrimp in the Same Domestic Like Product</u>

Indian Respondents claim that Defendant should have excluded frozen cooked shrimp from the definition of the domestic like product. To support their claim, Indian Respondents invoke the Commission's previous decision to exclude a different product, canned shrimp, from the investigation in *Certain Frozen or Canned Warmwater Shrimp and Prawns From Brazil, China, Ecuador, India, Thailand, and Vietnam*, Inv. Nos. 731-TA-1063-68 (Final), USITC Pub. 3748 (Jan. 2005) ("*Shrimp 2005 ITC Final")*. Indian Respondents argue that the number of U.S. producers of frozen cooked shrimp in this investigation is limited, similar to the number of U.S. producers of canned shrimp in the *Shrimp 2005 ITC Final*. However, as Defendant explains in detail in its brief, the facts underlying the Commission's determination in the *Shrimp 2005 ITC Final* are both not controlling and readily distinguishable.

As an initial matter, Indian Respondents' argument is notable for ignoring that frozen cooked shrimp – the product at issue here – was itself included in the definition of the domestic like product in

*NON-CONFIDENTIAL DOCUMENT*

the *Shrimp 2005 ITC Final*. *See Shrimp 2005 ITC Final* at 4-5. Indian

Respondents do not identify any changes in the domestic industry since

that determination. This fact is, by itself, fatal to Indian Respondents'

claim that frozen cooked shrimp must now be excluded from the

domestic like product in the instant investigation. To the extent this

Court considers the Commission's determination in the *Shrimp 2005*

*ITC Final*, the agency's inclusion of frozen cooked shrimp in that case is

much more probative than its exclusion of canned shrimp, an entirely

separate product.

As noted by Defendant, each of the six traditional like product

factors supported the Commission's determination that frozen raw

shrimp and frozen cooked shrimp are part of the same domestic like

product. There is, in fact, no clear dividing line between the two. *See*

Def. Br. at 26-34. *See also Valeo N. Am., Inc. v. United States*, 404 F.

Supp. 3d 1303, 1308 (Ct. Int'l Trade 2019), *aff'd*, 823 F. App'x 937 (Fed.

Cir. 2020) (holding that the "domestic like product determination is a

fact-specific inquiry pursuant to which the Commission weighs 'six

factors relating to the products in question'"); *Jeld-Wen, Inc. v. United*

*States*, 567 F. Supp. 3d 1344, 1350 n.2 (Ct. Int'l Trade 2022) ("These

6

*NON-CONFIDENTIAL DOCUMENT*

factors are not exhaustive, as an investigation may give rise to other considerations relevant to the factual determination on the domestic like product, and the Commission's practice in defining domestic like product is on a case-by-case basis with no single factor considered dispositive.").

Regarding channels of distribution, Defendant correctly notes that frozen raw shrimp and frozen cooked shrimp are marketed side-by-side to the same consumers, by the same retailers, in near-identical packaging. Def. Br. at 31. Indeed, information submitted by ASPA demonstrated that when consumers browse frozen raw shrimp on websites for grocery-delivery services, the first "similar item" shown is frozen cooked shrimp. Appx45255, Appx45302, Appx45433-45435 (ASPA Posthearing Brief, Answers to Questions at 29, Exh. 12). In addition, Indian Respondents' own testimony also contradicts the claim that cooked frozen shrimp is absent from the restaurant or food service channels. At the Commission's hearing, a witness for Indian Respondents testified that frozen cooked shrimp are also sold to restaurants and used to prepare dishes including "shrimp cocktail, or as

*NON-CONFIDENTIAL DOCUMENT*

part of a seafood platter, or perhaps even as an entrée add-on."

Appx58441-Appx58442 (Hr'g Tr. at 171 and 172 (Atluri)).

In addition, while canned warmwater shrimp is never subjected to a freezing process, both raw frozen shrimp and cooked frozen shrimp are produced through the same freezing process. Thus, the same freezing equipment and methods are used on both raw and cooked frozen warmwater shrimp, while canned warmwater shrimp is produced on separate equipment and through a separate process. *See Shrimp 2005 ITC Final* at 8 – 10.

