# IN THE UNITED STATES COURT OF INTERNATIONAL TRADE

# BEFORE THE HONORABLE M. MILLER BAKER, JUDGE

_____

|  |  |  |
|---|---|---|
| INDUSTRIAL PESQUERA SANTA PRISCILA, S.A. and SOCIEDAD NACIONAL DE GALAPAGOS, C.A., | ) ) ) ) | |
| *Plaintiffs,* | ) ) | |
| v. | ) ) | |
| UNITED STATES, | ) | Consol. Ct. No. 25-00029 |
| *Defendant,* | ) ) ) | |
| and | ) ) | |
| AD HOC SHRIMP TRADE ACTION COMMITTEE and AMERICAN SHRIMP PROCESSORS ASSOCIATION, | ) ) ) | |
| *Defendant-Intervenors.* | ) ) | |

_____)

**PLAINTIFFS' REPLY BRIEF IN SUPPORT OF THEIR RULE 56.2 MOTION FOR JUDGMENT ON THE AGENCY RECORD**

Submitted by:

Warren E. Connelly
Jarrod M. Goldfeder
Kenneth N. Hammer

TRADE PACIFIC PLLC
700 Pennsylvania Avenue, SE
Suite 500
Washington, D.C. 20003
(202) 223-3760

Counsel for Industrial Pesquera Santa
Priscila S.A. and Sociedad Nacional de
Galápagos, C.A.

Date: March 6, 2026

## TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES...........................................................................ii

INTRODUCTION............................................................................... 1

UNDISPUTED RECORD FACTS................................................... 2

ARGUMENT........................................................................ 4

    I.    THE LAW REQUIRED THE COMMISSION TO FIND
        THAT THE SHRIMP FISHERMEN SEGMENT OF THE
        DOMESTIC INDUSTRY WAS MATERIALLY INJURED
        BY SUBJECT IMPORTS............................................................ 4

    II.    SUBJECT IMPORTS DID NOT CAUSE SHRIMP
        FISHERMEN TO SUFFER MATERIAL INJURY IN
        2020 OR 2021............................................................... 4

    III.    THE COMMISSION ABUSED ITS DISCRETION BY
        FAILING TO REQUIRE SHRIMP FISHERMEN TO REPORT
        THEIR ANNUAL DIESEL FUEL PURCHASE VOLUME...... 8

    IV.    THE COMMISSION ERRED IN THE ANALYSIS IT
        USED TO DETERMINE THAT DIESEL FUEL COST
        INCREASES WERE NOT THE SOLE CAUSE OF
        MATERIAL INJURY TO SHRIMP FISHERMEN.................. 15

    V.    THE COMMISSION ABUSED ITS DISCRETION BY
        FAILING TO CONSIDER THE PLAINTIFFS' ANALYSIS
        OF THE IMPACT OF DIESEL FUEL PRICE
        INCREASES ON THE CONDITION OF SHRIMP
        FISHERMEN................................................................ 21

    VI.    A REMAND IS REQUIRED FOR THE COMMISSION TO
        OBTAIN THE GALLON-RELATED INFORMATION
        NEEDED TO DETERMINE THE EFFECT OF DIESEL FUEL
        PRICEINCREASES................................................................ 25

# TABLE OF AUTHORITIES

**International Trade Commission Determinations**                    <u>Page</u>

*Certain Frozen or Canned Warmwater Shrimp and Prawns from
Brazil, China, Ecuador, India, Thailand, and Vietnam,*
USITC Pub. 3748 (Jan. 2005)……………………………………………..5

*Frozen Warmwater Shrimp from Brazil, China, India, Thailand,
and Vietnam*, USITC Pub. 4221 (Mar. 2011)……………………………...5

*Frozen Warmwater Shrimp from Brazil, China, India, Thailand,
and Vietnam*, USITC Pub. 4688 (May 2017)………………………………5

*Frozen Warmwater Shrimp from China, India, Thailand,
and Vietnam*, USITC Pub. 5432 (June 2023)…………………………3,5,7

*Frozen Warmwater Shrimp from Ecuador, India, Indonesia,
and Vietnam*, USITC Pub. 5482 (Dec. 2023)………………………………3

*Frozen Warmwater Shrimp from Ecuador, India, Indonesia,
 and Vietnam*, USITC Pub. 5566 (Dec. 2024)………………………*passim*