In its prior 2005 determination, the Commission also noted other important differences in physical characteristics between canned and frozen shrimp, including packaging (i.e., a shelf-stable can that is not refrigerated or frozen) and the much smaller size of the shrimp used in canning. *See id*. at 10. Here, by contrast, both raw and cooked frozen warmwater shrimp are available in the same count sizes and product forms, and the same packaging. Appx1278, Appx1280-Appx1281. Thus, both raw and cooked frozen shrimp can be used in the same meal preparations and as "center-of-the-plate" items, making them fully interchangeable. *Id*. Canned shrimp, by contrast, due to their smaller

size, are instead used as one of several ingredients in a dish, such as a shrimp salad. *Shrimp 2005 ITC Final* at 9.

For all of these reasons, the Court should affirm the Commission's determination that cooked frozen shrimp and raw frozen shrimp are part of the same domestic like product.

        2.  <u>The Commission's Volume Determination Was Reasonable</u>

As noted by Defendant, the record did not support Indian Respondents' contention that the Commission should have considered the domestic industry's inability to meet demand when considering the significance of subject import volume. Def. Br. at 43 – 44.  Defendant also noted that the record does not support Indian Respondents' claim that supply constraints impacted U.S. producers rather than subject import volumes.  *Id*. at 39-40.

The record shows that over 90 percent of domestic fishermen (352 out of 385 responses) reported in their questionnaires that "the availability of live warmwater shrimp in the Gulf of Mexico or off the Atlantic Coast in U.S. territorial waters did not affect the supply of fresh warmwater shrimp for processing." Appx1307. About 70 percent of domestic processors (14 out of 20 in 2021-2022 and 13 out of 20 for 2023

*NON-CONFIDENTIAL DOCUMENT*

and year-to-date 2024) reported in their questionnaires that "the availability of wild-caught fresh warmwater shrimp in the United States did not constrain their ability to process frozen warmwater shrimp during the POI." Appx1307. Defendant further explained that the quantity of shrimp harvested by fishermen is largely driven instead by the question of whether there is a financial incentive for fishermen to take their vessels out to sea to harvest shrimp. Appx1341. Domestic fishermen noted that they "have been reducing their fishing efforts or abandoning them entirely, because the declining ex-vessel prices as a result of competition from subject import{s} have made it no longer viable for many of them to continue." *Id*.

In addition to the lack of supply constraints cited by domestic fishermen and processors, the record showed that domestic producers' loss of market share to subject imports forced them to curtail production and shipments at a much faster pace than the decline in demand. Appx1226-Appx1228. As a result, the domestic processing industry's already low capacity utilization rate of 47.2 percent in 2022 fell to just 36.9 percent in 2024. *Id*. In addition, the domestic industry was saddled with ever-growing inventories, which ballooned by 69.7 percent from

*NON-CONFIDENTIAL DOCUMENT*

2021 to 2023. *Id*. Indeed, by 2023, domestic processors were forced to add more than a third of the shrimp they produced to their swelling inventories instead of selling it to their customers, as sales were lost to subject imports. *Id*. All of these facts directly refute any contention that the domestic industry could not have supplied more demand. It was the overwhelming presence of large volumes of subject imports that prevented them from doing so. The lack of supply constraints is only underscored by the fact that the domestic industry was able to quickly ramp up production and shipments in interim 2024, after the petitions were filed. *Id*.

3. The Commission Reasonably Found Adverse Price Effects

As Defendant correctly notes, the finding of significant underselling was not based on a market share shift, though lost sales to lower priced imports did contribute to a gain of 5.2 percentage points of subject market share by subject imports, while the domestic industry lost 0.8 percentage points of market share, leading to declines in production, capacity utilization, shipments, and profitability. Def. Br. at 46 – 47. As such, even the loss of 0.8 percentage points of market share to subject imports was significant in the context of these investigations.

11

*NON-CONFIDENTIAL DOCUMENT*

The domestic industry's market share at the beginning of the period of investigation ("POI") was only 7.6 percent, and the decline to 6.8 percent contributed to the loss of 276.5 million pounds of domestic shipments from 2021 to 2023, a decline of 39.5 percent. Appx1226-Appx1228. Thus, Vietnamese Respondents' characterization of the domestic industry's loss of market share as insignificant ignores the fact that the domestic industry was already only barely able to hold on in a market dominated by low-priced imports at the beginning of the POI, and that position became even more tenuous due to widespread underselling throughout the period.