## INTRODUCTION

The Commission erred when it found that the shrimp fishermen segment of the domestic industry was materially injured by reason of subject imports.[1] That is because the Commission's final determination failed to address, much less rebut, the Plaintiffs' evidence that the sole cause of the deterioration in the condition of shrimp fishermen in 2022 and 2023 compared to the "base year" of 2021 was the soaring price of diesel fuel. The Commission and the Defendant-Intervenors have not denied that, if this Court ultimately finds that the fishermen segment of the domestic industry was not materially injured by subject imports, then that finding would require revocation of the Ecuadorian CVD order.

---

[1] Plaintiffs cite exclusively to the public versions of documents in the soft appendix, as well as to the public versions of the Commission's Response Brief ("Com'n Br.") and the Defendant-Intervenors' Joint Response Brief ("ASPA/AHSTAC Br."). This brief does not rely on any confidential information.

## UNDISPUTED RECORD FACTS

In the preliminary phase of its investigation, the Commission reviewed shrimp industry developments during the January 2020 through June 2023 period of investigation ("POI"). In the final phase, the Commission examined developments during the updated January 2021 through March 31, 2024 POI. In the final phase, 388 shrimp fishermen provided financial and trade data to the Commission.[2] Their questionnaire responses showed that:

(1) Sufficient quantities of shrimp were readily available to be caught in the waters of the Gulf of Mexico and South Atlantic throughout the POI. USITC Pub. 5566 at 78. Appx001440.

(2) Diesel fuel was the most significant cost that fishermen incurred throughout the POI, accounting for over 28% of total operating expenses in 2021 and over 38% of total operating expenses in both 2022 and 2023. USITC Pub. 5566 at F-11 (Table F-14). Appx001703.

---

[2] The Commission did not issue questionnaires to shrimp fishermen in the preliminary phase. Therefore, analysis of the effect, if any, of diesel fuel prices in 2020 on shrimp fishermen is not possible. The Commission's preliminary determination did not find that shrimp fishermen suffered material injury by reason of subject imports in 2020.

2

(3) The average price of diesel fuel was $2.80 per gallon in January 2020 and then dropped to $2.44 per gallon in January 2021. USITC Pub. 5482 at V-2 (Table V-1). Appx056690.

(4) That price rose to $5.39 per gallon by June 2022, before declining to $3.64 per gallon in December 2023. USITC Pub. 5566 at V-2 (Table V-1). Appx001572.

(5) In 2020, 329 reporting shrimp fishermen earned an operating profit of $9.755 million and an operating profit margin of 8.1%. Thus, the average per fisherman operating profit in that year was $29,650. ($9,755,000 ÷ 329 = $29,650.) USITC Pub. 5432 at E-65 (Table E-6). Appx056517.

(6) In 2021, 388 reporting shrimp fishermen earned an operating profit of $8.128 million and an operating profit margin of 6.2%. Thus, the average per fisherman operating profit in that year was $20,948 USITC Pub. 5566 at F-11 (Table F-14). Appx001703.

(7) With the exception of 2014, the operating profit margins of 8.1% in 2020 and 6.2% in 2021 were by far the highest margins that they reported in four antidumping and countervailing duty proceedings

3

that the Commission conducted covering the years from 2006-2023. *See*

Table, i*nfra*, at p. 6.

## ARGUMENT

## I. THE LAW REQUIRED THE COMMISSION TO FIND THAT THE SHRIMP FISHERMEN SEGMENT OF THE DOMESTIC INDUSTRY WAS MATERIALLY INJURED BY SUBJECT IMPORTS

Plaintiffs have repeatedly contended that the statutory term

"domestic industry" required the Commission to determine that both

the fishermen segment and the processor segment of the domestic

industry had suffered material injury from unfairly traded subject

imports in order to issue an affirmative final determination. *See, e.g.,*

Resps. Preh. Br. at 10. Appx043953. *See also* Pltfs. Br. at 20-22. ECF

No. 36-2. Neither the Commission nor ASPA/AHSTAC has disagreed

with Plaintiffs' contention. Instead, the Commission here acknowledges

that it was required to find that "subject imports adversely affected

both parts of the industry." Com'n Br. at 87.