Furthermore, Vietnamese Respondents' claims are based on the false claim that the domestic industry lost only 0.3 percentage points of market share. Vietnamese Resp. Br. at 28. Defendant correctly explains that this characterization improperly compares full-year data and interim data. Def. Br. at 48 – 49. In addition, Vietnamese Respondents' claim requires the Court to ignore the fact that the domestic industry was undisputably defined to include "all domestic harvesters of fresh warmwater shrimp <u>and</u> processors of frozen warmwater shrimp." Appx1288-1289 (emphasis added). Vietnamese Respondents argue that

*NON-CONFIDENTIAL DOCUMENT*

the Commission erred in combining market share to include fresh shrimp when "domestic production of frozen shrimp was more comparable to cumulated subject imports of frozen shrimp." Vietnamese Resp. Br. at 29. The statute, however, requires the Commission to assess the domestic industry "as a whole."  19 U.S.C. § 1677(4)(A) (emphasis added).  Thus, the statutory language requires the Commission to assess data pertaining to both domestic processors and fishermen.  *See id.*

Nonetheless, Vietnamese Respondents assert that the domestic industry did not lose enough market share for underselling to be "significant" in accordance with the statute. *See* Vietnamese Resp. Br. at 31. They attempt to frame this argument as a question of statutory interpretation that would require this Court to determine the meaning of "significant" under *Loper Bright. See id.* at 31-32 ("'Congress expects courts to handle technical statutory questions.' {*Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 402 (2024)}. The Court is therefore empowered to read every word in the statute and find that the change in the domestic industry's market share was not significant.").

13

*NON-CONFIDENTIAL DOCUMENT*

However, this Court has established that the Commission's underselling analysis under 19 U.S.C. § 1677(7)(C)(ii) is fact specific. *See Altx, Inc. v. United States*, 167 F. Supp. 2d 1353, 1365 (Ct. Int'l Trade 2001). The Court explained:

> The significance of underselling in an investigation will necessarily depend on the particulars of the product and industry at issue, not necessarily on the import of certain percentages understood in the abstract. To bind the Commission by such previous determinations on inherently fact-specific criteria would contradict the specific congressional mandate that "{t}he significance of the various factors affecting an industry will depend upon the facts of each particular case." S.Rep. No. 96–249, at 88 (1979). *See also Citrosuco Paulista, S.A. v. United States*, 12 CIT 1196, 1209, 704 F. Supp. 1075, 1087–88 (1988) ("{T}he Commission's determinations must be based upon an independent evaluation of the factors with respect to the unique economic situation of each product and industry under investigation.").

*Id*. The Supreme Court made clear that *Loper Bright* does not disturb the review standard for an agency's factual findings. *See Loper Bright*, 603 U.S. at 392. Therefore, the question before this Court is not to determine the meaning of "significant" in the context of the statute, but to consider whether the Commission's determination was supported by substantial evidence on the record. Here, Defendant relied on questionnaire data on the record to determine that subject imports significantly undersold the domestic like product during the POI.

14

Defendant further explained that underselling contributed to the domestic industry's loss in sales and market share during this period, which, in turn, led to domestic processors' and fishermen's declining financial performance. Appx1338-1339. Thus, Defendant's determination was supported by substantial evidence and should be sustained by this Court.

    4.  <u>The Commission Reasonably Found Imports Had a Significant Adverse Impact</u>

       As noted by Defendant, lost volume and declining prices caused by low-priced imports erased the domestic industry's profitability over the POI, both for processors and for fishermen. Appx1226-Appx1228. As a result, both segments suffered significant losses in both 2022 and 2023. *Id.* From 2021 to 2023, the processing segment of the industry lost more than $250 million in annual revenue and the fishermen segment lost more than $58 million, *id.*, a staggering amount for an industry comprised of small, family-owned businesses. As a result, fishing efforts declined, boats were being tied up all over the Gulf and South Atlantic, and the industry was on the verge of collapse. *See* Appx1341 (text & n.298), Appx1347 (text & nn.323-24), Appx58312 (Hr'g Tr. at 42 (Garcia)), Appx58315 (Hr'g Tr. at 45 (Tran)), Appx58302 (Hr'g Tr. at 32

15

*NON-CONFIDENTIAL DOCUMENT*

(Gibson)). Vietnamese Respondents' insistence that the domestic industry's performance was "strong" simply ignores the overwhelming evidence to the contrary – evidence that the entire domestic industry was severely injured due to the massive volumes of low-priced imports dominating the market.