## II. SUBJECT IMPORTS DID NOT CAUSE SHRIMP FISHERMEN TO SUFFER MATERIAL INJURY IN 2020 OR 2021

The Commission first began investigating alleged unfair trade in

frozen warmwater shrimp in late 2003, and that investigation resulted

in six antidumping orders, four of which remain in effect today on imports from China, India, Thailand and Vietnam.[3] *See Certain Frozen or Canned Warmwater Shrimp and Prawns From Brazil, China, Ecuador, India, Thailand, and Vietnam,* USITC Pub. 3748 (Jan. 2005). In four subsequent proceedings,[4] the Commission collected the following operating profit (loss) margins from questionnaire responses submitted by shrimp fishermen:[5]

---

[3] Commerce subsequently revoked the antidumping orders on subject imports from Brazil and Ecuador.

[4] Shrimp fishermen reported financial data in the following four investigations and sunset reviews: *Frozen Warmwater Shrimp from Brazil, China, India, Thailand, and Vietnam*, USITC Pub. 4221 (Mar. 2011) (data for 2006-2010); *Frozen Warmwater Shrimp from Brazil, China, India, Thailand, and Vietnam*, USITC Pub. 4688 (May 2017) (data for 2013-2015); *Frozen Warmwater Shrimp from China, India, Thailand, and Vietnam*, USITC Pub. 5432 (June 2023) (data for 2019-2020); and *Frozen Warmwater Shrimp from Ecuador, India, Indonesia, and Vietnam*, USITC Pub. 5566 (Dec. 2024) (data for 2021-2023).

[5] Data is not available for every year since 2006 because the Commission's period of investigation or period of review in each proceeding did not encompass every calendar year or interim period between 2006 and 2023. However, throughout this 18-year period, the domestic industry was fully protected against unfair trade by the six antidumping orders that it first obtained in 2005.

**Table: Operating Profit (Loss) Margins of Shrimp Fishermen**

| USITC Pub. No. and Issue Date | Nature of Proceeding | Year of Data | Operating profit (loss) margin |
|---|---|---|---|
| 4221 (3/2011) | 1st Sunset review | 2006 | 1.5% |
| 4221 (3/2011) | 1st Sunset review | 2007 | 2.1% |
| 4221 (3/2011) | 1st Sunset review | 2008 | 5.0% |
| 4221 (3/2011 | 1st Sunset review | 2009 | (2.6%) |
| 4688 (5/2017) | 2d Sunset review | 2013 | 5.0% |
| 4688 (5/2017) | 2d Sunset review | 2014 | 11.2% |
| 4688 (5/2017) | 2d Sunset review | 2015 | 5.1% |
| 5432 (6/2023) | 3d Sunset review | 2019 | 3.6% |
| 5432 (6/2023) | 3d Sunset review | 2020 | 8.1%[6] |
| 5566 (12/2024) | CVD Investigation | 2021 | 6.2% |
| 5566 (12/2024) | CVD Investigation | 2022 | (2.1%) |
| 5566 (12/2024) | CVD Investigation | 2023 | (2.4%) |

This Table shows that the operating margins of shrimp fishermen in the 2020 and 2021 "base periods" far exceeded the operating margins that shrimp fishermen reported in seven of the eight investigated full year periods preceding 2020.[7] For this reason, the Commission did not

---

[6] The Commission did not request financial or trade-related information from shrimp fishermen in the preliminary phase. However, it did so in its third sunset review, which included 2020 profit margin data.

[7] We use the term "base period" to refer to the first year of each period of investigation because that is the year from which the Commission measures and evaluates subsequent changes and their effects, if any, on the domestic industry. Of course, a domestic industry could also experience material injury by reason of subject imports in the base year, but the Commission did not make that finding here.

find (and the Defendant-Intervenors do not here assert) that subject imports caused material injury to those fishermen in either 2020 or 2021. *See* ASPA/AHSTAC Br. at 23-26.

Nevertheless, the Commission now suggests that diesel price increases during the 2021 "base year" impaired the condition of shrimp fishermen. Com'n Br. at 93-94. However, the Commission's Views did not address whether subject import prices or volumes in 2021 or 2020 caused shrimp fishermen to incur material injury in those two years. Thus, the Commission's new claim constitutes an impermissible *post-hoc* rationale of counsel.