For all of these reasons, the Court should affirm the Commission's adverse impact determination.

     5. <u>The Commission Reasonably Found Supply Constraints Could Not Explain the Injury the Domestic Industry Suffered</u>

As reviewed in Section III.B.2, above, the record did not support respondents' claims that the subject imports' gain in market share over the POI was due to domestic industry supply constraints. While it is true that the domestic industry may not be able to supply all of domestic consumption, there is no such requirement in the statute. Moreover, the record supported the conclusion that the domestic industry could have supplied greater volumes in the absence of underselling and price depression that caused domestic producers to lose market share and prevented processors from paying dockside prices justifying the boats' fishing effort. *See* Def. Br. at 67 – 70. The boats

16

*NON-CONFIDENTIAL DOCUMENT*

that stopped fishing during the POI did not tie up because there were no shrimp to harvest – they tied up because low-priced imports made it economically impossible to profitably harvest shrimp. The Commission has repeatedly, and correctly, found that a decline in prices lowers the incentive to harvest warmwater shrimp. *See Frozen Warmwater Shrimp from China, India, Thailand, and Vietnam*, Inv. Nos. 731-TA-1064 and 1066-1068 (Third Review), USITC Pub. 5432 (June 2023) at 79 – 80 ("While wild catch landings have never come close to meeting total apparent U.S. consumption in these reviews and the prior proceedings, respondents' arguments overlook our finding above that the overall domestic supply of shrimp also turns on the economic incentive for fishermen to harvest shrimp, such that high fuel costs and low dockside prices can also disincentivize fishermen from engaging in shrimping activities."). *See also Frozen Warmwater Shrimp from Brazil, China, India, Thailand, and Vietnam*, Inv. Nos. 731-TA-1063-1064 and 1066-1068, USITC Pub. 4688 (Second Review) (May 2017) at 54 ("We find that overall the domestic supply of shrimp turns in large part on the incentive for fishermen to harvest shrimp, and that fuel costs and low

*NON-CONFIDENTIAL DOCUMENT*

prices can serve as a disincentive to fishermen to take their boats out to harvest shrimp.").

In light of these facts, Indian Respondents commissioned a report by ION Economics purporting to show a lack of correlation between imports and the volume of domestic production. As noted by Defendant, the report had several methodological limitations given the incomplete data sources, limited regression methodology, and failure to account for periods preceding the flooding of the U.S. market by farmed shrimp imports. Def. Br. at 70 – 72.

The regression methodology, for example, claims to show no relationship between domestic landings and ex-vessel prices, and a separate simple regression purportedly shows no relationship between domestic landings and diesel prices. Appx45255, Appx45287 (ASPA Posthearing Brief, Answers to Questions at 14). Diesel prices, however, may impact both domestic landings and ex-vessel prices, rendering a simple regression of the latter two variables without controlling for the first variable misleading and incomplete. *Id.* ION failed to perform a multiple regression analysis that could have controlled for the many factors that simultaneously affect both the independent and dependent

NON-CONFIDENTIAL DOCUMENT

variables, and thus the Commission correctly found its methodology flawed.

As noted by Defendant, even the ION report's own data showed significant fluctuations in landings from year to year, rather than any fixed biological limit on supply as respondents claimed. Def. Br. at 72 – 73. Yet even these fluctuations understate the ability of the domestic industry to increase supply in the absence of unfair import competition. For the entire time period the ION report measures, imports maintained a commanding presence in the U.S. market. This renders the report incapable of supporting its conclusion that domestic volumes are entirely determined by biological and ecological factors. Commissioner Kearns understood this problem, and hypothesized that domestic volumes may have been larger in prior decades before imported shrimp entered the U.S. market in significant quantities. Appx58513-Appx58514 (Hr'g Tr. at 243 – 244 (Kearns)). Indeed, the historical data show that landings ranged from 179.3 million pounds in 1981 to 141.5 million pounds in 1983, before the surge in imports of farmed shrimp into the U.S. market, and other data showed that the industry regularly exceeded 200 million pounds in annual landings

*NON-CONFIDENTIAL DOCUMENT*

between 1950 and the late 1970s. Appx45255, Appx45288-Appx45289 (ASPA Posthearing Brief, Answers to Questions at 15 – 16). These totals are substantially greater than the landings of 128.0 to 115.0 million pounds realized during the POI. These facts undermined respondents' claims that the levels of landings reflected in the ION report represented the maximum natural supply of shrimp available in the Gulf and South Atlantic.