Moreover, neither the Commission nor ASPA/AHSTAC offer any rebuttal to the data in the above table showing that shrimp fishermen earned near-record profits in 2021 despite increasing fuel costs during that year. That is because, in the face of allegedly subsidized and dumped imports, shrimp fishermen in 2021: (1) increased their net sales volume by 2.7 million lbs. compared to 2020; (2) increased their net sales revenue by $29.1 million compared to 2020; and (3) increased their prices by $0.44 per lb. compared to 2020. *See* USITC Pub. 5432 at E-65-66 (Table E-6). Appx056517-056518.

7

## III.   THE COMMISSION ABUSED ITS DISCRETION BY FAILING TO REQUIRE SHRIMP FISHERMEN TO REPORT THEIR ANNUAL DIESEL FUEL PURCHASE VOLUME

The Commission failed to undertake a full and fair investigation of the impact of diesel fuel price increases on shrimp fishermen in 2022 and 2023 compared to 2021. In its preliminary phase determination, the Commission stated that, in its final phase investigation, "we intend to collect" information on shrimp fishermen since it did not do so in the preliminary phase. However, the Commission failed to ask the right question needed to evaluate the extent and effect of diesel fuel price increases on shrimp fishermen.

Plaintiffs have described their repeated, but unsuccessful efforts to convince the Commission to ask fishermen just one simple, easily answered, additional question, which was to report the number of gallons of fuel that they purchased during the POI. *See* Pltfs. Br. at 11-20.

The Commission here defends its failure by asserting that: (1) adding just this one question was "unnecessary"; (2) the Commission made "numerous revisions to the draft questionnaires in response to the parties' comments"; (3) the Commission, in deciding which questions to

add, had to "weigh the likely probative value of the information those requests would elicit against the burden that including those requests would impose on responding parties"; and (4) the Commission had to "evaluate different, often conflicting, requests from the comments of other interested parties on the same issue." Com'n Br. at 96-98.

As a result, the Commission claims that it "collected sufficient data on the fuel costs of U.S. fishermen for purposes of its analysis of the issue. *Id.* at 98. Therefore, the record that the Commission did compile was "adequate," and it allowed the Plaintiffs "to present their argument regarding diesel fuel costs based on this information presented in the prehearing report." *Id.* at 99.

In addition, the Plaintiffs should have been satisfied by the Commission's "many revisions to the final phase questionnaires in response to comments by the Ecuadorian respondents." *Id.* at 100, n.18. These revisions purportedly "bely" the respondents' allegation of bias. *Id.* at 100. However, none of the Commission's defenses holds up to scrutiny.

First, the Commission's claim that it "appropriately weighed the further probative value of requesting the volume of diesel fuel

purchased by fishermen against the burden that such a request would impose" lacks support. The record contains no evidence that any "weighing" occurred. Instead, the Commission brushed off Plaintiffs' request:

> The Commission collected data from U.S. fishermen concerning their costs of fuel and oil, and gathered publicly available data on the price of diesel fuel In the Gulf Coast region. Ecuadorian Respondents were able to present their principal argument in their posthearing brief regarding diesel fuel costs based on the record data that the Commission presented in the prehearing report.

USITC Pub. 5566 at 89. Appx001451. The Commission's claim that Plaintiffs "were able to present their principal argument" is simply untrue since we could not present that argument without having the missing volume information. Instead, we were compelled to estimate the effect of diesel price increases based on the scanty amount of available data.

Second, the claim that Plaintiffs' request would have imposed any burden, much less a significant burden, is specious because the questionnaire required fishermen to report their total "fuel and oil" operating expenses that they incurred in 2021, 2022, 2023, and the January-March 2023 and January-March 2024 quarters. *See* Section

10

III-2 of U.S. Farmers'/Fishermens' Questionnaire. Appx057237. It was impossible for fishermen to report their total annual or quarterly expenditures on diesel without first compiling the volume and per gallon price listed on each individual invoice that they had to pay when they filled their fuel tanks. The Commission has never denied this fact.

Thus, since each invoice necessarily reported the volume purchased, the addition of Plaintiffs' question asking for this volume, not just the total dollars expended, required almost no extra effort. It was right there on the same documents that the fishermen had to review to answer the request for the total dollar value of the gallons that they purchased.