The Court should therefore affirm the Commission's determination that supply constraints could not explain the injury the domestic industry suffered during the POI.

6.  The Commission Reasonably Found That Competition Was Not Attenuated

Defendant correctly explains the facts that supported the Commission's determination that there is at least a moderate degree of substitutability between domestic and imported shrimp despite differences in the degree to which they are produced from wild capture versus aquaculture. Def. Br. at 77 – 79. In addition to the fact that most purchasers reported that they and their customers never or only sometimes make purchasing decisions based on the producer or country of origin, Appx1038, whether shrimp was wild-caught or farmed did not

NON-CONFIDENTIAL DOCUMENT

rise to the level of a top purchasing factor, Appx1039. Physically identical farmed and wild-caught shrimp are often marketed side-by-side, with farmed shrimp often bearing symbols associated with oceans and boats despite not being wild-caught, and the American flag despite being imported. Appx45255, Appx45296-Appx45297, Appx45381-Appx45386 (ASPA Posthearing Brief, Answers to Questions at 23 – 24, Exhs. 6 and 7). Indeed, restaurants and retailers are so eager to present wild-caught American shrimp and farm-raised imported shrimp as interchangeable that they have discouraged domestic processors from pursuing efforts to distinguish their product. Appx58297-Appx58298, Appx58355-Appx58358 (Hr'g Tr. at 27-28 and 85 (Gollott), 86-87 (Pearson), and 88 (Antley)).

It is precisely because of the high degree of substitutability between domestic and imported product that price is such an important factor in purchasing decisions for frozen warmwater shrimp. Price was rated by purchasers as one of the top three purchasing factors for shrimp, 70 percent of purchasers reported that price was a very important factor in their purchasing decisions, and 15 out of 20 purchasers report that they sometimes, usually, or always buy the

21

*NON-CONFIDENTIAL DOCUMENT*

lowest priced product. Appx1039-Appx1040. The importance of price in purchasing decisions belies respondents' claims that competition was attenuated between wild-caught and farm-raised shrimp.

The testimony of domestic processors further underscored the direct, head-to-head competition between domestic and imported product based on price. As Mr. Pearson, President of JBS Packing Company, Inc., stated at the Commission's hearing: "{A}s a direct competitor, do our customers say, hey you need to be at this price because this is what we get imports for? Every day. There's no question about that." Appx58356 (Hr'g Tr. at 86 (Pearson)). Mr. Antley, Vice President of Operations for Wood's Fisheries, also shared an experience regarding a purchaser "who basically said {the requested shrimp product} needs to be below $5 and if you can't do that we have to go with imported shrimp." Appx58358 (Hr'g Tr. at 88 (Antley)).

In short, the record evidence supported the Commission's determination that there is direct, and not attenuated, competition between imported and domestic shrimp, allowing large volumes of low-priced imports to take sales and market share from domestic producers, drive down prices, and cause material injury. For all of these reasons,

22

*NON-CONFIDENTIAL DOCUMENT*

the Court should affirm the Commission's determination that competition between wild-caught domestic shrimp and imported farm-raised shrimp is not so attenuated as to break the causal link between large volumes of low-priced imports and material injury to the domestic industry.

7.  <u>The Commission Reasonably Found Injury to the Fishing Segment of the Industry</u>

Fishermen also suffered material injury as imports took market share, undersold domestic producers, and suppressed and depressed prices. As Defendant correctly explains, evidence on the record does not support a finding that diesel fuel costs were the cause of any injury to domestic fishermen. Def. Br. at 88 – 90. In the Commission's Views, the agency noted that the data relied on by Ecuadorian Respondents actually demonstrates that fuel prices fluctuated throughout the POI. Prices "increased from January 2021 to June 2022, decreased through June 2023, and fluctuated thereafter" during the interim period. Appx1314, Appx1124. The Commission explained that "{i}f, as respondents claim, the fuel and oil cost was the most important driver of any injury to the fishermen, then there should have been a major improvement in their financial condition in 2023 given the sharp

23

*NON-CONFIDENTIAL DOCUMENT*

decline in their fuel and oil cost." Appx1348. Domestic fishermen, instead, experienced operating losses in 2023, "with their worst operating ratio (negative 2.4 percent) of the POI, as their net sales average unit value ('AUV') declined by a much greater amount than the unit value of their fuel and oil expenses." Appx1348.