For that reason, the Commission could not rebut Plaintiffs' claim that inclusion of the request for the "Number of gallons of fuel and oil purchased" imposed no additional burden:

> It was easy to add, and there is no question that shrimpers have always maintained records showing how many gallons of diesel fuel they purchase since they had to report in Table III-2 their total cost of 'fuel and oil' during the POI.

Ecua. Resps. Preh. Br. at 8. Appx044939.

Plaintiffs also provided an extensive rationale for their request:

Inclusion of this request in Table III-1 will allow the Commission and the Respondents to calculate the extra fuel cost that shrimpers have incurred during the POI. For example, assume that a fisherman used 100,000 gallons of fuel in 2021. If the average price of this fuel was $2.50 per gallon, then the total fuel cost in 2021 was $250,000. Next, assume that this fisherman used 80,000 gallons of fuel in 2022 at $4.50 per gallon. The price increase between 2021 and 2022 was $2.00 per gallon. Multiplied by 80,000 gallons yields an increase in cost of $160,000. This increase could completely or at least significantly account for any decline in profitability shown in operating income (or loss) or net income (or loss) reported in Table III-1 during the POI.

However, without knowing the number of gallons purchased, it is not possible to evaluate the impact of documented diesel fuel price increases during the POI.  In other words, this information is essential to allow a thorough investigation of the impact of concededly enormous diesel fuel price increases on shrimpers.

*See* Ecua. Resps. Comments on Draft Final Phase Questionnaires at 10.

Appx057178.  *See also* Ecua. Resps. Preh. Br. at 7-8:

If this line item had been added to the questionnaire, then we could have quickly and easily calculated the cost per gallon of diesel fuel for each reporting shrimper in each POI period by simply dividing the reported number of purchased gallons by the total expense that each shrimper reported for "Fuel and oil" in Table III-2. Once we calculated the per gallon cost in each POI period, we would then have been able to calculate the total increased cost that each shrimper incurred between 2021 and 2023.

Appx044938-044939. Then, Plaintiffs provided an extended discussion, as well as examples, of how we could have accurately determined the impact of diesel fuel price increases on fishermen in 2022 and 2023 if the Commission had not rejected our request. *Id.* at 5-10.

Third, the Commission's claim that it made "numerous revisions to the draft questionnaires in response to the parties' comments" ignores the fact that the Plaintiffs submitted just one comment on the draft fishermen's questionnaire. Com'n Br. at 97. In contrast, parties representing domestic industry interests requested a total of eight changes to the draft fishermen's questionnaire, all of which the Commission accepted. *See* Pltfs. Br. at 15-16.

There is no dispute that the law required the Commission to make a separate finding that material injury occurred to the fishermen segment of the domestic industry by reason of subject imports. Thus, obtaining the diesel fuel purchase volume information was a critical element of determining whether such injury occurred, especially because fuel "was the largest production cost for U.S. shrimp fishermen." USITC Pub. 5566 at 52. Appx001414. In fact, in both 2022 and 2023, it accounted for over 38% of all operating expenses.

Other parties, as well as the Plaintiffs, sought additional modifications of the draft questionnaires that the Commission separately issued to domestic processors, importers, and purchasers. However, the so-called "weighing" of the "probative value" of these requests for information from three different industry segments has no evidentiary support and, in any event, is irrelevant to the issue now before the Court, which is whether Plaintiffs' request for diesel fuel purchase volumes was "probative" of the causes of material injury to fishermen.

Fourth, the Commission's assertion that there were "often conflicting requests" from the comments of other interested parties does not apply to the comments that were filed concerning the draft fishermen's questionnaire. That is why the Commission cannot and does not identify any conflicts concerning proposed changes to the fishermen's questionnaire.

Instead, as Plaintiffs previously described, the Commission made *eight* changes to the fishermen's questionnaire at the request of domestic parties, while denying the single request posed by the

Ecuadorian Respondents. This was arbitrary, capricious, and an abuse of discretion.