Evidence on the record clearly shows that "U.S. fishermen experienced a sharp decline in the prices they received for the shrimp they harvested, with their net sales {AUV} declining by 42.6 percent from 2021 to 2023, falling from $3.66 per pound in 2021 to $3.05 per pound in 2022 and $2.10 per pound in 2023." Appx1326. Witnesses testified that up to half of the fleet were sitting idle in different parts of the Gulf due to low prices. Appx58302, Appx58311, Appx58315 (Hr'g Tr. at 32 (Gibson), 41 (Garcia), and 45 (Tran)). This is because domestic processors faced downward pricing pressure from low-priced subject imports and were forced to lower the prices they paid fishermen for fresh shrimp. Appx1326, Appx1329. Processors need a healthy fishing fleet that has the economic incentive to catch shrimp, and fishermen need a healthy processing segment to process their harvest and take it to market. When large volumes of imports depress prices to such a

degree that processors cannot earn a profit, and processors cannot afford to pay the boats what they need to justify their fishing effort, the industry begins to collapse. Ecuadorian Respondents' arguments conveniently ignore this evidence when insisting that increasing diesel fuel costs were the sole cause of injury to U.S. fishermen.

Furthermore, Ecuadorian Respondents argue that Defendant failed to collect information about the "{n}umber of gallons of fuel and oil purchased" to "evaluate the impact of dramatically increased diesel fuel price increases over the {POI}." Ecuadorian Resp. Br. at 15. They now claim that the Commission's failure to collect this information was "biased" because the Commission incorporated changes requested by other parties into the final version of the questionnaire. *Id.* at 31.

However, Defendant sufficiently explained that although it considered these requests, the agency must also "weigh the likely probative value of the information those requests would elicit against the burden that including those requests in the questionnaire would impose on responding parties." Appx1350. As Defendant noted in its brief, Ecuadorian Respondents' request would be burdensome for U.S. fishermen, including the members of AHSTAC, who are comprised of

*NON-CONFIDENTIAL DOCUMENT*

small enterprises with limited capacity to answer lengthy and complex questionnaires, to provide such information.[2] *See* Def. Br. at 101. Defendant also explained in the Final Views that there was sufficient data on the record to assess the issue because it "collected data from U.S. fishermen concerning their costs of fuel and oil and gathered publicly available data on the price of diesel fuel in the Gulf Coast region." Appx1351.

As such, Defendant's determination that U.S. fishermen were materially injured by subject imports was supported by substantial evidence and should be sustained by this Court. For all of these reasons, the Court should uphold the Commission's affirmative injury determination.

_____

[2] AHSTAC notes that the domestic industry has made significant efforts to increase participation from U.S. fishermen in the Commission's proceedings, which has led to the number of questionnaire responses increasing to 388 in the underlying investigation, *see* Appx1267, from 130 responses in the prior investigation, *see Shrimp 2005 ITC Final* at 31. Ecuadorian Respondents' request for additional, duplicative information requests would have the practical impact of discouraging participation and thereby limiting the information available to the Commission to assess the domestic industry.

26

*NON-CONFIDENTIAL DOCUMENT*

## IV. CONCLUSION

For the foregoing reasons, Defendant-Intervenors respectfully request that the Court deny the plaintiffs' Motions for Judgment on the Agency Record and sustain the Commission's final determination in its entirety as supported by substantial evidence and in accordance with law.

Respectfully submitted,

/s/ Nathaniel Maandig Rickard
Nathaniel Maandig Rickard
Zachary J. Walker
Anjelika D. Jani

**PICARD KENTZ & ROWE LLP**
1155 Connecticut Ave., NW
Suite 700
Washington, DC 20036
(202) 331-5040

*Counsel to Ad Hoc Shrimp Trade Action Committee*

/s/ Roger B. Schagrin
Roger B. Schagrin
Elizabeth J. Drake
Nicholas C. Phillips*

**SCHAGRIN ASSOCIATES**
900 Seventh Street, N.W.
Suite 500
Washington, D.C.  20001
(202) 223-1700

*Counsel for ASPA*

*Admitted only in New York. Practice limited to matters before federal courts and agencies.