IV.    **THE COMMISSION ERRED IN THE ANALYSIS IT USED TO DETERMINE THAT DIESEL FUEL COST INCREASES WERE NOT THE SOLE CAUSE OF MATERIAL INJURY TO SHRIMP FISHERMEN**

To support its finding that diesel fuel price increases in 2022 and 2023 did not constitute the sole cause of material injury to fishermen, the Commission relied almost entirely on the following statement and its alleged consequences:

> Fuel was the largest production cost for U.S. shrimp fishermen. Diesel prices in the Gulf Coast region increased from January 2021 to June 2022, decreased through June 2023, and then fluctuated thereafter, for an overall increase of 52.4 percent during the POI. U.S. fishermen's reported fuel and oil expenses increased by 8.5 percent from 2021 to 2022, then decreased by 27.2 percent from 2022 to 2023, for an overall decrease of 21.1 percent from 2021 to 2023. On a unit basis, U.S. fishermen's reported fuel and oil expenses increased from $1.03 *per pound* in 2021 to $1.18 *per pound* in 2022, and then fell to $0.84 *per pound* in 2023.

USITC Pub. 5566 at 52. Appx001414. (Emphasis added, footnotes omitted.) The Commission then relied on these "per pound" calculations when rebutting Plaintiffs' contention that the "increase in the cost of

15

fuel diesel fuel was the cause of any injury to U.S. shrimp fishermen."
*Id.* at 85. Appx001447.[8]

The Commission's reliance on per pound data presents a highly misleading picture of the financial difficulties that fishermen faced throughout 2022 and 2023 when they filled up their fuel tanks before starting their fishing trips. When fishermen took trips in January 2021, they paid an average of $2.44 per gallon. By June 2022, they had to pay $5.39 per gallon before the price declined to $3.64 per gallon in December 2023. *See* USITC Pub. 5566 at V-2 (Table V-1). Appx001572. On average, fishermen had to pay $3.03 per gallon in 2021, $4.95 per gallon in 2022, and $3.92 per gallon in 2023. *See* Pltfs. Br. at 42-44.

When fishermen fill their tanks, they do not know how many shrimp they are going to catch. Moreover, they are unlikely to know how many days they will spend at sea either getting to their fishing grounds or spending time at those grounds. What they do know is how much they paid to fill their fuel tanks *before* starting their trips.

---

[8] The ASPA/AHSTAC Joint Memorandum adds nothing to the Commission's arguments, so we need not address it here.

Thus, the price that they pay per gallon and the resulting total cost to them for the gallons purchased at the start of each trip has a significant impact on how profitable each trip will be. To put it another way, fishermen do not and cannot know the price per pound of diesel fuel before they start fishing because they cannot know in advance how many pounds of shrimp they will catch.

However, the Commission did not calculate or rely upon the cost per gallon or the resulting total cost that fishermen incurred when they filled their tanks. Rather, it measured the cost to those fishermen by dividing the total lbs. they caught during each year into the total cost of fuel that they purchased in that year to derive a cost per pound of diesel.

So, for example, the Commission determined that fishermen, in the aggregate, caught 36,023,000 lbs. of shrimp in 2021 and paid a total of $37,128,000 for diesel fuel in that year. Thus, it calculated a price of $1.03 per lb. that the fishermen paid. *See* USITC Pub. 5566 at F-11 (Table F-14). Appx001703. It was only through this methodology that it was able to find that the fuel price per lb. increased to $1.18 in 2022 and then declined to $0.84 per lb. in 2023.

17

However, the fuel price did not decline in either 2022 or 2023 compared to 2021. Rather, as just noted, it increased from an average of $3.03 per gallon in 2021 to $4.95 per gallon and to $3.92 per gallon in 2023. Thus, the Commission's "price per pound" methodology obscures the adverse effect of significant diesel fuel price increases on fishermen in both 2022 and 2023 compared to 2021.

In other words, the Commission's claim that the price of diesel fuel declined from $1.03 per lb. in 2021 to $0.84 per lb. in 2023 ignores the fact that fishermen actually paid $0.89 per gallon *more* in 2023 than they did in 2021. Considering this stark contrast, the Commission's claim lacks record support that it "reasonably considered" the effect on fishermen of significantly increased fuel costs, when calculated on a per gallon, not a per pound, basis. Com'n Br. at 90, 92.