Dated: January 9, 2026

*NON-CONFIDENTIAL DOCUMENT*

## <u>CERTIFICATE OF COMPLIANCE WITH FORMATTING AND WORD COUNT LIMITATIONS</u>

I hereby certify that the foregoing response brief contains 4,987 words and therefore complies with the word limitation set forth in the Rule 56.2 Notice for these cases. In preparing this certificate of compliance, I have relied upon the word count function of the word processing system used to prepare the brief. This brief was prepared according to the type setting and formatting requirements as set forth in the CIT Rules, Chambers Procedures, and Judge Baker's Individual Practice Rules for the preparation of briefs.

Dated: January 9, 2026              <u>/s/ Elizabeth J. Drake</u>
                                          Elizabeth J. Drake

*NON-CONFIDENTIAL DOCUMENT*

## <u>CERTIFICATE OF COMPLIANCE WITH CONFIDENTIALITY<br>AND ARTIFICAL INTELLIGENCE RULES</u>

I hereby certify that the foregoing response brief contains no

words or numbers designated as confidential. I further certify that this

brief was not prepared with the assistance of a generative artificial

intelligence program.

Dated: January 9, 2026                  <u>/s/ Elizabeth J. Drake</u>
                                                      Elizabeth J. Drake

*NON-CONFIDENTIAL DOCUMENT*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on this day, January 9, 2026, I provided true and correct copies of the foregoing response brief to all counsel of record via filing with the Court's CM/ECF system. I further certify that courtesy copies will be provided consistent with the Court's instructions.

Dated: January 9, 2026                    <u>/s/ Elizabeth J. Drake</u>
                                                      Elizabeth J. Drake

*NON-CONFIDENTIAL DOCUMENT*

## UNITED STATES COURT OF INTERNATIONAL TRADE
## BEFORE THE HONORABLE M. MILLER BAKER, JUDGE

| | |
|---|---|
| INDUSTRIAL PESQUERA SANTA PRISCILA S.A. and SOCIEDAD NACIONAL DE GALÁPAGOS, C.A., <br>            *Plaintiffs,* <br><br> v. <br><br> UNITED STATES, <br>            *Defendant,* <br><br> and <br><br> AD HOC SHRIMP TRADE ACTION COMMITTEE and AMERICAN SHRIMP PROCESSORS ASSOCIATION, <br>            *Defendant-Intervenors.* | No. 25-00029-MMB |
| SEAFOOD EXPORTERS ASSOCIATION OF INDIA, <br>            *Plaintiff,* <br><br> v. <br><br> UNITED STATES, <br>            *Defendant,* <br><br> and <br><br> AD HOC SHRIMP TRADE ACTION COMMITTEE and AMERICAN SHRIMP PROCESSORS ASSOCIATION, <br>            *Defendant-Intervenors.* | No. 25-00031-MMB |

*NON-CONFIDENTIAL DOCUMENT*

SHRIMP COMMITTEE OF THE
VIETNAM ASSOCIATION OF SEAFOOD
EXPORTERS AND PRODUCERS,
            *Plaintiff,*

v.

UNITED STATES,
            *Defendant,*

and

AD HOC SHRIMP TRADE ACTION
COMMITTEE and AMERICAN SHRIMP
PROCESSORS ASSOCIATION,
            *Defendant-Intervenors.*

No. 25-00032-MMB

## **PROPOSED ORDER**

Upon consideration of the Rule 56.2 motions for judgment on the agency record filed by Plaintiffs Industrial Pesquera Santa Priscila S.A. and Sociedad Nacional De Galapagos C.A. in Case No. 1:25-cv-00029-MMB, by Plaintiff Seafood Exporters Association of India in Case No. 1:25-cv-00031-MMB, and by Plaintiff Shrimp Committee of the Vietnam Association of Seafood Exporters and Producers in Case No. 1:25-cv-00032-MMB, and upon consideration of the responses thereto and all relevant record documents, it is hereby

**ORDERED**, that Plaintiffs' motions for judgment on the agency

*NON-CONFIDENTIAL DOCUMENT*

record in Case Nos. 1:25-cv-00029-MMB, 1:25-cv-00031-MMB, and

1:25-cv-00032-MMB are denied; and it is further

     **ORDERED**, that each of the above-referenced cases be

terminated consistent with this Court's opinion.

     **SO ORDERED**.


                  _____

                  HON. M. MILLER BAKER, JUDGE


Dated: _____, 2026
      New York, New York