A fisherman, Robert Garcia, testified at the Staff Conference that he took a fishing trip in September 2023, and he purchased 15,000 gallons of fuel in that month before starting his trip. Tr. at 34. Appx055183. The average price of diesel in September 2023 was $4.25 per gallon. In January 2022, it was $2.44 per gallon. *See* USITC Pub. 5566 at V-2 (Table V-1). Appx001572. Thus, Mr. Garcia likely paid

18

$1.81 more per gallon in September 2023 than he would have paid in January 2021. This would have resulted in a total cost increase of $27,150 for the 15,000 gallons that he bought.[9] Yet, the Commission illogically insists that Mr. Garcia's fuel cost actually declined by 18.9% between 2021 and 2023.

The Commission supports its reliance on its misleading per pound diesel price analysis by claiming that the "Commission frequently analyzes the financial data for the domestic industry both in absolute terms and in terms of unit values, such as dollars per pound." Com'n Br. at 90. However, the Commission does not identify any authority for the use of this "frequent" method of analysis in the unique circumstances presented here and, in any event, it is well established that every case turns on its own facts.

Equally unsupportable is the Commission's assertion that the use of a per pound measurement of fuel costs is "arguably more instructive

---

[9] Fishermen reported an average per fisherman operating loss in 2023 of $4,564. *See* USITC Pub. 5566 at F-11 (Table F-14). Appx001703. ($1,771,000 total reported operating loss divided by 388 reporting shrimp fishermen equals an average loss per fisherman of $4,564). Thus, the increased price of diesel that Mr. Garcia likely paid in 2023 vastly exceeded the average loss in 2023 of all fishermen. Thus, his increased cost of diesel fuel solely accounted for his operating loss.

than fuel costs per gallon because the former measure directly influenced the fishermen's profitability." Com'n Br. at 91. However, if soaring fuel costs drove down profits, as Plaintiffs claim, then the increased price of diesel fuel per gallon throughout the POI is by far the most "instructive" metric.

In contrast, the per pound metric is a function of sales volume, not fuel consumption gallons. Fishermen do not buy diesel fuel by first estimating how many shrimp they expect to catch, nor does the Commission claim that they do. Yet, that is the import of the Commission's reliance on the per pound metric.

Moreover, the purchase of fuel is a direct function of how many days they expect to be at sea. The volume of shrimp that they catch while at sea is highly variable from day to day, but the number of days that they burn fuel is not.

The Commission also claims that Plaintiffs have engaged in a "selective presentation" of the fuel price data because they have ignored the Commission's finding that "diesel fuel prices per gallon declined during the second half of the POI with some fluctuations." Com'n Br. at 92. However, the average price in 2021 was $3.03 per gallon, the

average price in 2022 was $4.95 per gallon, and the average price in 2023 was $3.92 per gallon.

Yes, the average price declined in 2023 compared to 2022, but the 2023 price was still almost 30% higher than the price in 2021. Yet, by constantly claiming that the price declined between 2022 and 2023 when measured on a per pound basis, the Commission intentionally obscures the fact that fishermen paid almost 30% per gallon more in 2023 than they paid in 2021 (as well as 63% more per gallon in 2022 than in 2021).

There is nothing "selective" about this data. What is selective is the Commission's attempt to show that diesel fuel prices declined between 2022 and 2023 based on its misleading per pound metric.

## V.    THE COMMISSION ABUSED ITS DISCRETION BY FAILING TO CONSIDER THE PLAINTIFFS' ANALYSIS OF THE IMPACT OF DIESEL FUEL PRICE INCREASES ON THE CONDITION OF SHRIMP FISHERMEN

Plaintiffs provided several analyses of the impact of soaring diesel fuel prices, which demonstrated that the price increases in 2022 and 2023 were the sole cause of material injury. *See* Ecua. Resps. Preh. Br. at 8-9. Appx044939-044940; Ecua. Resps. Posth. Br. at 1-3.

Appx045161-045163. We previously provided a summary of those analyses and do not repeat them here. Pltfs. Br. at 22-28.

In summary, we tried to determine whether fishermen in 2022 and 2023 would have equaled or exceeded their virtually unprecedented operating profits in 2020 and 2021, even in the face of increasing subject import volumes that were sold at lower prices, but for the increased price of diesel fuel that fishermen had to pay. To do this, we assumed that fishermen would repeat in 2022 and 2023 the 2021 volumes that they caught, the 2021 prices that they charged, the 2021 sales revenues that they earned, the 2021 operating costs that they incurred, and their resulting 2021 operating profits.

The only variable that we changed was the price of diesel fuel. These analyses showed that, even if fishermen repeated their highly profitable operating performance in 2021 in both 2022 and 2023, the soaring prices of diesel fuel would have turned the industry-wide 6.2% operating profit in 2021 into a significant operating loss in both 2022 and 2023.

The Commission ignored this highly probative evidence, and it continues to avoid addressing this evidence here, as the law requires.[10] Their only possible reason is that they have no answer. Instead, they rely on evidence that in 2022 and 2023, compared to 2021: (1) fishermen lowered their prices; (2) reduced the number of days that they fished and the number of boats that they operated; and (3) sustained operating losses. Com'n Br. at 87. However, since diesel fuel prices declined between 2022 and 2023 by 29.4% (measured on the misleading per pound basis), the fishermen should have experienced a "major improvement in their financial condition." *Id.* at 89. The fact that they did not was attributable to "their falling prices as a result of subject imports." *Id.* Moreover, Plaintiffs allegedly "completely ignore{d} the prices that fishermen received for their shrimp." *Id.* at 94.

The fatal flaw in the Commission's reliance on the fishermen's declining prices and profits in 2022 and 2023 is that Plaintiffs were able to isolate the effect of soaring diesel fuel prices in our counter-factual

---

[10] Case law uniformly supports Plaintiffs' contention that the Commission had an obligation, which it failed to satisfy, to consider record evidence that "fairly detracts" from the evidence that it relied upon. Pltfs. Br. at 36-38.

23

analyses by first assuming that fishermen would repeat all of their 2021 metrics in 2022 and 2023 as they registered in 2021, including charging the same prices and incurring the same expenses in 2022 and 2023 as they did in 2021.

We held these variables constant in 2022 and 2023 to replicate the experience of fishermen in the highly profitable year of 2021. All that our analysis changed was the price of diesel fuel, and that change demonstrated that the highly profitable results in 2021 would change to enormous operating losses in 2022 and 2023 that were solely attributable to diesel fuel price increases. *See* Pltfs. Br. at 42-46.

Plaintiffs demonstrated that fishermen sustained an aggregate $20.4 million increase in diesel fuel expense in 2022 compared to 2021 and a $10.8 million increase in 2023 compared to 2021. Thus, the fuel cost increases generated the entire loss that fishermen sustained in 2022 and 2023 even after we held constant the operating revenues, average unit prices, non-fuel operating expenses, and number of fishing days recorded in 2021. *See* Ecua. Resps. Posth. Br. at 1-4. Appx045161-045164. The Commission chose to ignore this analysis and thereby abused its discretion.

## VI.   A REMAND IS REQUIRED FOR THE COMMISSION TO OBTAIN THE GALLON-RELATED INFORMATION NEEDED TO DETERMINE THE EFFECT OF DIESEL FUEL PRICE INCREASES

For the foregoing reasons, this Court should remand the case with an instruction that the Commission reopen the record and request that shrimp fishermen report just one item of data – the volume of diesel fuel gallons that they purchased in each POI period. Only then can the parties and the Commission can determine the effect of diesel fuel price increases on shrimp fishermen in 2022 and 2023.

Respectfully submitted,

/s/ Warren E. Connelly
Warren E. Connelly
Jarrod M. Goldfeder
Kenneth N. Hammer

TRADE PACIFIC PLLC
700 Pennsylvania Avenue, SE
Suite 500
Washington, D.C. 20003
(202) 223-3760

Counsel for Industrial Pesquera Santa Priscila S.A. and Sociedad Nacional de Galápagos, C.A.

Date: March 6, 2026

## CERTIFICATE OF COMPLIANCE

Undersigned counsel hereby certifies that:

(1) this Reply Brief complies with the 5,000 word count limitation in this Court's December 22, 2025 Amended Scheduling Order. ECF No. 47. This Reply Brief contains 4,922 words according to the word count function used in the word processing software used to prepare this Reply Brief.

(2) this Reply Brief has not been prepared with the assistance of a generative artificial intelligence program based on natural language prompts.

(3) he is not aware of any pending Federal Circuit case that may potentially bear on the issues presented here.

(4) This Reply Brief contains no words or numbers designated as confidential.

<u>/s/ Warren E. Connelly</u>

Warren E. Connelly

Date: March 6, 2026

26