# UNITED STATES COURT OF INTERNATIONAL TRADE
## THE HONORABLE M. MILLER BAKER, JUDGE

| | |
|---|---|
| INDUSTRIAL PESQUERA SANTA PRISCILA S.A. and SOCIEDAD NACIONAL DE GALAPAGOS C.A.,<br>*Plaintiffs,*<br><br>v.<br><br>UNITED STATES,<br>*Defendant,*<br><br>and<br><br>AD HOC SHRIMP TRADE ACTION COMMITTEE and AMERICAN SHRIMP PROCESSORS ASSOCIATION,<br>*Defendant-Intervenors.* | No. 25-00029-MMB |
| SEAFOOD EXPORTERS ASSOCIATION OF INDIA,<br>*Plaintiff,*<br><br>v.<br><br>UNITED STATES,<br>*Defendant,*<br><br>and<br><br>AD HOC SHRIMP TRADE ACTION COMMITTEE and AMERICAN SHRIMP PROCESSORS ASSOCIATION,<br>*Defendant-Intervenors.* | No. 25-00031-MMB |

VIETNAM ASSOCIATION OF SEAFOOD
EXPORTERS AND PRODUCERS,

*Plaintiff,*

v.                                                              No. 25-00032-MMB

UNITED STATES,

*Defendant,*

and

AD HOC SHRIMP TRADE ACTION
COMMITTEE and AMERICAN
SHRIMP PRODUCERS ASSOCIATION,

*Defendant-Intervenors.*

---

**DEFENDANT U.S. INTERNATIONAL TRADE COMMISSION'S
REVISED NONCONFIDENTIAL MEMORANDUM IN OPPOSITION
TO MOTIONS OF PLAINTIFFS FOR JUDGMENT
ON THE AGENCY RECORD**

---

JOHN D. HENDERSON
Attorney-Advisor
Office of the General Counsel
U.S. International Trade
Commission
Telephone: (202) 205-2130
Facsimile: (202) 205-3111
john.henderson@usitc.gov

MARGARET D. MACDONALD
General Counsel

KARL VON SCHRILTZ
Assistant General Counsel
for Litigation
Telephone: (202) 205-3096
Facsimile: (202) 205-3111
Karl.vonSchriltz@usitc.gov

DATED:  November 24, 2025
REVISED:  May 19, 2026

ii

## TABLE OF CONTENTS

Table of Authorities.................................................................................vi

Glossary ....................................................................................................x

I.    STATEMENT PURSUANT TO RULE 56.2 .................................1

    A.    Administrative Determinations under Review ......................1

    B.    Issues Presented and Summary of Argument........................2

        1.    Did the Commission reasonably include frozen
            cooked shrimp in a single domestic like product
            with frozen raw shrimp?...............................................2

        2.    Did the Commission reasonably find subject
            import volume significant?   ..........................................3

        3.    Did the Commission reasonably find that subject
            imports had significant adverse price effects?..............4

        4.    Did the Commission reasonably find that subject
            imports had a significant adverse impact?...................6

        5.    Did the Commission reasonably find that supply
            constraints did not cause the domestic industry's
            injury?........................................................................8

        6.    Were the Commission's findings that competition
            was not attenuated between subject imports and
            domestic shrimp supported by substantial
            evidence and in accordance with law? ........................10

        7.    Did the Commission reasonably find that subject
            imports injured U.S. fishermen?.................................11

        8.    Did the Commission conduct an adequate
            investigation?............................................................12

iii

## TABLE OF CONTENTS (cont'd)

II.    **STATEMENT OF FACTS** ............................................................ 13

    *Like Product* ...................................................................... 14

    *Domestic Industry* ............................................................ 15

    *Cumulation* ...................................................................... 15

    *Conditions of Competition* ............................................... 15

    *Volume* .............................................................................. 18

    *Price Effects* ..................................................................... 19

    *Impact* ............................................................................... 21

III.    **ARGUMENT** ............................................................................ 23

    A.    Standard of Review ............................................... 23

    B.    The Commission Reasonably Found that Frozen
        Cooked Shrimp Was Not a Separate Like Product .............. 26

    C.    The Commission Reasonably Found that Subject
        Import Volume Was Significant ............................................ 38

    D.    The Commission Reasonably Found Significant
        Underselling by Subject Imports .......................................... 44

    E.    The Commission Reasonably Found Significant
        Price Depression by Subject Imports ................................... 52

    F.    The Commission Reasonably Found that Subject
        Imports Had a Significant Adverse Impact on the
        Domestic Industry ................................................................ 57

    G.    The Commission Reasonably Found that Supply
        Constraints Did Not Cause the Domestic Industry's
        Injury ................................................................................... 65

**TABLE OF CONTENTS (cont'd)**

H.  The Commission Reasonably Found that Competition Was Not Attenuated Between Subject Imports and Domestic Product ................................................. 76

I.  The Commission Reasonably Found that Subject Imports Injured U.S. Fishermen ........................................... 87

J.  The Commission Conducted an Adequate Investigation ........................................................... 96

IV.  **CONCLUSION**...........................................................**108**

**CONFIDENTIAL MATERIAL OMITTED**

The material bracketed within the text on pages 4, 16, 20-21, 45 and 84 describes sensitive nonpublic information regarding domestic and subject import volume and pricing provided by, and derived from information provided by, individual U.S. processors and importers; volume and pricing information regarding lost sales provided by, and derived from information provided by, individual U.S. purchasers; the name of a U.S. purchaser questionnaire respondent related to nonpublic purchasing decisions; as well as information related to production methods and mix for domestically-produced warmwater shrimp. This information was granted confidential treatment by the Commission. *See* 19 U.S.C. § 1677f(b)(1)(A); 19 C.F.R. § 201.6(a).

# TABLE OF AUTHORITIES

**Cases**                                                                **Page(s)**

*Adisseo Espana S.A. v. United States,*
No. 1:21-cv-00562-MMB, Slip. Op., *available at* 2023 WL
8866562 (Ct. Int'l Trade Dec. 18, 2023) ............................................. 41

*Allegheny Ludlum Corp. v. United States,*
287 F.3d 1365 (Fed. Cir. 2002) ................................................. 104, 105

*Altx, Inc. v. United States,*
26 CIT 709 (2002) ............................................................................. 43

*Coal. of Gulf Shrimp Indus. v. United States,*
71 F. Supp. 3d 1356 (Ct. Int'l Trade 2015) ............................ 44, 57, 91

*Consolo v. Fed. Mar. Comm'n,*
383 U.S. 607 (1966) .......................................................................... 24

*DAK Ams. LLC v. United States,*
517 F. Supp. 3d 1349 (Ct. Int'l Trade 2021) ................................ 44, 57

*Full Member Subgrp. of Am. Inst. of Steel Constr. v.
United States,*
81 F.4th 1242 (Fed. Cir. 2023) ............................ 12, 104, 105, 107, 108

*Goss Graphics Sys., Inc. v. United States,*
22 CIT 983, 33 F. Supp. 2d 1082 (1998), *aff'd,* 216 F.3d
1357 (Fed. Cir. 2000) ........................................................................ 25

*Hitachi Metals v. United States,*
949 F.3d 710 (Fed. Cir. 2020) ........................................ 104, 105, 108

*Hynix Semiconductor, Inc. v. United States,*
30 CIT 1208, 431 F. Supp. 2d 1302 (2006) ......................................... 72

*ITG Voma Corp. v. U.S. International Trade Commission,*
253 F. Supp. 3d 1339 (Ct. Int'l Trade 2017),
*aff'd,* 753 F. A'ppx 913 (Fed. Cir. 2019) ............................................. 41

# TABLE OF AUTHORITIES (cont'd)

**Cases (cont'd)**          **Page(s)**

*JMC Steel Grp. v. United States,*
38 CIT 1460, 24 F. Supp. 3d 1290 (2014)............................................63

*LG Elecs., Inc. v. U.S.  Int'l Trade Comm'n,*
38 CIT 1562, 26 F. Supp. 3d 1338 (2014).................. 102, 104, 105, 108

*Mexichem Fluor Inc. v. United States,*
179 F. Supp. 3d 1238 (Ct. Int'l Trade 2016) .......................................63

*Mitsubishi Heavy Indus., Ltd. v. United States,*
275 F.3d 1056 (Fed. Cir. 2001) ...........................................................26

*Nippon Steel Corp. v. United States,*
458 F.3d 1345 (Fed. Cir. 2006) .....................................................25, 26

*Nucor Corp. v. United States,*
28 CIT 188, 318 F. Supp. 2d 1207 (2004)...........................................25

*OCP S.A. v. United States,*
658 F. Supp. 3d 1297 (Ct. Int'l Trade 2023) ......................................43

*OCTAL Inc. v. United States,*
539 F. Supp. 3d 1291 (Ct. Int'l Trade 2021) ...........................3, 40, 41

*Tenaris Bay City, Inc. v. United States,*
789 F. Supp. 3d 1352 (Ct. Int'l Trade 2025) .................................4, 42

*Timken U.S. Corp. v. United States,*
421 F.3d 1350 (Fed. Cir. 2005) .....................................................25, 85

*Torrington Co. v. United States,*
14 CIT 648, 747 F. Supp. 744 (1990), *aff'd,*
938 F.2d 1278 (Fed. Cir. 1991) ...........................................................34

*U.S. Steel Grp. v. United States,*
96 F.3d 1352 (Fed. Cir. 1996) ......................................................24, 25

# TABLE OF AUTHORITIES (cont'd)

**Cases (cont'd)**                                                        **Page(s)**

*United Steel, Paper & Forestry, Rubber, Mfg., Energy, Allied*
*Indus. & Serv. Workers Int'l Union v. United States,*
425 F. Supp. 3d 1374 (Ct. Int'l Trade 2020) ...................................... 91

*Universal Camera Corp. v. NLRB,*
340 U.S. 474 (1951) ................................................................................ 24

*USEC Inc. v. United States,*
34 F. App'x 725 (Fed. Cir. 2002) ......................................................... 25

*Yanghzou Bestpak Gifts & Crafts Co. v. United States,*
716 F.3d 1370 (Fed. Cir. 2013) ............................................................ 50

**Statutes**

19 U.S.C. § 1516a(b)(1)(B)(i) ..................................................................... 23

19 U.S.C. § 1677(4)(A) ..................................................................... 5, 51, 59

19 U.S.C. § 1677(7)(B) ............................................................................... 40

19 U.S.C. § 1677(7)(C) ............................................................................... 42

19 U.S.C. § 1677(7)(C)(i)..................................................................... 3, 38, 40

19 U.S.C. § 1677(7)(C)(ii) .......................................................................... 40

19 U.S.C. § 1677(7)(C)(iii) ......................................................................... 42

19 U.S.C. § 1677(7)(C)(iii)(I) ........................................................... 5, 51, 59

19 U.S.C. § 1677(10) .................................................................................. 28

28 U.S.C. § 2639(a)(1)................................................................................ 23

# TABLE OF AUTHORITIES (cont'd)

**Code of Federal Regulations**                                                  **Page(s)**

19 C.F.R. § 207.20.............................................................................. 104

19 C.F.R. § 207.20(b) .............................................................96, 107, 108

**Legislative History Materials**

Statement of Administrative Action to the Uruguay Round
  Agreements Act, H.R. Rep. No. 103-316, vol. I (1994) .................25, 85

**USITC Publications**

*Certain Frozen or Canned Warmwater Shrimp and Prawns
  From Brazil, China, Ecuador, India, Thailand, and
  Vietnam*,
  Inv. Nos. 731-TA-1063-1068 (Preliminary),
  USITC Pub. 3672 (Feb. 2004)...................................................... 35, 36

*Certain Frozen or Canned Warmwater Shrimp and Prawns
  From Brazil, China, Ecuador, India, Thailand, and
  Vietnam*,
  Inv. Nos. 731-TA-1063-1068 (Final),
  USITC Pub. 3748 (Jan. 2005)................................................36, 37, 76

*Certain Structural Beams from China, Germany, Italy,
  Luxembourg, Russia, South Africa, Spain, and Taiwan*,
  Inv. Nos. 731-TA-935-942 (Preliminary),
  USITC Pub. 3438 (July 2021)............................................................ 35

*Paper Shopping Bags from Turkey*,
  Inv. No. 731-TA-1626 (Final),
  USITC Pub. 5504 (May 2024)............................................................ 34

**GLOSSARY**

| Term | Definition |
|---|---|
| AUV | average unit values |
| POI | period of investigation (here, January 2021 through March 2024) |
| NOAA | National Oceanic and Atmospheric Administration |
| EIA | U.S. Energy Information Administration |
| AHSTAC | Ad Hoc Shrimp Trade Action Committee (participant in the *Shrimp* investigation) |
| VnPlBr | Vietnamese Plaintiff's Opening Brief<br><br>(Plaintiff's Confidential Rule 56.2 Motion for Judgment on the Agency Record in *Shrimp Committee of the Vietnam Association of Seafood Exporters and Producers v. United States*, Ct. No. 1:25-cv-00032-MMB) (Dkt. 40) |
| IndPlBr | Indian Plaintiffs' Opening Brief<br><br>(Plaintiff's Confidential Memorandum in Support of Its Rule 56.2 Motion for Judgment on the Agency Record in *Seafood Exporters Association of India v. United States*, Ct. No. 1:25-cv-00031-MMB) (Dkt. 34-2) |
| EcuPlBr | Ecuadorian Plaintiffs' Opening Brief<br><br>(Plaintiffs' Memorandum of Points and Authorities in Support of Their Rule 56.2 Motion for Judgment on the Agency Record in *Industrial Pesquera Santa Priscila S.A. and Sociedad Nacional De Galapagos, C.A., v. United States*, Ct. No. 1:25-cv-00029-MMB) (Dkt. 36-2) |

## GLOSSARY

| Term | Definition |
|---|---|
| FTC | Federal Trade Commission |
| Views | U.S. International Trade Commission's Confidential Views in *Frozen Warmwater Shrimp from Ecuador, India, Indonesia, and Vietnam,* Inv. No. 701-TA-699-700 and 702 and 731-TA-1660 (Final) (Appx1265-1353) |
| CSR | Commission's Confidential Staff Report in *Frozen Warmwater Shrimp from Ecuador, India, Indonesia, and Vietnam,* Inv. No. 701-TA-699-700 and 702 and 731-TA-1660 (Final) (Appx1000-1264) |
| Commerce | U.S. Department of Commerce |
| Commission (or ITC) | U.S. International Trade Commission |
| PRWs | production and related workers |
| Petitioner | American Shrimp Processing Association (filer of the petition underlying the Commission's investigation) |
| interim 2024 | period of January 2024 to March 2024 |
| interim 2023 | period of January 2023 to March 2023 |

xi

Defendant United States opposes the Motions for Judgment on the Agency Record filed by plaintiffs (1) Industrial Pesquera Santa Priscila S.A. and Sociedad Nacional de Galapagos, C.A. ("Ecuadorian Respondents" or "Ecuadorian Plaintiffs") in Case No. 25-00029; (2) Seafood Exporters Association of India ("Indian Respondents" or "Indian Plaintiffs") in Case No. 25-00031, and (3) Shrimp Committee of the Vietnam Association of Seafood Exporters and Producers ("Vietnamese Respondents" or "Vietnamese Plaintiffs") in Case No. 25-00032. The final determinations of the United States International Trade Commission ("the Commission") in the countervailing duty investigations on imports of frozen warmwater shrimp rod from Ecuador, India, and Vietnam are supported by substantial evidence and in accordance with law. This Court should therefore affirm them.

## I.    STATEMENT PURSUANT TO RULE 56.2

### A.    Administrative Determinations under Review

Plaintiffs seek review of the Commission's affirmative determinations in the countervailing duty investigations of frozen warmwater shrimp from Ecuador, India, and Vietnam. Notice of the determinations was published in the Federal Register on December 17, 2024. Appx1354. The Commission's Views for these investigations are

1

contained in *Frozen Warmwater Shrimp from Ecuador, India, Indonesia, and Vietnam,* Inv. No. 701-TA-699-700 and 702 and 731-TA-1660 (Final), USITC Pub. 5566 (Dec. 2024), Appx1355-1708.[1]

### B.   Issues Presented and Summary of Argument

#### 1.   Did the Commission reasonably include frozen cooked shrimp in a single domestic like product with frozen raw shrimp?

Yes.  The Commission reasonably found that there was no clear dividing line between frozen cooked shrimp and frozen raw shrimp.  It found that the two types of frozen shrimp overlapped in terms of physical characteristics and uses, shared the same initial processing steps, and did not clearly differ in channels of distribution and producer and customer perceptions.  It fully considered evidence raised by Indian Respondents that arguably detracted from its findings, including limitations to interchangeability and additional production equipment for cooked shrimp, but reasonably found that they were outweighed by the similarities between cooked shrimp and raw shrimp with respect to the other like product factors.

---

[1] Citations to the Commission's confidential views ("Views") are to Appx1265-1353 and to the confidential staff report ("CSR") are to Appx1000-1264.

### 2. Did the Commission reasonably find subject import volume significant?

Yes. It is undisputed that the volume, market share, and ratio to domestic production of cumulated subject imports were, respectively, at least 1.4 billion pounds, 78.7 percent, and 1,174 percent during each full year of the period of investigation ("POI"), and that subject import market share increased by 5.2 percentage points and their ratio to U.S. production by 200.6 percentage points from 2021 to 2023, *see* Appx1315. Thus, the Commission reasonably found that the volume of subject imports was significant.

While Indian Plaintiffs fault the Commission for not addressing the impact of subject imports in the context of conditions of competition in its volume analysis, the statute requires the Commission to consider only the significance of subject import volume in absolute terms and relative to U.S. consumption and production. 19 U.S.C. § 1677(7)(C)(i). This court has consistently rejected arguments that the Commission must consider "volume effects" in its volume analysis, *OCTAL Inc. v. United States,* 539 F. Supp. 3d 1291, 1299-1300 (Ct. Int'l Trade 2021), and has recognized that the statute requires the Commission to consider conditions of competition for its impact analysis, not its volume

3

*PROPRIETARY INFORMATION SUBJECT TO PROTECTIVE ORDER REDACTED*

analysis. *Tenaris Bay City, Inc. v. United States,* 789 F. Supp. 3d 1352, 1373 (Ct. Int'l Trade 2025).

### 3. Did the Commission reasonably find that subject imports had significant adverse price effects?

Yes. The Commission reasonably found significant underselling by subject imports based on undisputed evidence that subject imports undersold domestically produced shrimp in 65.9 percent of quarterly comparisons, or 87.2 percent of the volume of subject imports in the Commission's pricing data, and confirmed lost sales reported by seven purchasers that purchased [ number ] pounds of low-priced subject imports instead of domestic shrimp based on price. Appx1317-1318. Contrary to Vietnamese Plaintiffs' contention, the Commission's finding of significant underselling was not based on a market share shift; rather, having found significant underselling, the Commission explained that this underselling led subject imports to gain 5.2 percentage points of market share between 2021 and 2023, partially at the expense of the domestic industry, which lost 0.8 percentage points of market share to subject imports over the period. Appx1320. Vietnamese Plaintiffs' efforts to calculate a smaller market share loss for the industry are without merit, since they are based on U.S.

processors alone, excluding fishermen, rather than on the industry as a whole, as the statute requires.  19 U.S.C. §§ 1677(4)(A), 1677(7)(C)(iii)(I).  They also inappropriately compare market share in January-March 2024 to that in full year 2021, when the seasonality of U.S. demand and supply would distort such a comparison.  Appx1303-1304.

The Commission also reasonably found that subject imports depressed domestic prices to a significant degree based on the pervasive underselling by subject imports and substantial declines in U.S. processors' sales prices and the average unit values ("AUVs") of U.S. shipments for both U.S. processors and fishermen.  Appx1325-1326. The Commission explained that as U.S. processors had to lower their prices to compete with low-priced subject imports, they were forced to lower the prices they could pay fishermen.  The fishermen's prices were thus also depressed by competition from low-priced subject imports, with the AUVs of their U.S. shipments declining 42.6 percent between 2021 and 2023.  Appx1329.

Vietnamese Plaintiffs argue that the Commission's price depression finding was somehow inconsistent with domestic industry

profitability and increased capital expenditures.  Contrary to this argument, the Commission found that the industry's profits in 2021 turned to losses in 2022 and 2023 as subject imports captured sales and market share and depressed domestic prices, while three-quarters of responding processors reported cancelling, postponing, or rejecting investments due to subject imports.  Appx1338-1339, Appx1349; *see* Appx1166 (CSR at Table VI-9).

### 4.    Did the Commission reasonably find that subject imports had a significant adverse impact?

Yes.  The Commission found that U.S. processors' loss of sales and market share as a result of significant underselling by significant volumes of subject imports led to declines in the processors' production, capacity utilization, and U.S. shipments, and that their lower output and depressed prices as a result of the underselling caused a sharp decline in their financial performance during the POI, including operating losses in 2022 and 2023.  The Commission explained that U.S. fishermen also experienced declining financial performance and operating losses, as U.S. processors were forced by low-priced subject imports to lower the price they paid for fresh shrimp, resulting in lower prices for fishermen and a reduced incentive for them to harvest

6

shrimp, which in turn resulted in fewer fishing days and lower output. Appx1339.

None of Plaintiffs' arguments withstand scrutiny. Vietnamese Plaintiffs again attempt to minimize the market share shift by using an incorrect definition of the domestic industry, excluding fishermen, and an inappropriate comparison of interim 2024 to full year 2021. Far from dismissing demand conditions, as Vietnamese Plaintiffs claim, the Commission explained that declining U.S. demand did not explain the extent of the deterioration in the domestic industry's condition during the POI, as the industry's output indicators declined by far more than 13.6 percent decline in apparent U.S. consumption between 2021 and 2023. Appx1344. They reprise their argument that the industry's profits and capital expenditures were healthy, ignoring the industry's losses in 2022 and 2023 and the majority of responding processors reporting cancelled or postponed investments. Finally, the Commission reasonably attached weight to the correlation between subject imports and the industry's declining performance during the three full years of the POI, instead of focusing on interim 2024 data as advocated by Vietnamese Plaintiffs, in light of the much greater amount of data over

the full years and the seasonality of the shrimp market. Nevertheless, the Commission also found that post-POI data closest to the vote date showed that subject imports declined and the domestic industry's condition improved following the U.S. Department of Commerce's ("Commerce") imposition of preliminary duties, lending additional support to the Commission's impact finding. Appx1339 (n.290).

### 5. Did the Commission reasonably find that supply constraints did not cause the domestic industry's injury?

Yes. The Commission fully considered the record data and reasonably found no significant supply constraints that would have prevented the domestic industry from supplying additional volumes of frozen shrimp. A majority of responding U.S. processors reported their production was not constrained by supplies of wild-caught shrimp and over 90 percent of 385 responding U.S. fishermen reported their harvests were not constrained by the availability of live shrimp in U.S. waters. The Commission explained that the quantity of wild-caught shrimp harvested by U.S. fishermen during the POI, and therefore the quantity of frozen shrimp produced by U.S. processors, was largely dictated by the financial incentives for fishermen to harvest shrimp. It

8

found that fishermen reduced or abandoned their fishing efforts during the POI as declining prices caused by subject import competition made fishing economically unviable. Appx1341. It also found a substantial increase in processors' inventories from 2021 to 2023, reflecting their ability to sell more frozen shrimp. Appx1341.

The Commission considered the report by ION Economics submitted by respondents arguing that any injury to U.S. processors resulted from a biological limit on the volume of wild-caught shrimp that fishermen were capable of harvesting. While acknowledging the existence of some biological limit, the Commission explained its disagreement with the ION report's conclusions, and reasonably attached more weight to other evidence that domestic frozen shrimp production and shipments had not been constrained, as reported by responding fishermen and processors. Appx1340-1341. The Commission also noted several methodological limitations to the ION report, which Plaintiffs do not dispute. Appx1342-1343. Moreover, Indian Plaintiffs' argument that U.S. landings of wild-caught shrimp have been fixed, unchanging, and constant for decades are contradicted

9

by ION report data showing substantial fluctuations in annual landings in the Gulf Coast.  Appx44444.

### 6. Were the Commission's findings that competition was not attenuated between subject imports and domestic shrimp supported by substantial evidence and in accordance with law?

Yes.  The Commission's findings that competition between subject imports and domestic shrimp was not attenuated because of differences between farm-raised imported shrimp and wild-caught domestic shrimp were supported by substantial evidence.  The Commission found that frozen warmwater shrimp was frequently marketed and sold in ways that downplayed the distinctions between domestic wild-caught shrimp and imported farm-raised shrimp, inhibiting purchasing decisions on that basis and elevating the importance of price, and that distributors and retailers discouraged U.S. processors from marketing their shrimp as domestic and wild-caught.  It found that consumers often do not know whether they have purchased wild-caught or farm-raised shrimp, and simply request shrimp without regard to its origin.  The Commission also found that respondents' claim of attenuated competition was inconsistent with the lost sales data from responding purchasers confirming that they purchased significant volumes of low-

priced subject imports instead of domestically produced frozen warmwater shrimp because of their lower prices.

Thus, notwithstanding some differences in interchangeability reported by importers and purchasers, the Commission reasonably found that there was at least a moderate degree of substitutability between domestically produced frozen warmwater shrimp and subject imports, and that competition between subject imports and domestic product was not attenuated based on differences between farm-raised and wild-caught frozen warmwater shrimp.

### 7.    Did the Commission reasonably find that subject imports injured U.S. fishermen?

Yes.  The Commission found that the 44.2 percent decline in the fishermen's net sales AUVs during 2021-2023 caused by subject imports led to a decline in their financial performance, including losses in 2022 and 2023, a reduced incentive to harvest shrimp, and declines in fishing days, boats in operation, production and related workers ("PRWs"), and output from 2021 to 2023.  Appx1333-1334.  After considering diesel fuel costs per gallon and the fishermen's reported fuel and oil expenses, the Commission observed that if fuel cost was the most important driver of any injury to the fishermen, as respondents argued, their

11

financial condition should have improved from 2022 to 2023 as their fuel and oil costs per pound of shrimp declined 29.4 percent.  Instead, the Commission found that the fishermen experienced an operating loss and their worst operating ratio of the POI (negative 2.4 percent) in 2023.  Appx1348.  Contrary to Indian Plaintiffs' argument, the Commission considered diesel fuel costs per gallon and found that they increased through June 2022 before generally declining through June 2023 and fluctuating thereafter.  Appx1314.  These declining fuel costs were consistent with the fishermen's reported decline in their fuel and oil costs from 2022 to 2023, which supported the Commission's finding that subject imports, rather than fuel costs, accounted for the fishermen's losses during the period.

### 8.   Did the Commission conduct an adequate investigation?

Yes.  The Commission conducted a thorough investigation and collected a voluminous record, satisfying its obligation to conduct investigative activities and make active, reasonable efforts to obtain relevant data.  *See Full Member Subgrp. of Am. Inst. of Steel Constr. v. United States,* 81 F.4th 1242, 1257 (Fed. Cir. 2023).  While Plaintiffs argue that the Commission erred by not including all of their proposed

12

data requests in its final phase questionnaires, including a request for the volume of diesel fuel purchased by fishermen during the POI, the Commission collected all the data necessary for its analysis under the statute, including with respect to the issues raised by the parties, and reasonably rejected requests for the collection of additional information that were unnecessary and unduly burdensome.

## II.    STATEMENT OF FACTS

On October 25, 2023, the American Shrimp Processing Association ("Petitioner") filed countervailing duty petitions with respect to imports of frozen warmwater shrimp from Ecuador, India, Indonesia, and Vietnam, and antidumping duty petitions with respect to imports from Ecuador and Indonesia.  Appx1709-1751.  The Commission accordingly instituted antidumping and countervailing duty investigations as of that date.  Appx54922-54925.

Following issuance of its affirmative preliminary determinations on December 11, 2023, Appx56521-56522, the Commission provided drafts of the final phase questionnaires to the parties for comment on January 26, 2024.  Appx56828.  After receiving the parties' comments, the Commission took them into account, making numerous changes to

13

the draft questionnaires, and issued final phase questionnaires on June 26, 2024, to U.S. producers, U.S. importers, U.S. purchasers, U.S. fishermen, and foreign producers/exporters.  Appx57225-57439.

*Like Product.*  The scope of the investigations defined by Commerce included imports of frozen warmwater shrimp, but not imports of fresh warmwater shrimp.  Petitioner and the Ad Hoc Shrimp Trade Action Committee ("AHSTAC") argued that out-of-scope domestically produced fresh warmwater shrimp should be included in the definition of the domestic like product along with domestically produced frozen warmwater shrimp, and no respondent party argued differently.  Appx1273 (&n.24), Appx1276.  The Commission determined that out-of-scope fresh warmwater shrimp should be included in the domestic like product, based on its "semi-finished products" analysis. Appx1284-1287.

Indian Respondents argued that the Commission should define frozen cooked shrimp to be a separate domestic like product, but the Commission rejected the argument on finding that there was no clear dividing line between frozen cooked shrimp and frozen raw shrimp based on an analysis of its six like product factors.  Appx1275-1276,

14

Appx1278-1284.  Accordingly, the Commission defined a single domestic like product consisting of frozen warmwater shrimp, coextensive with Commerce's scope, and out-of-scope fresh warmwater shrimp. Appx1287.

*Domestic Industry.*  In accordance with its definition of the domestic like product, the Commission defined the domestic industry to include all domestic harvesters of fresh warmwater shrimp and processors of frozen warmwater shrimp.  Appx1288-1289.[2]

*Cumulation.*  The Commission cumulated subject imports from Ecuador, India, Indonesia, and Vietnam for purposes of its material injury analysis.  Appx1290-1298.[3]

*Conditions of Competition.*  The Commission defined the POI for its investigations as January 2021 through March 2024.  Appx1292. The Commission found that apparent U.S. consumption declined 13.6 percent between 2021 and 2023, but was 3.4 percent higher in January-

---

[2] No party argued that the domestic industry should not include the fishermen harvesting raw shrimp.  Appx1288.

[3] Plaintiffs do not challenge the Commission's cumulation analysis.

PROPRIETARY INFORMATION SUBJECT
TO PROTECTIVE ORDER REDACTED

March 2024 ("interim 2024") compared with January-March 2023 ("interim 2023").  Appx1304.  The Commission found that there was seasonality in U.S. demand for warmwater shrimp.  Appx1303.

The Commission's domestic industry data were based on questionnaire responses of 20 U.S. processors and 388 fishermen. Appx1304.[4]  It found that both U.S. processors' production of frozen warmwater shrimp and U.S. fishermen's harvesting of raw shrimp are seasonal.  Appx1304.  The Commission found that domestically processed shrimp is overwhelmingly wild-caught, with [ % ] percent of U.S. processors' U.S. shipments of frozen warmwater shrimp in 2023 being wild-caught and [ % ] percent being farm-raised.  Appx1304.  By contrast, it found that almost all (99.8 percent of) subject imports were farm-raised, while 0.2 percent were wild-caught.  Appx1307.

The Commission found that the domestic industry's market share declined from 7.6 percent in 2021 to 6.4 percent in 2022, and then

---

[4] The Commission collected data from the U.S. processors and fishermen through different questionnaires, and separately reported data for the processors ("frozen") and fishermen ("fresh"), but reported combined data for the domestic industry as a whole ("frozen and fresh") with respect to market share, U.S. shipments, and production workers. Appx1226-1228 (Table C-1).

16

increased to 6.8 percent in 2023; its market share was 6.7 percent in interim 2024, compared with 5.4 percent in interim 2023.  Appx1308.  It found that the market share of cumulated subject imports increased from 78.7 percent in 2021 to 80.2 percent in 2022 and 83.9 percent in 2023; their market share was 84.1 percent in interim 2024, compared with 82.9 percent in interim 2023.  Appx1307.

The Commission found that most U.S. processors, importers, and purchasers reported that they had not experienced supply constraints during the POI.  Appx1305-1306.  It found that a majority of responding U.S. processors reported that the availability of wild-caught fresh warmwater shrimp in the United States did not constrain their ability to process frozen warmwater shrimp during the POI.  Appx1307.  The Commission further found that over 90 percent of responding U.S. fishermen reported that the availability of live warmwater shrimp in the Gulf of Mexico or off the Atlantic Coast in U.S. territorial waters did not affect the supply of fresh warmwater shrimp for processing. Appx1307.

The Commission found that there was at least a moderate degree of substitutability between domestically produced frozen warmwater

17

shrimp and subject imports.  Appx1309.  It found that price is an important factor in purchasing decisions for frozen warmwater shrimp, among other important factors.  Appx1312.

The Commission found that the largest component of U.S. processors' cost of goods sold was raw materials, specifically raw warmwater shrimp.  Appx1313.  It found that fuel was the largest production cost for U.S. shrimp fishermen.  Appx1314.  It noted that diesel prices in the Gulf Coast region increased from January 2021 to June 2022, decreased through June 2023, and then fluctuated thereafter, for an overall increase of 52.4 percent during the POI.  Appx1314.  The Commission found that U.S. fishermen's reported fuel and oil expenses declined 21.1 percent between 2021 and 2023, increasing by 8.5 percent from 2021 to 2022, then decreasing by 27.2 percent from 2022 to 2023.  Appx1347-1348.

*Volume.*  The Commission found that the volume of cumulated subject imports was significant in absolute terms and relative to U.S. production and consumption, and that the increase in the volume of cumulated subject imports was significant relative to U.S. production and consumption.  Appx1315-1316.

18

*Price Effects.*  The Commission collected quarterly quantity and pricing data from U.S. processors and importers on sales of five frozen warmwater shrimp products shipped to unrelated U.S. customers during the POI.  Appx1316.  Based on the questionnaire data obtained from 15 U.S. processors and 49 importers, the Commission found that subject imports undersold domestic product in 141 of 214 (or 65.9 percent of) quarterly comparisons.  Appx1316-1317.  By volume, it found that there were 387.5 million pounds of subject imports in the quarters with underselling, accounting for 87.2 percent of reported subject import sales volume in the Commission's pricing data.  Appx1317.

The Commission also considered information from purchasers regarding lost sales.  Ten of the 20 responding purchasers reported purchasing subject imports instead of domestic product during the POI, with eight of those ten reporting that subject imports were priced lower.  Appx1318.  Seven of these purchasers reported that price was a primary reason for the decision to purchase subject imports rather than domestic product, including four purchasers that estimated that they

19

*PROPRIETARY INFORMATION SUBJECT
TO PROTECTIVE ORDER REDACTED*

purchased [ number ] pounds of subject imports instead of

domestic product due to price.  Appx1318.

The Commission found that cumulated subject imports

significantly undersold domestic product during the POI, in light of the

at least moderate degree of substitutability between subject imports

and domestic product, the importance of price in purchasing decisions,

the pervasive subject import underselling, and the substantial volume

of confirmed lost sales.  Appx1320.  It further found that this

underselling led to significant lost sales by the domestic industry and a

shift in market share from the domestic industry to cumulated subject

imports between 2021 and 2023.  Appx1320.  The Commission

explained that cumulated subject imports gained 5.2 percentage points

of market share, including 0.8 percentage points captured from the

domestic industry, between 2021 and 2023.  Appx1320.

The Commission found that cumulated subject imports

significantly depressed domestic prices.  Appx1328.[5]  It found that U.S.

---

[5] The Commission considered whether subject imports prevented
price increases, which otherwise would have occurred, to a significant
degree during the POI, but made no finding of significant price
suppression by subject imports.  *See* Appx1325-1327.

PROPRIETARY INFORMATION SUBJECT
TO PROTECTIVE ORDER REDACTED

processors' sales prices declined 23.0 to 36.1 percent from 2021 to 2023, depending on the product, while subject import sales prices declined 5.4 to [ % ] percent over the same period, depending on the product and subject country. Appx1325-1326. The Commission found that as U.S. processors had to lower their prices to compete with subject imports, they in turn were forced to lower the prices they could pay fishermen, depressing the fishermen's sales prices for wild-caught shrimp, as reflected by the 42.6 percent decline in the fishermen's net sales AUVs from 2021 to 2023. Appx1326, Appx1329.

*Impact.* The Commission found that the significant volume of cumulated subject imports significantly undersold the domestic like product during the POI. Appx1338. It explained that this caused the domestic industry to lose sales and market share to subject imports, and significantly depressed the U.S. processors' and fishermen's prices for frozen and fresh shrimp. Appx1338. The Commission further explained that the U.S. processors' loss of sales and market share to subject imports led to declines in processors' production, capacity utilization, and U.S. shipments. Appx1338. The Commission found that processors' lower output and depressed prices as a result of subject

21

import underselling caused a sharp decline in their financial performance during the POI, including operating losses in 2022 and 2023.  Appx1338-1339.

The Commission found that U.S. fishermen also experienced declining financial performance, as U.S. processors, faced with loss of market share and lower prices due to subject imports, lowered the price they would pay for fresh shrimp.  Appx1339.  It explained that this resulted in lower prices for fishermen, reducing their incentive to harvest shrimp, which in turn resulted in fewer fishing days, fewer boats in operation, fewer production-related workers, and lower output for the fishermen.  Appx1339.  The Commission found that the sharp decline in the fishermen's net sales AUVs led to a significant deterioration in their financial performance, including operating losses in 2022 and 2023.  Appx1333.

The Commission also examined a number of factors argued by respondents to ensure that it was not attributing injury caused by other factors to subject imports.  It found that none of those factors could explain the injury that it had attributed to subject imports or sever the causal link between subject imports and the domestic industry's

22

deteriorating condition during the POI.  Appx1339-1340, Appx1343-1350.

Thus, the Commission determined that the domestic industry was materially injured by reason of cumulated subject imports from Ecuador, India, Indonesia, Vietnam.  Appx1353.[6]  These appeals followed.

## III.  ARGUMENT

### A.  Standard of Review

Under the Tariff Act of 1930, the Court reviews a Commission determination by assessing whether it is "unsupported by substantial evidence on the record, or otherwise not in accordance with law."  19 U.S.C. § 1516a(b)(1)(B)(i).  The Commission's determinations are presumed to be correct and the burden is on the party challenging a determination to demonstrate otherwise.  28 U.S.C. § 2639(a)(1).[7]

---

[6] Commerce made negative final determinations in its antidumping investigation with respect to Ecuador and its countervailing duty investigation with respect to Indonesia, and the Commission accordingly terminated its corresponding investigations. Appx59839-59840.

[7] Vietnamese Plaintiffs argue that the Commission's determinations should also be reviewable under an "arbitrary and capricious" standard, Vietnamese Plaintiffs' Rule 56.2 Brief ("VnPlBr")

[*Footnote continued on next page*]

23

The Supreme Court has defined "substantial evidence" as being "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 477 (1951). According to the Court, substantial evidence is "something less than the weight of the evidence, and the possibility of drawing two inconsistent conclusions from the evidence does not prevent an administrative agency's finding from being supported by substantial evidence." *Consolo v. Fed. Mar. Comm'n*, 383 U.S. 607, 614 (1966). Thus, under the substantial evidence standard, a court may not, "even as to matters not requiring expertise . . . displace the {agency's} choice between two fairly conflicting views, even though the court would justifiably have made a different choice had the matter been before it *de novo*." *Universal Camera*, 340 U.S. at 488.

The Commission is the trier of fact in injury investigations. As such, "{i}t is the Commission's task to evaluate the evidence it collects during its investigation" and "{c}ertain decisions, such as the weight to be assigned a particular piece of evidence, lie at the core of that

at 20-23, but that is not the standard of review for these determinations under the statute.

24

evaluative process." *U.S. Steel Grp. v. United States*, 96 F.3d 1352, 1357 (Fed. Cir. 1996); *Nippon Steel Corp. v. United States*, 458 F.3d 1345, 1350 (Fed. Cir. 2006).  Accordingly, the Commission has "discretion to make reasonable interpretations of the evidence and to determine the overall significance of any particular factor in its analysis." *Goss Graphics Sys., Inc. v. United States*, 22 CIT 983, 1005, 33 F. Supp. 2d 1082, 1100 (1998), *aff'd,* 216 F.3d 1357 (Fed. Cir. 2000).

Furthermore, because the Commission "'is presumed to have considered all of the evidence on the record,'" it is "'not required to explicitly address every piece of evidence presented by the parties'" during an investigation.  *Nucor Corp. v. United States*, 28 CIT 188, 234, 318 F. Supp. 2d 1207, 1247 (2004) (quoting *USEC Inc. v. United States*, 34 F. App'x 725, 731 (Fed. Cir. 2002)).  Instead, the Commission need only address the "issues material to {its} determination" so that the "path of the agency may reasonably be discerned."  Statement of Administrative Action to the Uruguay Round Agreements Act, H.R. Rep. No. 103-316, vol. I at 892 (1994) (quotation omitted) ("SAA"); *see Timken U.S. Corp. v. United States*, 421 F.3d 1350, 1354-57 (Fed. Cir. 2005).

In the end, when a party challenges the Commission's determination under the substantial evidence standard, as Plaintiffs do here, it has "'chosen a course with a high barrier to reversal.'" *Nippon Steel*, 458 F.3d at 1350, 1355 (quoting *Mitsubishi Heavy Indus., Ltd. v. United States*, 275 F.3d 1056, 1060 (Fed. Cir. 2001)).  As the Federal Circuit stated, "when the totality of the evidence does not illuminate a black-and-white answer to a disputed issue, it is the role of the expert fact-finder – here the majority of the Presidentially-appointed, Senate-approved Commissioners – to decide which side's evidence to believe." *Nippon Steel*, 458 F.3d at 1359.  Thus, "{s}o long as there is adequate basis in support of the Commission's choice of evidentiary weight, the Court of International Trade and {the Federal Circuit}, reviewing under the substantial evidence standard, must defer to the Commission." *Id.*

## B.   The Commission Reasonably Found that Frozen Cooked Shrimp Was Not a Separate Like Product

In its domestic like product analysis, the Commission defined a single like product consisting of frozen warmwater shrimp, coextensive with Commerce's scope, and out-of-scope fresh warmwater shrimp. Appx1287.  No party disputed that fresh shrimp should be included in the domestic like product definition.  Appx1287.  While Indian

26

Respondents argued that the Commission should define frozen cooked shrimp within the scope to be a separate like product, the Commission declined to do so, finding that there was no clear dividing line between frozen cooked shrimp and frozen raw shrimp.  Appx1278-1284.

Indian Plaintiffs now contest the Commission's finding that frozen cooked shrimp was not a separate like product from frozen raw shrimp, arguing that the Commission "overlooked evidence confirming a clear dividing line" between the two.  Indian Plaintiffs' Rule 56.2 Brief ("IndPlBr") at 44.  To the contrary, as explained below, the Commission's Views expressly considered all the evidence highlighted by Indian Plaintiffs, and explained that it did not establish a clear dividing line.  Appx1278-1284.  Indeed, Indian Plaintiffs acknowledge that frozen cooked shrimp and frozen raw shrimp have similar physical characteristics and end uses and are sold in similar packaging.  IndPlBr at 44-45, 50.  They further acknowledge that the Commission "cited its normal analysis factors," *id.* at 49, and addressed their factual arguments, but contend that the Commission failed to give them proper weight.  *Id.* at 44-49.  The Commission's like product determination was

27

supported by substantial evidence, and Indian Plaintiffs' request that this Court reweigh the evidence should be rejected.

The Commission's domestic like product analysis begins with the subject merchandise as determined by Commerce.  The statute defines "domestic like product" as "a product which is like, or in the absence of like, most similar in characteristics and uses with, the article subject to an investigation."  19 U.S.C. § 1677(10).  The Commission explained that its decision regarding the appropriate domestic like product(s) in an investigation is a factual determination, and that it applies the statutory standard on a case-by-case basis.  Appx1269-1270.  The Commission typically examines six factors in its analysis: physical characteristics and uses, manufacturing, facilities, production processes and employees, channels of distribution, interchangeability, producer and customer perceptions, and price.  No single factor is dispositive, and the Commission may consider other factors it deems relevant based on the facts of a particular investigation.  The Commission looks for clear dividing lines among possible like products and disregards minor variations.  Appx1270.

Here, the Commission found that all domestically produced frozen warmwater shrimp within the scope, including cooked shrimp, share significant similarities in physical characteristics and the same predominant end-use, for human consumption, despite different methods of processing, including cooking.  Appx1278, Appx1281.  That frozen cooked shrimp was sold already cooked and ready to eat (once thawed) did not establish a significant difference in physical characteristics or end uses from frozen raw shrimp, the Commission explained, given that frozen raw shrimp also must be thawed and requires only one additional step, cooking, for meal preparation.  Appx1278-1279.  Indian Respondents acknowledge that frozen cooked shrimp and frozen raw shrimp have similar physical characteristics and the same end use.  IndPlBr at 44-45, 50.

The Commission found that there was substantial overlap in the production processes required to produce frozen raw shrimp and frozen cooked shrimp.  It explained that all frozen shrimp, including cooked shrimp, goes through the same initial processing steps, including weighing, washing, sizing, and grading, and then, depending on the end

29

product, peeling, deveining and other processing steps prior to freezing. Appx1279-1281. Indian Plaintiffs do not dispute these findings.

The Commission also recognized that specialized, expensive equipment is necessary to produce cooked shrimp. Appx1279. The Commission noted Indian Respondents' evidence that FDA approval is required for facilities producing cooked shrimp, and that firms and dedicated workers producing cooked shrimp must meet strict hygiene standards. Appx1279, Appx1282.

The Commission further found that there was overlap between U.S. producers of frozen raw shrimp and frozen cooked shrimp, in that all three U.S. producers of cooked shrimp also produced frozen raw shrimp, although the record was unclear whether they produced frozen cooked shrimp in the same facilities with the same employees used to produce frozen raw shrimp. Appx1279-1280, Appx1282.

Absent specific data concerning channels of distribution, the Commission considered evidence from the parties to find that there was some overlap in channels, and no evidence of a "distinct" channel for cooked shrimp that did not include frozen raw shrimp as well. Appx1280, Appx1281-1282. Although Indian Respondents claimed that

30

"retailers/grocery chains" were a distinct channel for frozen cooked shrimp, they conceded that frozen raw shrimp may be sold through the same channel.  Appx1280; *see* Appx44313-44314 (Indian Respondents' Prehearing Brief at 6-7).  Petitioner argued that retailers and major food service distributors carried both products, as shown by Sysco's online catalog.  Appx1280; *see* Appx45437-45438 (Petitioner's Posthearing Brief, Exh. 13).

The Commission acknowledged that most responding purchasers (15 of 20 firms) reported that raw and cooked shrimp were never interchangeable.  Appx1280.  However, it found that other evidence indicated a degree of interchangeability between the products, in that frozen raw shrimp and frozen cooked shrimp are processed in the same forms and used in the same applications, with evidence that they are marketed side-by-side by retailers in near-identical packaging and on websites as if they were interchangeable.  Appx1280-1282.  The Commission cited exhibits showing similar packaging for cooked and raw shrimp by retailers Amazon Fresh and Costco/Kirkland and by Sysco.  Appx1280-1281 (nn.49, 51, 53); Appx45406-45418, Appx45425-45431, Appx45437-45438 (Petitioner's Posthearing Brief, Exhs. 11, 13).

Indian Plaintiffs concede that packaging is "similar" between cooked and raw frozen shrimp. IndPlBr at 50.

The Commission found that the record did not establish a clear difference between cooked shrimp and raw shrimp in terms of producer and customer perceptions. Appx1281-1282. While noting Indian Respondents' contention that frozen cooked shrimp is perceived as a "ready to eat" product, while frozen raw shrimp is perceived as a "ready to cook" product, the Commission again observed that retailers displayed cooked shrimp and raw shrimp alongside each other with near-identical packaging, consistent with overlapping perceptions of the products. Appx1280-1281.

The Commission found that the limited pricing data available did not provide a sufficient basis to compare the prices of domestically produced cooked and raw frozen shrimp. Appx1281.

The Commission concluded that there was not a clear dividing line between frozen cooked shrimp and frozen raw shrimp. It found that the two types of frozen shrimp overlapped in terms of physical characteristics and uses, shared the same initial processing steps, and did not clearly differ in channels of distribution and producer and

32

customer perceptions.  Appx1281-1283.  While recognizing that there were also differences between the two products in terms of production equipment and interchangeability, the Commission observed that U.S. producers of frozen raw shrimp and cooked shrimp overlapped and that processors and retailers marketed the products as though they were interchangeable.  Appx1282.  Based on the substantial similarities between the two products, the Commission found no clear dividing line between them and included them in a single domestic like product.

Thus, the Commission addressed the record evidence as to each like product factor, including evidence that arguably detracted from its like product findings.  Indian Plaintiffs simply disagree with the weight the Commission gave to that evidence, and now urge this Court to reweigh the evidence, an invitation it should decline.  While Plaintiffs argue that the Commission's Views "ignore{d}" and "downplayed" the investment and equipment and possible regulatory requirements needed to produce cooked shrimp, IndPlBr at 46-47, the Commission specifically explained these issues, providing estimates of the amount of the required investment.  Appx1279, Appx1282.  Similarly, the Commission expressly considered purchasers' responses with respect to

the interchangeability of cooked and raw shrimp.  Appx1280, Appx1282.

Nevertheless, the Commission reasonably found that the existence of

some differences in production equipment and interchangeability did

not create a clear dividing line between cooked shrimp and raw shrimp,

given the similarities in terms of other like product factors.

Indian Plaintiffs argue that the Commission was "myopic" to focus

on whether the three U.S. firms that produced both raw shrimp and

cooked shrimp did so at the same facility with the same employees.

IndPlBr at 47.  However, the Commission's analysis must focus on

whether there is a clear diving line between domestically produced

frozen raw shrimp and domestically produced frozen cooked shrimp.

*Paper Shopping Bags from Turkey*, Inv. No. 731-TA-1626 (Final),

USITC Pub. 5504 at 17 (May 2024) ("{T}he Commission's domestic like

product analysis focuses on whether there is a clear dividing line

between domestically produced products."); *see Torrington Co. v. United

States*, 14 CIT 648, 652, 747 F. Supp. 744, 749 (1990), *aff'd*, 938 F.2d

1278 (Fed. Cir. 1991).  Thus, the Commission appropriately focused its

analysis on U.S. producers of cooked shrimp, rather than on foreign firms that produce cooked shrimp imported into the United States.[8]

Indeed, as the Commission explained, Appx1283 (n.57), the Commission's analysis of cooked shrimp here was similar to its analysis in the 2004 Shrimp investigations in which the Commission also included cooked shrimp and other "value-added" processed frozen shrimp in the same like product as primary processed frozen shrimp. *Certain Frozen or Canned Warmwater Shrimp and Prawns From Brazil, China, Ecuador, India, Thailand, and Vietnam*, Inv. Nos. 731-TA-1063-1068 (Preliminary), USITC Pub. 3672 at 6-9 (Feb. 2004). In those investigations, the Commission recognized that value-added

---

[8] Indian Respondents included few citations in support of their arguments concerning the production process for cooked shrimp in their prehearing brief, and offered hearing testimony concerning the process from a witness from a U.S. importer of frozen cooked shrimp, Devi Seafoods, Inc., whose parent company was an Indian producer and exporter of frozen cooked shrimp. *See* Appx44316-44317 (Indian Respondents' Prehearing Brief at 9-10); Appx58438-58441 (Hr'g. Tr. at 168-171 (Atluri)). The Commission observed that information presented by the parties concerning the characteristics of imports of cooked shrimp is not relevant to its domestic like product analysis. Appx1278 (n.40). *See Certain Structural Beams from China, Germany, Italy, Luxembourg, Russia, South Africa, Spain, and Taiwan*, Inv. Nos. 731-TA-935-942 (Preliminary), USITC Pub. 3438 at 5 n.15 (July 2021) (a foreign producer's "information regarding practices in Germany is not relevant to the Commission's definition of the U.S.-produced product").

35

frozen shrimp products such as cooked shrimp were not fully interchangeable with the primary frozen shrimp products, and that the further processing of some value-added products required additional equipment. *Id.* at 9. Despite these differences, however, the Commission found that the products had "no more than minor differences in physical characteristics, end uses, and channels of distribution," and thus found no "clear dividing line separating the continuum of processed warmwater shrimp products." *Id.* Thus, the Commission's analysis in this case was consistent with its analysis in the 2004 investigations, in that differences in interchangeability and production equipment were found insufficient to establish a clear dividing line between cooked shrimp and other frozen warmwater shrimp products, given the similarities in terms of other like product factors such as physical characteristics, end uses, and channels of distribution. Appx1283 (n.57).

Ignoring the 2004 investigations, Indian Plaintiffs instead focus on a 2005 Commission determination finding that canned shrimp was a separate like product from frozen shrimp. *Certain Frozen or Canned Warmwater Shrimp and Prawns From Brazil, China, Ecuador, India,*

*Thailand, and Vietnam*, Inv. Nos. 731-TA-1063-1068 (Final), USITC

Pub. 3748 at 6-9 (Jan. 2005) ("*2005 Shrimp Determination*"); *see*

Appx1283 (n.58). While acknowledging that the Commission's 2005

determination is not controlling here, Indian Plaintiffs emphasize that

there was only one U.S. producer of canned shrimp in the 2005 case,

while here there are three U.S. producers of cooked shrimp. IndPlBr at

50. As the Commission explained in in its 2005 views, however, the one

U.S. producer of canned shrimp did not produce frozen shrimp at all,

indicating "no overlap between producers of canned shrimp and

producers of frozen shrimp," *2005 Shrimp Determination,* USITC Pub.

3748 at 9, and canned shrimp also differed from frozen shrimp in terms

of the other like product factors, including physical characteristics and

uses. S*ee* Appx1283 (n.58).

Here, by contrast, the three U.S. producers of frozen cooked

shrimp also produce frozen raw shrimp, supporting the Commission's

findings of overlap and the lack of a clear dividing line between frozen

cooked shrimp and frozen raw shrimp. Appx1279-1280, Appx1282. The

Commission also found overlap between the two products in terms of

other like product factors. Appx1281-1282. Contrary to Indian

37

Plaintiffs' argument, IndPlBr at 48, the number and size of the U.S. producers of cooked shrimp, as well as whether their production, capacity, and investment are sufficiently "meaningful," are not relevant to whether there is a clear dividing line between domestically produced frozen cooked shrimp and domestically produced frozen raw shrimp in terms of the like product factors.

Thus, the Commission reasonably found that there was no clear dividing line between frozen cooked shrimp and frozen raw shrimp, and thus included them in a single domestic like product. This Court should reject Indian Plaintiffs' invitation to reweigh the evidence and sustain this aspect of the Commission's analysis.

## C. The Commission Reasonably Found that Subject Import Volume Was Significant

The statute instructs the Commission to "consider whether the volume of imports of the merchandise, or any increase in that volume, either in absolute terms or relative to production or consumption in the United States, is significant." 19 U.S.C. § 1677(7)(C)(i). In accordance with the statute, the Commission found that the volume of cumulated subject imports was 1.5 billion pounds in 2021, 1.4 billion pounds in 2022 and 2023, 317.1 million pounds in interim 2023, and 332.5 million

pounds in interim 2024. Appx1315.[9] It found that the volume of cumulated subject imports as a share of apparent U.S. consumption increased by 5.2 percentage points from 2021 to 2023, rising from 78.7 percent in 2021 to 80.2 percent in 2022 and 83.9 percent in 2023; it was 82.9 percent in interim 2023 and 84.1 percent in interim 2024. Appx1315. The Commission found that the ratio of cumulated subject imports to domestic industry production was 1,174.2 percent in 2021, 1,406.9 percent in 2022, 1,374.8 percent in 2023; 2,161.3 percent in interim 2023, and 1,858.4 percent in interim 2024. Appx1315. Based on these data, the Commission reasonably found the volume of cumulated subject imports significant in absolute terms and relative to U.S. consumption and production, and the increase in that volume significant relative to U.S. consumption and production. Appx1316.

No plaintiff contests any of the data underlying the Commission's volume findings, or suggests, contrary to these data, that cumulated subject imports were not significant in terms of absolute volume, market share, or as a ratio to domestic production. Nevertheless,

---

[9] Given the 7.9 percent decrease in subject import volume between 2021 and 2023, the Commission did not make a finding of a significant increase in subject import volume in absolute terms. Appx1315.

39

Indian Plaintiffs argue that "subject import volumes have no impact on U.S. producers due to domestic supply constraints," and fault the Commission for not addressing the *impact* of subject imports in the context of conditions of competition in its volume analysis. IndPlBr at 36-37. The plain language of the statutory volume provision contains no mention of "effects," however, unlike the price and impact provisions. *Compare* 19 U.S.C. § 1677(7)(C)(i) *with id.* at § 1677(7)(C)(ii) ("In evaluating the effect of imports of such merchandise on prices . . . ."); *see also id.* at § 1677(7)(B) (bifurcating the Commission's injury assessment between analysis of subject import "volume," and its "consequent impact" (*i.e.*, its effects)). Moreover, the Commission is not required to consider the reasons for increased subject import volumes in assessing whether the volume or increase in volume is significant. The statute explicitly permits a finding that subject import volumes are "significant" in "absolute terms," based upon volume alone. *See OCTAL*, 539 F. Supp. 3d at 1299-1300 (citing 19 U.S.C. § 1677(7)(C)(i)). Thus, the Commission appropriately addressed Indian Plaintiffs' arguments in its impact analysis.

In reviewing volume findings in previous cases, this court has rejected similar arguments that the Commission was legally required to consider the reasons for and effects of increased subject imports.  In *OCTAL,* the court held that "the statute does not require that the Commission consider the effects of subject imports in its volume analysis."  *Id.*  Similarly, in *ITG Voma Corp. v. U.S. International Trade Commission,* the court rejected plaintiff's argument that the Commission was obligated to consider the domestic industry's capacity constraints and financial performance in its analysis of the volume of subject imports, finding instead that the Commission must consider those factors when analyzing the impact of subject imports.  253 F. Supp. 3d 1339, 1357 (Ct. Int'l Trade 2017), *aff'd*, 753 F. A'ppx 913 (Fed. Cir. 2019).  More recently, in *Adisseo Espana S.A. v. United States*, this court rejected plaintiff's challenge to the Commission's volume analysis based on its alleged failure to address the "volume effects" of subject imports, and sustained the Commission's volume analysis, explaining that it would consider plaintiff's "volume effects" arguments in reviewing the Commission's impact analysis.  No. 1:21-cv-00562-MMB, Slip. Op. at 15-16, *available at* 2023 WL 8866562, at *6 (Ct. Int'l Trade

41

Dec. 18, 2023).  This Court should likewise reject the Indian Plaintiffs' argument that the Commission was somehow required to consider "volume effects" in evaluating the significance of import volume.

Furthermore, the statute only requires that the Commission take conditions of competition into account when analyzing the impact of subject imports.  *Compare* 19 U.S.C. § 1677(7)(C) *with* 19 U.S.C. § 1677(7)(C)(iii).  Section 1677(7)(C)(iii) lists "relevant economic factors" the Commission must consider when examining the impact of subject imports on the domestic industry and requires the Commission to "evaluate all relevant economic factors described in this clause," meaning section 1677(7)(C)(iii), "within the context of the business cycle and conditions of competition."  Indeed, this court has recognized that the Commission need not consider the conditions of competition in its volume analysis, as that requirement only applies to *impact*.  *See Tenaris Bay City,* 789 F. Supp. 3d at 1373 ("The Court agrees that the last section of 19 U.S.C. § 1677(7)(C)(iii) regarding 'conditions of competition' should be read to apply only to the 'impact on affected domestic industry' section of the statute.").

42

Indian Plaintiffs' reliance (IndPlBr at 37-38) on *OCP S.A. v. United States,* 658 F. Supp. 3d 1297 (Ct. Int'l Trade 2023) and *Altx, Inc. v. United States,* 26 CIT 709 (2002) is misplaced. As noted above, the statute only requires the Commission to take conditions of competition into account when analyzing *impact.* Moreover, these cases are factually distinguishable, as they "'stand{} for the principle that imported volumes may not be significant if the imported quantities fill demand that the domestic industry is unable to meet 'either because of incapability or lack of viability.'" *OCP*, 658 F. Supp. 3d at 1320 (quoting *Altx*, 26 CIT at 717). Here, as further discussed in section III.G below, the Commission rejected Indian Plaintiffs' arguments that subject imports satisfied demand that the domestic industry was unable to supply, explaining that over 90 percent of responding U.S. fisherman had reported no constraints on their ability to harvest fresh warmwater shrimp, while a majority of responding U.S. processors reported that the availability of fresh-caught warmwater shrimp had not constrained their ability to process frozen shrimp. Appx1307, Appx1340-1341. Accordingly, there was no need for the Commission to consider "demand

43

that the domestic industry is unable to meet" in its consideration of the significance of subject import volume.

Because the Commission reasonably found that the volume of cumulated subject imports was significant, the Court should reject Indian Plaintiffs' arguments and sustain the finding.

**D.    The Commission Reasonably Found Significant Underselling by Subject Imports**

Plaintiffs do not dispute that subject imports undersold domestically produced frozen warmwater shrimp during the POI.  To analyze underselling, the Commission collects quarterly price and quantity sales data on strictly defined pricing products and then compares domestic and subject prices to determine the quarters of underselling and the subject import sales volume associated with those quarters.  Courts have repeatedly sustained this methodology.  *DAK Ams. LLC v. United States*, 517 F. Supp. 3d 1349, 1365-66 (Ct. Int'l Trade 2021); *Coal. of Gulf Shrimp Indus. v. United States*, 71 F. Supp. 3d 1356, 1366-67 (Ct. Int'l Trade 2015).

Here, based on pricing data reported by 15 U.S. processors and 49 importers on five products, the Commission found that subject imports undersold domestically produced shrimp in 141 of 214 (or 65.9 percent

44

PROPRIETARY INFORMATION SUBJECT
TO PROTECTIVE ORDER REDACTED

of) quarterly comparisons.  Appx1316-1317.  By volume, it found that there were 387.5 million pounds of reported subject import sales in quarters with underselling, accounting for 87.2 percent of reported subject import sales volume in the Commission's pricing data. Appx1317.  Plaintiffs do not dispute these data.

Plaintiffs likewise do not dispute the confirmed lost sales found by the Commission.  The Commission found that ten of the 20 responding purchasers reported that they had purchased subject imports instead of domestic product during the POI, with eight of those ten reporting that subject imports were priced lower.  Appx1318.  Seven of these purchasers reported that price was a primary reason for their decision to purchase subject imports rather than domestic product, including four purchasers that estimated that they purchased [ number ] pounds of subject imports instead of domestic product due to the lower price.  Appx1318.  The Commission found that these confirmed lost sales were equivalent to [ % ] percent of U.S. processors' U.S. shipments during the POI.  Appx1318-1319.

Based on this undisputed evidence of pervasive subject import underselling, as well as the at least moderate degree of substitutability

between subject imports and the domestic like product, the importance of price in purchasing decisions for frozen warmwater shrimp, and the substantial volume of confirmed lost sales, the Commission found that cumulated subject imports significantly undersold the domestic like product during the POI. Appx1320. Since the evidence supporting the Commission's significant underselling finding is undisputed, this Court should affirm it.

Vietnamese Plaintiffs nevertheless mistakenly contend that the Commission improperly found significant underselling because, according to them, "the domestic industry's market share was nearly unchanged." VnPlBr at 27-28. However, Vietnamese Plaintiffs misunderstand the Commission's significant underselling finding, which was not based on a market share shift, but rather, as explained above, on the Commission's undisputed findings of pervasive underselling, confirmed lost sales, moderate substitutability, and the importance of price. Appx1320. Only after having found significant underselling by subject imports did the Commission explain that this significant underselling led cumulated subject imports to gain 5.2 percentage points of market share between 2021 and 2023, including

46

0.8 percentage points of market share at the domestic industry's expense.  Appx1320.

Notwithstanding Vietnamese Plaintiffs' extensive research into dictionary definitions of the word "significant," VnPlBr at 31-33, the Commission reasonably explained the significance of the market share shift from the domestic industry to subject imports from 2021 to 2023, finding that the loss of sales and market share to subject imports led to declines in the production, capacity utilization and U.S. shipments of U.S. processors, which in turn contributed to the declining financial performance of both processors and fishermen.  Appx1338-1339. Moreover, the Commission noted that the 0.8 percentage-point market share shift to subject imports from 2021 to 2023 was equivalent to a loss of over 10 percent of the domestic industry's 7.6 percent market share in 2021.

Although the market share shift itself is not the basis for the Commission's finding of significant underselling, Vietnamese Plaintiffs nevertheless rest their price effects and impact arguments on their contention that the domestic industry did not lose 0.8 percentage points of market share, as the Commission found, but rather 0.3 percentage

points.  VnPlBr at 28, 32, 40, 42.  This argument does not withstand scrutiny.

To calculate their smaller market share shift, Vietnamese Plaintiffs inappropriately compare market share data for the January-March 2024 interim period with market share data for full year 2021. VnPlBr at 28-29.  However, the Commission avoids comparing interim data with full-year data because such comparisons can be influenced by seasonality, and the Commission found that U.S. demand for frozen warmwater shrimp and supply from U.S. processors and fishermen is seasonal.[10]  Instead, the Commission typically compares the data for an interim period with the data for the same interim period from the previous year, as it did here throughout the Views.  *See* Appx1335-1338. Accordingly, the Commission reasonably compared the domestic

_____

[10] Specifically, the Commission found that responding firms reported seasonality in U.S. demand, with some reporting that demand from restaurants was higher in the summer, while retail demand was higher during the winter holidays and during Lent.  Appx1303.  It also found that U.S. processors' production is seasonal, noting that one firm reported its heaviest production was from May to mid-July and from August to mid-December.  Appx1304.  The Commission further found that shrimp harvesting by U.S. fishermen in the South Atlantic and Gulf of Mexico is seasonal, with seasonal peaks varying by species, although it found that seasonality was less of a constraint for fishermen than it had been in the past.  Appx1304-1305.

48

industry's market share for interim 2024 to that in interim 2023 data, rather than to that in full year 2021. Appx1307-1308, Appx1315.

Moreover, even if it were appropriate to compare the domestic industry's market share in interim 2024 (6.7 percent) to that in full year 2021 (7.6 percent), which is not the case, the decline in the domestic industry's market share would have been 0.9 percentage points, not 0.3 percentage points as the Vietnamese Plaintiffs assert. Appx1308, *see* Appx1226 (CSR at Table C-1). Thus, even under their flawed approach, the Commission's finding that low-priced cumulated subject imports captured significant market share from the domestic industry would be supported by substantial evidence.

In order to reach their desired 0.3 percentage point figure, Vietnamese Plaintiffs ignore the Commission's definition of the domestic industry, including U.S. processors and fishermen, and rely on their own definition of the domestic industry, including only U.S. processors. VnPlBr at 28, 32, 40, 42.[11] However, no party during the

---

[11] Vietnamese Plaintiffs inconsistently rely on the Commission's definition of the domestic industry when it suits them, as in arguing that the "domestic industry's" shipments increased from 2022 to 2023. VnPlBr at 35. U.S. processors' shipments declined from 2022 to 2023. Appx1227 (CSR at Table C-1).

49

investigations disputed that fresh shrimp should be included within the Commission's definition of the domestic like product, and no party disputed that the harvesters of fresh shrimp should be included in the definition of the domestic industry.  Appx1276, Appx1288.  Indeed, Vietnamese Plaintiffs acknowledge that the Commission defined the like product to include fresh shrimp, but then appear to argue that the Commission should not have defined the domestic industry to include the fishermen harvesting fresh shrimp.  VnPlBr at 29-31.  To the extent Vietnamese Plaintiffs are now challenging the Commission's definition of the domestic industry to include fishermen, they failed to exhaust their administrative remedies by never raising this issue before the Commission.  *See Yanghzou Bestpak Gifts & Crafts Co. v. United States*, 716 F.3d 1370, 1381 (Fed. Cir. 2013).

Furthermore, there is no legal basis for the Vietnamese Plaintiffs' argument that the Commission should have focused on the market share of only one segment of the domestic industry, U.S. processors. VnPlBr at 29-31.  Having defined the domestic like product to include both frozen and fresh shrimp, the Commission appropriately defined

50

the domestic industry to include both U.S. processors, which produced frozen shrimp, and fishermen, which caught fresh shrimp. 19 U.S.C. § 1677(4)(A) (defining "industry" as "producers as a whole of the domestic like product"). Under the statute, the Commission considers the impact of subject imports on the domestic industry "as a whole," including in evaluating an "actual and potential decline … in market share." 19 U.S.C. §§ 1677(4)(A), 1677(7)(C)(iii)(I). Contrary to Vietnamese Plaintiffs' argument that "imported frozen shrimp is unlikely to impact the U.S. market share for fresh shrimp," VnPlBr at 30, the Commission explained how the impact of low-priced subject imports on U.S. processors resulted in lower prices for fishermen, thereby reducing fishermen's incentive to harvest fresh shrimp, and their output. Appx1339. Finally, even if it were appropriate for the Commission to focus only on the market share of U.S. processors, the market share loss from U.S. processors to subject imports between 2021 and 2023 would have been *higher*, at 1.0 percentage points (6.8 percent market share in 2021 less 5.8 percent market share in 2023) than the 0.8 percentage point market share loss experienced by the domestic industry as a whole. *See* Appx1226 (CSR at Table C-1).

Regardless of Vietnamese Plaintiffs' creative and inconsistent arguments, the Commission reasonably based its market share analysis on the domestic industry as a whole, and on the comparison of full-year data from 2021 to 2023. The Court should therefore sustain this aspect of the Commission's analysis.

### E.    The Commission Reasonably Found Significant Price Depression by Subject Imports

The Commission reasonably found that subject imports depressed domestic prices to a significant degree, based on the pervasive underselling by subject imports, which had a commanding and expanding share of the U.S. market during the POI, as well as the at least moderate substitutability of subject and domestic frozen shrimp and the importance of price. Specifically, the Commission found that U.S. processors' sales prices declined by 23.0 to 36.1 percent between 2021 and 2023, depending on the product, while the AUVs of their U.S. shipments of frozen shrimp declined 17.9 percent. Appx1328. The Commission explained that as U.S. processors had to lower their prices to compete with low-priced subject imports, those processors in turn were forced to lower the prices they could pay fishermen, and the fishermen's prices were thus also depressed by competition from low-

priced subject imports. Appx1329. It found that between 2021 and 2023, the AUVs of U.S. fishermen's net sales of fresh shrimp declined 42.6 percent. Appx1329. The Commission found that neither the decline in apparent U.S. consumption between 2021 and 2023 nor the decline in fuel and other costs could explain the far greater declines in the domestic industry's prices and AUVs. Appx1328-1329. Because the Commission's price depression finding was reasonable, the Court should affirm it.

Vietnamese Plaintiffs do not dispute the Commission's findings of underselling by subject imports or of the declines in U.S. processors' and fishermen's prices. Instead they argue, unpersuasively, that subject imports could not have depressed domestic prices because, in their view, the domestic industry did not lose significant market share to subject imports and there was no correlation between the decline in the industry's prices and adverse effects on the industry. VnPlBr at 33-36. Vietnamese Plaintiffs' mistaken argument that the domestic industry did not lose significant market share to subject imports is without merit, for the reasons discussed in the preceding section.

53

Vietnamese Plaintiffs argue that subject imports had "no adverse effect on the domestic industry" during the POI, asserting that the industry "experienced increased operating income" during the period of declining subject import prices from 2022 to 2023 and interim 2024, while U.S. processors increased their capital expenditures.  VnPlBr at 34.  Contrary to this argument, however, the record showed that after domestic processors and fishermen had positive operating income in 2021, they then suffered operating losses in 2022 and 2023 as their prices declined, albeit with lower operating losses in 2023 than in 2022. Appx1334, Appx1337.[12]  Thus, Vietnamese Plaintiffs' assertions that the domestic industry enjoyed "increased operating income" in 2023 and thus suffered "no adverse effect" from subject import underselling and price depression are contradicted by the record.

---

[12] Specifically, the Commission found that U.S. processors' operating income worsened from $1.0 million in 2021 to operating losses of $4.2 million in 2022 and $1.2 million in 2023; operating income was $546,000 in interim 2024, compared with an operating loss of $2.6 million in interim 2023; U.S. fishermen's operating income worsened from $8.1 million in 2021 to operating losses of $2.2 million in 2022 and $1.8 million in 2023.  Appx1334, Appx1337.

The Commission also considered the increase in the domestic industry's capital expenditures from 2021 to 2023, highlighted by Vietnamese Plaintiffs as purportedly establishing that the industry's performance improved during the period, VnPlBr at 34, 41, and explained that subject imports had nevertheless hampered the industry's investment efforts. Appx1348-1349. In response to respondent arguments that the industry had failed to make investments to produce "value-added" products to compete with subject imports, the Commission found that the industry tried to make such investments, as confirmed by the increase in capital expenditures and a U.S. processor's hearing testimony. Appx1348-1349 (text & n.333) (citing Appx58299 (Hr'g Tr. at 29 (Gollott))). However, the Commission found that a number of processors reported that they had to cancel or postpone such projects as a result of competition from low-priced subject imports. Appx1348-1349 (text & n.334); Appx1166 (CSR at Table VI-9) (15 of 20 responding U.S. processors reported having investment projects cancelled, postponed, or rejected because of subject import competition); Appx58307 (Hr'g Tr. at 37 (Antley)). While the industry's increased capital expenditures are apparently the sole basis for

55

Vietnamese Plaintiffs' argument that the industry experienced a "strong" and "resilient" performance during the POI, VnPlBr at 41, 43, 45-46, the Commission recognized the increase but reasonably explained that low-priced subject imports had nevertheless prevented domestic producers from proceeding with capital investments, supporting its adverse price effects and impact findings.  Appx1349.

Moreover, Vietnamese Plaintiffs' contention that the domestic industry's market share and U.S. shipments increased from 2022 to 2023 as subject imports undersold domestic product, VnPlBr at 34-35,[13] is fully consistent with domestic producers reducing their prices in an effort to compete for sales with low-priced subject imports, as the Commission found.  Appx1329.  Thus, the Commission's finding that significant underselling caused the industry to lose sales and market share to subject imports and depressed domestic prices was supported by substantial evidence and fully consistent with its traditional

---

[13] The domestic industry defined by the Commission, including both fishermen and processors, experienced an 0.3 percent increase in U.S. shipments between 2022 and 2023, while the "domestic industry" as Vietnamese Plaintiffs would redefine it to exclude fishermen experienced an 0.6 percent decline in U.S. shipments in the same period.  Appx1227 (CSR at Table C-1).

56

approach to establishing adverse price effects, which the court has previously affirmed. *DAK Ams.,* 517 F. Supp. 3d at 1365-66; *Coal. of Gulf Shrimp Indus.,* 71 F. Supp. 3d at 1366-67. The Court should likewise affirm the Commission's price effects findings in this case.

**F.    The Commission Reasonably Found that Subject Imports Had a Significant Adverse Impact on the Domestic Industry**

The Commission found that cumulated subject imports had a significant adverse impact on the domestic industry. Appx1353. In its impact analysis, the Commission found that the significant volume of cumulated subject imports significantly undersold the domestic like product during the POI, which caused the domestic industry to lose sales and market share to subject imports, and significantly depressed the U.S. processors' and fishermen's prices for frozen and fresh warmwater shrimp. Appx1338. It explained that the U.S. processors' loss of sales and market share to subject imports led to declines in their production, capacity utilization, and U.S. shipments, and that the lower output and depressed prices as a result of subject import underselling caused a sharp decline in the industry's financial performance during the POI, including operating losses in 2022 and 2023. Appx1337-1338.

57

The Commission explained that U.S. fishermen also experienced declining financial performance, as U.S. processors, faced with loss of market share and lower prices due to subject imports, lowered the price they would pay for fresh shrimp, resulting in lower prices for fishermen and reducing their incentive to shrimp, which in turn resulted in fewer fishing days, fewer boats in operation, fewer production-related workers, and lower output. Appx1339. The Commission's impact analysis was supported by substantial evidence and should therefore be upheld.

Vietnamese Plaintiffs contest the Commission's material injury determination, arguing that it rests on "isolated data points," again contending that the domestic industry's market share loss to subject imports was not 0.8 percentage points, as the Commission found, but 0.3 percentage points. VnPlBr at 39-43. Repeating their price effects argument, Vietnamese Plaintiffs argue that the Commission should have considered market share data for only one portion of the domestic industry, processors, and ignored fishermen, and should have compared the market share data in this highly seasonal industry for interim 2024

58

directly against the full year 2021 market share data rather than against interim data. *Id.* at 40.

As previously discussed, in accordance with the statute, the Commission conducts its injury analysis, including its market share analysis, with respect to the domestic industry "as a whole," 19 U.S.C. §§ 1677(4)(A), 1677(7)(C)(iii)(I), and thus appropriately considered the market share loss of domestic producers as a whole, including U.S. processors and fishermen. The Commission also reasonably found that the domestic industry lost 0.8 percentage points of market share to subject imports between 2021 and 2023. Appx1320. Vietnamese Plaintiffs' effort to shrink the market share loss down to 0.3 percentage points is based on an incorrect definition of the domestic industry to exclude fishermen and an inappropriate comparison of interim 2024 to full year 2021, distorted by the seasonality of the shrimp market.

Vietnamese Plaintiffs argue that the Commission "dismissed" demand conditions during the POI in its impact analysis. Appx1303-1304. To the contrary, the Commission explained that the domestic industry's injury could not be explained by falling U.S. demand between 2021 and 2023. Appx1343-1344. It found that declining apparent U.S.

59

consumption did not explain the 0.8 percentage point market share shift from the domestic industry to subject imports between 2021 and 2023, at a time the industry was capable of supplying additional shrimp volumes. Appx1343-1344.

The Commission further explained that the decline in U.S. demand did not explain the extent of the deterioration in the domestic industry's condition during the POI, as the industry's output indicators declined by far more than apparent U.S. consumption. Appx1344. The Commission explained that, while apparent U.S. consumption declined 13.6 percent between 2021 and 2023, U.S. processors' production declined 21.1 percent and their U.S. shipments 26.3 percent, while the industry's net sales AUVs declined 21.7 percent, the value of U.S. shipments declined 39.5 percent, and U.S. fishermen's net sales value declined 44.2 percent. Appx1344.

Vietnamese Plaintiffs acknowledge that the domestic industry's indicators declined between 2021 and 2023, but nevertheless claim that several indicators, including net income and capacity utilization, declined by less than apparent U.S. consumption, thus purportedly indicating that subject imports could not have been the cause of the

60

industry's injury.  VnPlBr at 41. The Commission discussed all the relevant indicators of the industry's performance and provided the percentage data for their 2021 to 2023 trends, including where those trends may have detracted from the Commission's conclusions, and reasonably concluded that the negative trends outweighed the positive ones.  Appx1333-1338.  Indeed, Vietnamese Plaintiffs' contention that the domestic industry's net income "declined by less than apparent U.S. consumption" from 2021 to 2023, VnPlBr at 41, is contradicted by the record, since U.S. processors' net income worsened from positive $18.0 million in 2021 to a *net loss* of $185,000 in 2023, while U.S. fishermen's net income worsened from positive $6.7 million to a *net loss* of $2.7 million in 2023.  Appx1334, Appx1337.  Thus, contrary to Vietnamese Plaintiffs' argument, the processors' and fishermen's worsening financial performance from 2021 to 2023, with net income turning to net losses, supported the Commission's finding that subject imports had a significant adverse impact on the industry.[14]

---

[14] Vietnamese Plaintiffs' contention that the domestic industry's capacity utilization declined by less than apparent U.S. consumption is also dubious, VnPlBr at 41, since the record indicates that apparent U.S. consumption fell by 13.6 *percent* between 2021 and 2023, while

[*Footnote continued on next page*]

61

As noted, Vietnamese Plaintiffs contend that the increase in the domestic industry's capital expenditures between 2021 and 2023 indicates that the industry's performance improved during the POI. VnPlBr at 34, 41.  However, as discussed in the preceding section, the Commission explained that subject imports substantially hampered the industry's investment efforts, as a number of processors reported that they had to cancel or postpone such projects as a result of competition from low-priced subject imports.  Appx1348-1349; Appx1166 (CSR at Table VI-9).  Thus, the Commission reasonably concluded that the negative effects of subject imports on the industry's ability to make capital investments supported the Commission's adverse impact finding.

Vietnamese Plaintiffs further argue, unpersuasively, that the Commission should have given the domestic industry's performance in January-March 2024 greater weight than the industry's performance during the three full years of the POI because the interim 2024 period was closer to the Commission's vote date.  VnPlBr at 28-29.  Contrary to

---

U.S. processors' capacity utilization fell by 10.3 *percentage points*, so the two indicators are not comparable. Appx1335, Appx1344.

this argument, the Commission reasonably relied on the correlation between significant volumes of low-priced subject imports and the industry's declining performance during the 2021-2023 period, as subject imports captured sales and market share from the industry and depressed domestic prices. *Mexichem Fluor Inc. v. United States*, 179 F. Supp. 3d 1238, 1248 (Ct. Int'l Trade 2016) (holding that "{t}he Commission . . . reasonably analyzed the correlation between subject import trends and domestic industry performance") (citation omitted); *JMC Steel Grp. v. United States*, 38 CIT 1460, 1468, 24 F. Supp. 3d 1290, 1300 (2014) (affirming the Commission's use of a correlation analysis "tracking subject import trends in relation to trends in the domestic industry's performance," and noting that the court had approved its use in prior cases) (citations omitted).  Attaching greater weight to the three months of interim 2024 data, as advocated by Vietnamese Plaintiffs, would have made little sense in light of the much smaller amount of data, three months versus three full years, and the seasonality of the shrimp market.

Furthermore, the Commission considered interim data and found that the higher apparent U.S. consumption in interim 2024 compared

with interim 2023 coincided with an improvement in some of the U.S. processors' performance indicators (*e.g.,* production, U.S. shipments, and market share) but not others (*e.g.,* revenues and inventories).  *See* Appx1335-1338.  The Commission also found that despite higher apparent U.S. consumption in interim 2024 than in interim 2023, U.S. processors' prices and U.S. shipment AUVs were lower, suggesting that there was not a strong correlation between apparent U.S. consumption and the domestic industry's pricing trends.  Appx1328 ( text & n.240).

Moreover, the Commission considered post-POI data on the record concerning the domestic industry's performance following Commerce's imposition of preliminary duties in April and May of 2024.  The Commission found that improved market conditions for the domestic industry following imposition of provisional measures, as cumulated subject import volumes declined and domestic prices increased, provided additional support to its finding that subject imports caused the industry's declining performance during the POI.  Appx1339 (n.290).  Thus, contrary to Vietnamese Plaintiffs' contention, the Commission noted that the record information closest to the vote date

64

supported its finding that subject imports injured the domestic industry.

### G.    The Commission Reasonably Found that Supply Constraints Did Not Cause the Domestic Industry's Injury

Indian Plaintiffs argue that the Commission failed to adequately consider its argument that subject imports could not have injured the domestic industry because the industry was allegedly incapable of producing additional volumes of frozen shrimp due to biological limits on the quantity of fresh shrimp available to be harvested by U.S. fishermen.  IndPlBr at 15-42.  To the contrary, the Commission thoroughly explained why the Indian Plaintiffs' argument was not supported by the record and could not explain the injury the Commission had attributed to  subject imports.  The Court should reject the Indian Plaintiffs' invitation to reweigh the evidence and should affirm this aspect of the Commission's analysis.

Contrary to Indian Plaintiffs' argument that the Commission failed to mention domestic industry supply constraints in its analysis of the conditions of competition, IndPlBr at 28, the Commission provided a detailed analysis of the record data concerning supply constraints

65

experienced by market participants during the POI. It found that most responding U.S. processors, importers, and purchasers reported that they had not experienced supply constraints during the POI. Appx1305-1306.[15]

Considering whether the availability of fresh warmwater shrimp in the United States had created any supply constraints during the POI, the Commission found that a majority of responding U.S. processors (14 of 20 for 2021 and 2022, and 13 of 20 for 2023 and interim 2024) reported that the availability of wild-caught fresh warmwater shrimp in the United States did not constrain their ability to process frozen warmwater shrimp during the POI. Appx1307. The Commission further found that over 90 percent of responding U.S. fishermen (352 of 385) reported that the availability of live warmwater shrimp in the Gulf of Mexico or off the Atlantic Coast in U.S. territorial waters did not affect the supply of fresh warmwater shrimp for

---

[15] The Commission found that U.S. processors reporting supply constraints identified low shrimp prices and high input costs that had decreased the supply of fresh shrimp, lack of cold storage space, unavailability of certain shrimp sizes at times, freight issues, items that were seasonally unavailable, and further processed items requiring increased labor. Appx1306.

processing. Appx1307. Thus, contrary to Indian Plaintiffs' contention, the Commission reasonably found no significant supply constraints that would have prevented the domestic industry from supplying additional volumes of frozen shrimp.

Indian Plaintiffs also argue that the Commission did not adequately address a report by ION Economics (Appx44415-44925), submitted by respondents in these investigations, arguing that there was no causal link between subject imports and any injury to the domestic industry because of a biological limit on the harvests of wild-caught shrimp by U.S. fishermen. IndPlBr at 17-36. The Commission considered the ION report, and acknowledged that there was ultimately some biological limit on the quantity of warmwater shrimp that could be harvested during any particular period of time. Appx1340. However, the Commission detailed why it did not agree with the ION report's arguments, and reasonably attached more weight to other evidence that the existence of such an undefined limit would not have constrained the domestic industry from increasing its production and sales during the POI. Appx1340. As the Commission explained, over 90 percent of responding U.S. fishermen reported that the availability

67

of live shrimp did not affect the supply of fresh warmwater shrimp, and a majority of responding U.S. processors reported that availability of wild-caught fresh shrimp in the United States did not constrain their ability to process frozen warmwater shrimp during the POI. Appx1341. It further noted the testimony and questionnaire responses of individual U.S. fishermen reporting that the supply of shrimp was abundant in U.S. coastal waters. Appx1341 (citing Appx58312 (Hr'g. Tr. at 42 (Garcia)), Appx58320 (Hr'g. Tr. at 50 (Jones)), Appx58371 (Hr'g. Tr. at 101 (Tran))). The Commission also noted the substantial increase in U.S. processors' end-of-period inventories in 2022 and 2023, to a level equivalent to 2.2 percent of apparent U.S. consumption in 2023, indicating that the processors had the ability to ship substantial additional volumes of frozen warmwater shrimp. Appx1341.

The Commission further explained that the quantity of wild-caught shrimp harvested by U.S. fishermen during the POI, and therefore the quantity of domestic production of frozen warmwater shrimp by U.S. processors, was largely dictated by the financial incentives for fishermen to harvest shrimp, notwithstanding any eventual limit on the volume of warmwater shrimp that could be

68

harvested.  Appx1341-1342.  The Commission explained that many fishermen had been reducing their fishing efforts or abandoning them entirely during the POI, because the declining prices they were receiving as a result of competition from low-priced subject imports made it no longer viable for them to continue.  Appx1341.

Specifically, the Commission found that from 2021 to 2023, U.S. fishermen reported an 11.5 percent decline in the number of PRWs employed, a 16.6 percent decline in the total number of fishing days, and a 3.2 percent decline in the number of boats operated.  Appx1341-1342.  The Commission cited the testimony of fishermen that the low dockside prices as a result of competition from low-priced subject imports had substantially reduced their harvesting activity as fishermen and their crews could not make enough money to keep working on the shrimp boats.  *See* Appx1341 (text & n.298), Appx1347 (text & nn.323-24).  For example, fisherman Anthony Garcia testified:

> We have never seen so much of the fleet in our area idled by low prices. … With no economic incentive to shrimp, our landings have been deeply depressed this year. … This sharp decline has nothing to do with limits on the shrimp that are available to catch, weather events, or other factors. The resource is abundant, and our boats are catching as much as they ever did when they go

69

out.  The problem is the falling prices by imports.
When we do the math, those prices simply cannot
justify the expense of going out to harvest shrimp.

Appx58312 (Hr'g Tr. at 42) (cited in Appx1341 (n.298)).  Similarly,

fisherman Tony Tran testified:

When shrimp boats cannot earn enough money to
make a return, they have to make the painful
decision to tie up at the dock rather than fish.
There is no lack of resources – there are plenty of
shrimp out there in the Gulf available to catch.
But the math has not worked.  In the past few
years, imports have disrupted the market so
severely that many boat owners have had to
reduce fishing or stop altogether.

Appx58315 (Hr'g Tr. at 45); *see also* Appx58302 (Hr'g Tr. at 32

(Gibson)); Appx58368-58370 (Hr'g Tr. at 98-100 (Cooper)) (all cited in

Appx1341 (n.298)).  Thus, the Commission's finding that U.S. fishermen

reduced their harvesting activities during the POI because of reduced

financial incentives due to low-priced subject imports was supported by

substantial evidence, and it reasonably gave that evidence greater

weight than the existence of an undefined ultimate biological limit over

a period of time.

The Commission also explained that it was unpersuaded by the

ION report's argument that domestic warmwater shrimp supplies were

70

determined by biological limits, given the report's methodological limitations. Appx1342. The Commission noted that, as respondents acknowledged, ION's report was unable to include substantial data regarding landings in the South Atlantic because those data were not available in time from the National Oceanic and Atmospheric Administration ("NOAA"), as respondents acknowledged. Appx1342. In addition, the ION report ran a series of simple regression analyses to test the relationship between a single independent variable (*e.g.,* ex-vessel prices), and the dependent variable (*e.g.,* domestic landings), but failed to perform any multiple regression analyses to control for the many factors simultaneously affecting both independent and dependent variables (*e.g.* diesel prices). Appx1342. Moreover, the Commission explained that the ION report's focus on a time period (2012 through June 2024) in which imports dominated the U.S. shrimp market, failing to address supply conditions before imports entered the market, called into question ION's assertion that domestic supply is determined by fixed biological limits rather than by imports. Appx1342-1343. Indian Plaintiffs do not dispute these limitations, but disagree about the

71

weight to be accorded them. *See* IndPlBr at 33-35. The Court should reject Plaintiffs' invitation to reweigh the evidence.

Equally unavailing is Indian Plaintiffs' argument that the Commission somehow erred by discussing the ION report "only" in its impact analysis, but not in its analysis of conditions of competition. IndPlBr at 28-29, 33. This court has recognized that "the ITC need not lay out its analysis in some prescribed way, as there is no 'magic word analysis.'" *Hynix Semiconductor, Inc. v. United States*, 30 CIT 1208, 1219, 431 F. Supp. 2d 1302, 1314 (2006). The Commission reasonably addressed supply constraints generally as a condition of competition and the ION report specifically in its analysis of impact, as a respondent argument pertaining to causation. Appx1305-1307, Appx1340-1343.

Nor do the ION report data support Indian Plaintiffs' argument that domestic landings of fresh warmwater shrimp have been "constant for decades" and "unchanging" and "fixed," supposedly reflecting a definite biological limit. IndPlBr at 16, 19-21, 34-35, 39-40. Far from being constant, the ION report's historical data from NOAA indicate that Gulf landings fluctuated substantially over time, declining 20.2

percent from 2006 to 2007 (from 156.2 million pounds to 124.7 million pounds) and another 21.7 percent from 2007 to 2008, increasing 34.5 percent from 2008 to 2009, declining 27.2 percent from 2009 to 2010, and then increasing 23.1 percent from 2010 to 2011. *Derived from* Appx44444 (ION Exh. ION-B1a). These data further show that Gulf landings increased 29.0 percent from 2015 to 2017 before declining 21.5 percent from 2017 to 2020. Appx44444. Similarly, historical data from NOAA submitted by AHSTAC show large fluctuations in landings for the Gulf of Mexico and South Atlantic over time, including a 23.2 percent decline from 2006 to 2007 (from 166.9 million pounds to 128.2 million pounds), a 30.5 percent increase from 2015 to 2016, a 19.4 percent decline from 2017 to 2018, and a 23.3 percent increase from 2018 to 2019, *derived from* Appx57694-57696 (AHSTAC's Prehearing Brief, Exh. 2), contrary to Indian Plaintiffs' assertion that the data show that "domestic landings have not varied to any meaningful degree since 2006." IndPlBr at 25. These 20-30 percent fluctuations in annual landings in the historical data supplied by ION and AHSTAC belie Indian Plaintiffs' repeated characterizations of the landings as "constant," "unchanging," and "fixed," and lend further support to the

Commission's finding that the fishermen's harvests during the POI were largely dictated by the financial incentives for fishermen to harvest shrimp, not any biological limit.  Appx1343.

Indian Plaintiffs' other arguments challenging the Commission's analysis of the ION report do not withstand scrutiny.  First they inexplicably fault the domestic industry for not increasing landings and production in response to what they characterize as "increased demand" during the POI, arguing that the industry's failure to do so somehow supports the existence of a biological limit.  IndPlBr at 32.  However, Indian Plaintiffs contradict their own argument by acknowledging earlier in their brief that "demand decreased from 2021 to 2023."  IndPlBr at 22.  Indeed, the Commission found that apparent U.S. consumption declined 13.6 percent between 2021 and 2023.  Appx1304.

Indian Plaintiffs also argue that the ION report's conclusion that subject imports had no impact on the domestic industry finds support in the industry's performance from 2021 to 2023, asserting that "while subject import market share rose, {industry} sales revenue was growing as cost was decreasing."  IndPlBr at 22.  Contrary to Indian Plaintiffs' assertion, however, the domestic industry's sales revenues declined

74

sharply as low-priced imports captured sales and market share from the industry and depressed domestic prices. Appx1338-1339.[16] Thus, the trend in the domestic industry's revenues during the POI provides no support for Indian Plaintiffs' arguments or ION's report.

Finally, Indian Plaintiffs argue that "a key underpinning of the Commission's findings" that the ION report allegedly undercut is that "with antidumping and/or countervailing duties, the source of the domestic industry's injury will be disciplined, which would in turn enable the domestic industry to simply increase production and profits." IndPlBr at 21. Not surprisingly, they include no citation to the Commission's Views for this alleged analysis, because the Commission conducted no such analysis and made no such findings. It is Commerce, not the Commission, that determines dumping margins and subsidy rates for subject imports, and the statute does not require the

---

[16] Specifically, the Commission found that U.S. processors' net sales value (revenue) declined 39.2 percent from 2021 to 2023, while U.S. fishermen's net sales value declined 44.2 percent during the same period. Appx1334, Appx1337.

75

Commission to analyze the likely effects of the duties determined by Commerce on the domestic industry's future production and profits.[17]

Because the Commission reasonably found that there were no significant supply constraints that would have prevented the domestic industry from supplying additional volumes of frozen shrimp, the Court should affirm this aspect of the Commission's analysis.

### H.   The Commission Reasonably Found that Competition Was Not Attenuated Between Subject Imports and Domestic Product

The Commission considered and rejected respondents' arguments that competition was attenuated between subject imports and domestically produced frozen warmwater shrimp.  Appx1320.  The Commission specifically found that competition was not attenuated by virtue of almost all subject imports being farm-raised and almost all domestically produced frozen warmwater shrimp being wild-caught. Appx1321-1322.

---

[17] *See 2005 Shrimp Determination,* USITC Pub. 3748 at 35 n. 246 (respondents' argument "that imposition of duties will not remedy the difficulties of the domestic industry … is not relevant as a legal matter. Nothing in the statute or case law requires (or allows) {the Commission} to consider the likely effectiveness of an antidumping duty order in making our injury determination").

In its analysis of the substitutability of subject imports and domestic product, the Commission found that a majority of responding U.S. processors reported that farm-raised and wild-caught warmwater shrimp were always interchangeable, and that subject imports were always interchangeable with domestically produced frozen warmwater shrimp. Appx1309, Appx1311. In addition, the Commission found that majorities of responding importers reported that domestically produced frozen warmwater shrimp was at least sometimes interchangeable with subject imports, while pluralities found that they were never interchangeable, and majorities or pluralities of purchasers found that domestic product was never interchangeable with subject imports. Appx1309. The Commission also acknowledged the responses of purchasers and importers that reported limited interchangeability between wild-caught and farm-raised shrimp, with a majority of responding importers reporting that they were never interchangeable. Appx1311. Thus, the Commission fully discussed the questionnaire responses of importers and purchasers as to the interchangeability of subject imports and domestic product, including responses that detracted from its findings.

77

The Commission also considered other record evidence indicating that subject imports of farm-raised shrimp were interchangeable with domestically produced wild-caught shrimp. It found that frozen warmwater shrimp was frequently marketed and sold in ways that downplayed the distinctions between domestic wild-caught shrimp and imported farm-raised shrimp, inhibiting purchasing decisions on that basis and elevating distinctions in price, and that distributors and retailers discouraged U.S. processors from marketing their shrimp as domestic and wild-caught. Appx1311-1312, Appx1321-1323. It found that consumers often do not know whether they have purchased wild-caught or farm-raised shrimp, and simply request shrimp without regard to its origin, indicating that there is interchangeability between the two. Appx1312, Appx1321-1323.

The Commission also found that majorities or pluralities of responding purchasers reported that domestically produced frozen warmwater shrimp and subject imports from each subject country were comparable with respect to numerous product characteristics, including product consistency, quality meets industry standards, quality exceeds industry standards, and count size. Appx1321-1322. Moreover, the

Commission noted that a majority of responding purchasers reported that they and their customers never or only sometimes make purchasing decisions based on the country of origin. Appx1311. The Commission also found that respondents' claim of attenuated competition was inconsistent with lost sales data from responding purchasers confirming that they purchased significant volumes of low-priced subject imports instead of domestically produced frozen warmwater shrimp because of price. Appx1322.

Thus, the Commission reasonably found that there was at least a moderate degree of substitutability between domestically produced frozen warmwater shrimp and subject imports. Appx1309. Similarly, the Commission's finding that, notwithstanding some differences in interchangeability, competition between subject imports and domestic product was not attenuated based on differences between farm-raised and wild-caught frozen warmwater shrimp was reasonable. Appx1321-1322. The Court should therefore affirm this aspect of the Commission's analysis.

Vietnamese Respondents nevertheless contest the Commission's findings, requesting that this Court reweigh the evidence regarding the

79

degree of interchangeability between farm-raised shrimp and wild-caught shrimp. None of their arguments withstand scrutiny.

Vietnamese Plaintiffs' argument that the Commission failed to consider evidence that detracted from its conclusions relies on a selective quotation from the Commission's Views, taking out of context the Commission's observation that "some" responding U.S. importers and purchasers reported "limited interchangeability" between farm-raised and wild-caught frozen warmwater shrimp. VnPlBr at 50-51 (citing Appx1321). They ignore that in the same sentence the Commission specifically recognized that a majority of importers reported that wild-caught and farm-raised shrimp were never interchangeable, and referenced its prior more detailed findings from its substitutability analysis about purchasers' responses regarding the interchangeability between farm-raised and wild-caught shrimp. Appx1321*; see* Appx1311. Thus, the Commission appropriately considered the importers' and purchasers' responses regarding interchangeability, contrary to Vietnamese Plaintiffs' allegation based on a selective partial quotation.

80

Vietnamese Plaintiffs also contest the Commission's findings that frozen warmwater shrimp is frequently marketed and sold in ways that downplay the distinction between domestic wild-caught shrimp and imported farm-raised shrimp, mistakenly suggesting that this finding is based on "a photograph of a single package of frozen shrimp." VnPlBr at 52. While the Commission did cite retail packaging from a firm using a shrimp boat logo to sell farm-raised shrimp, Appx45385 (Petitioner's Posthearing Brief, Exh. 7), *cited in* Appx1323 (n.215), it also relied on the testimony of industry witnesses that seafood restaurants and retailers frequently used images of shrimp boats and nets to market imported farm-raised shrimp. Appx1311-1312 (text & n.168), Appx1323 (text & n.215).

U.S. processor Arnie Gollott testified that "{r}estaurants profit from the confusion as they sell imported shrimp they buy at bargain basement prices to customers who think they are getting a wild caught American product. Just ask yourself, how many seafood restaurants have nets, pictures of boats and ships' wheels on the walls?" Appx58297 (Hr'g Tr. at 27); *see also* Appx58356 (Hr'g Tr. at 86 (Pearson)) (both cited in Appx1323 (n.215)). The Commission also cited a September

81

2024 bulletin by the Federal Trade Commission ("FTC") addressing misleading advertising by seafood restaurants that use pictures of fishermen and fishing boats and references to "fresh" and "local catch" to sell imported farm-raised shrimp, as well as an article about an October 2024 FTC letter to seafood restaurants warning them not to use misleading menus or advertising featuring locally-caught shrimp to market imported farm-raised shrimp. Appx45387-45392 (Petitioner's Posthearing Brief, Exhs. 8-9), *cited in* Appx1323 (n.215). Moreover, the Commission noted that Louisiana passed a state law in 2019 requiring restaurants to state on their menus if they were selling imported shrimp or crawfish, and that by 2023 Louisiana health inspectors had found over 2,600 violations of the law, but had issued no fines. Appx1312 (n.169), *citing* Appx45394-45399 (Petitioner's Posthearing Brief, Exh. 10); Appx58297-58298 (Hr'g Tr. at 27-28 (Gollott)). The Commission also noted that vendors advertising fresh seafood from the Gulf of Mexico at shrimp festivals in Alabama and Louisiana in 2024 were found to have sold almost exclusively imported shrimp. Appx1323 (n.214) *citing* Appx58298 (Hr'g Tr. at 28 (Gollott)); Appx45400-45405 (Petitioner's Posthearing Brief, Exh. 10). Thus, contrary to Vietnamese

82

Plaintiffs' contention, the substantial evidence of these marketing practices is hardly limited to "a single package of frozen shrimp."

In addition to the record evidence of imported farm-raised shrimp being marketed as if it were fresh domestic wild-caught shrimp, the Commission also noted the testimony of U.S. processors that retailers, distributors, and restaurants discouraged them from marketing their wild-caught shrimp with "made in the USA" labels or American flags, because these firms do not want to differentiate domestic wild-caught shrimp from the lower-priced imported farm-raised shrimp that they sell. Appx1311-1312, Appx1323 (text & n.214). Mr. Gollott testified that distributors and retailers "do not want … {U.S. processors} to advertise our domestic product because they don't want their customers to know that the stuff they are getting mostly is not domestic product. So they don't want to put too much differentiation on their product lines," adding that the packaging lists the origin of the shrimp only "in very, very fine print." Appx58355 (Hr'g Tr. at 85) *cited in* Appx1312 (n.168). Similarly, U.S. processor Reese Antley testified that his firm seeks to put a U.S. flag or a "USA" label on the packaging it designs for its retail private label customers, but the retailers won't permit it: "{w}e

83

**PROPRIETARY INFORMATION SUBJECT TO PROTECTIVE ORDER REDACTED**

cannot have product of USA in big because {the retailers} want it uniform across so people don't know what they're buying.  They're buying shrimp. … {T}here's no education in what they're buying whether it's farm raised, imported product or whether it's domestic product."  Appx58358 (Hr'g Tr. at 88); *see also* Appx58356-58357 (Hr'g Tr. at 86-87 (Pearson)) (both cited in Appx1312 (n.168)).  Thus, ample evidence in the record supports the Commission's finding that the marketing of both domestic and imported frozen warmwater shrimp frequently leaves consumers unaware of whether they are purchasing domestic wild-caught shrimp or imported farm-raise shrimp. Appx1311, Appx1321.

Vietnamese Plaintiffs note hearing testimony of a witness from Costco regarding its views as to the limits on interchangeability between wild-caught and farm-raised frozen shrimp, as well as staff conference testimony from a witness from Publix Super Markets and [ purchaser's ] questionnaire response indicating that they treat the two types of shrimp differently.  VnPlBr at 54, 57-58.  However, the fact that large and sophisticated retailers and/or wholesalers of shrimp may be aware of the differences between farm-raised and wild-caught

shrimp in their operations in no way undercuts the substantial evidence supporting the Commission's finding that the marketing of frozen warmwater shrimp frequently leaves customers unaware of what kind of shrimp they are purchasing, thus elevating the importance of price. Appx1321. While not addressing this specific evidence in its Views, the Commission clearly considered Costo's testimony, having received it at the hearing, and the path of its reasoning in finding the testimony outweighed by other evidence is abundantly clear. SAA at 892; *see also Timken*, 421 F.3d at 1354–57. Indeed, Vietnamese Plaintiffs do not challenge, or even acknowledge, the Commission's finding that the large volume of confirmed lost sales, whereby purchasers reported purchasing subject imports instead of domestic shrimp due to price, showed that competition was not significantly attenuated by non-price differences. Appx1322.

The Commission also reasonably attached weight to purchasers reporting that domestic shrimp are comparable to subject imports in terms of various non-price product characteristics, including product consistency, quality meets industry standards, quality exceeds industry standards, and count size, providing additional evidence that

85

competition is not attenuated between domestic and subject frozen shrimp. Appx1321-1322. Contrary to Vietnamese Plaintiffs' arguments, VnPlBr at 57, there is no evidence that purchasers compared wild-caught and farm-raised frozen shrimp using "different standards," and even if they did, it is unclear how such different standards would undermine their responses that domestic and subject shrimp are generally comparable in terms of these factors. In addition, notwithstanding Vietnamese Plaintiffs' argument, VnPlBr at 55-56, the Commission reasonably attached weight to the fact that a majority of responding purchasers reported that they and their customers never or only sometimes make purchasing decisions based on the country of origin. Appx1321. Any purchaser with a preference for wild-caught shrimp would have reported purchasing shrimp based on country of origin, as such shrimp is only available from the United States.

Because the Commission reasonably found that competition between subject imports and domestic shrimp was not attenuated based on differences between farm-raised and wild-caught shrimp, the Court should affirm this aspect of the Commission's analysis.

## I.   The Commission Reasonably Found that Subject Imports Injured U.S. Fishermen

In finding that subject imports materially injured the domestic industry, the Commission explained that subject imports adversely affected both parts of the industry, U.S. processors and U.S. fishermen. The Commission found that as processors had to lower their prices to compete with subject imports, they in turn were forced to lower the prices they could pay fishermen, depressing the fishermen's sales prices for wild-caught shrimp, as reflected by the 42.6 decline in their net sales AUVs from 2021 to 2023.  Appx1329.  The Commission found that the sharp decline in the fishermen's net sales AUVs led to a decline in their financial performance, including operating losses in 2022 and 2023, and declines in fishing days, boats in operation, PRWs, and output from 2021 to 2023.  Appx1333-1334, Appx1339.

In considering various factors to ensure that it was not attributing to subject imports injury that was caused by other factors, the Commission addressed fuel costs during the POI, given that fuel was the largest production cost for U.S. fishermen.  Appx1314.  The Commission collected data from the U.S. Energy Information Administration ("EIA") with respect to the monthly prices of Gulf Coast

87

No. 2 diesel retail price per gallon, and presented the data in Table V-1 and Figure V-1 of the Staff Report. Appx1124-1125. Addressing the EIA price per gallon data, the Commission found that the cost of diesel fuel in the Gulf Coast increased during the first half of the POI, from January 2021 to June 2022, but then generally declined during the second half of the POI through June 2023 and fluctuated thereafter. Appx1314, Appx1347.

The Commission also collected questionnaire data from shrimp fishermen with respect to their fuel and oil expenses during the POI. Appx1351; *see* Appx57237 (U.S. Fishermen's Questionnaire at III-2). The Commission received questionnaire responses from 388 fishermen. Appx1267. Based on the questionnaire data, the Commission found that the fishermen's fuel and oil operating expenses declined 21.1 percent between 2021 and 2023, increasing 8.5 percent from $37.1 million in 2021 to $40.3 million in 2022, but then dropping sharply by 27.2 percent to $29.3 million in 2023. Appx1347-1348 (text & n.327). It further found that the fishermen's unit value for their fuel and oil expenses declined 18.9 percent from 2021 to 2023, increasing from $1.03 per pound in 2021 to $1.18 per pound in 2022, and then declining to

88

$0.84 per pound in 2023. Appx1348. On a per unit basis, it found that the fishermen's fuel and oil expenses increased 15.0 percent from 2021 to 2022, then declined 29.4 percent from 2022 to 2023. Appx1348 (n.328).

The Commission then addressed arguments by Ecuadorian and Indonesian Respondents that higher diesel costs were the sole cause of any injury to the fishermen. *See* Appx1347 (text & n.320). The Commission observed that if fuel cost was the most important driver of any injury to the fishermen, as respondents claimed, there should have been a major improvement in their financial condition in 2023, given that their per unit fuel and oil costs had declined 29.4 percent from 2022 to 2023. Appx1348 (text & n.329). Instead, the Commission found that the fishermen experienced an operating loss that year, with their worst operating ratio (negative 2.4 percent) of the POI, as their net sales AUV declined by far more than the unit value of their fuel and oil expenses. Appx1348 (text & n.330). Thus, the Commission reasonably found that the fishermen's injury was not caused by their fuel and oil expenses, but rather by their falling prices as a result of subject

89

imports. Appx1348. The Court should therefore affirm this aspect of the Commission's analysis.

Ecuadorian Plaintiffs argue that the Commission erred by adopting a methodology addressing the fishermen's fuel costs per pound of shrimp harvested, when it allegedly should have used a methodology that considered only fuel costs per gallon. Ecuadorian Plaintiffs' Rule 56.2 Brief ("EcuPlBr") at 24-26. Contrary to this argument, however, the Commission reasonably considered both fuel costs per gallon and fuel costs per pound and both measures supported its conclusion that subject imports, not fuel costs, accounted for the U.S. fishermen's financial losses.

The Commission frequently analyzes the financial data for the domestic industry both in absolute terms and in terms of unit values, such as dollars per pound. This permits the Commission to compare a domestic industry's net sales AUVs to its unit costs to consider the extent to which the industry's revenues cover changes in its costs. Consistent with that approach, the Commission analyzed the fishermen's financial performance in terms of dollars per pound, which permitted comparisons of the fishermen's net sales AUVs (revenues)

90

with their unit costs (including fuel and oil costs) for each year of the period to see whether fishermen's revenues were covering changes in their costs.  Appx1347-1348 (text & nn.328-331).  Indeed, the fishermen's reported fuel and oil costs per pound were arguably more instructive than fuel costs per gallon because the former measure directly influenced the fishermen's profitability.  That U.S. fishermen's net sales AUVs declined by substantially more than their unit fuel and oil costs from 2022 to 2023, leading to their worst operating ratio during the POI, supported the Commission's finding that subject imports, not fuel and oil costs, drove the losses.  Appx1259 (Table F-14).  As this court has held, "{w}hen evaluating challenges to the ITC's methodology, the court will affirm the chosen methodology as long as it is reasonable…  The Court examines "not what methodology {Plaintiff} would prefer, but … whether the methodology actually used by the Commission was reasonable."  *Coal. of Gulf Shrimp Indus.*, 71 F. Supp. 3d at 1367 (quotation omitted); *United Steel, Paper & Forestry, Rubber, Mfg., Energy, Allied Indus. & Serv. Workers Int'l Union v. United States*, 425 F. Supp. 3d 1374, 1379 (Ct. Int'l Trade 2020).  Because the Commission's methodology here was reasonable, considering the U.S.

91

fishermen's fuel and oil costs on a per pound basis, the Court should affirm it.

Moreover, contrary to Ecuadorian Plaintiffs' argument, the Commission also considered diesel fuel costs on a per gallon basis and found that they increased during the first half of the POI, but then declined during the second half of the POI. Appx1347. In the same paragraph in which Ecuadorian Plaintiffs accuse the Commission of "mischaracter{izing}" the trend in fuel oil prices by focusing on prices per pound, they characterize the EIA data on diesel fuel prices by focusing on January of each year -- $2.44 per gallon in January 2021, $3.46 per gallon in January 2022, and $4.28 in January 2023 -- to create an apparent "trend" of fuel prices continuously increasing during the period and reaching a peak in 2023. EcuPlBr at 39-40. This selective presentation of the data ignores the Commission's findings that diesel fuel prices per gallon declined during the second half of the POI, with some fluctuations. Appx1347.

The Commission's characterization of diesel fuel price trends is confirmed by comparing the EIA diesel fuel price for June of each year of the POI: $3.04 per gallon in June 2021, $5.39 per gallon in June

92

2022, and $3.50 per gallon in June 2023.  Appx1125 (Table V-1).

Similarly, the EIA diesel price for December of each of these years was

$3.36 per gallon in December 2021, $4.31 per gallon in December 2022,

and $3.64 per gallon in December 2023.  Appx1125 (Table V-1).  These

data, as well as the line graph in the Staff Report depicting diesel fuel

prices per gallon during the POI, Appx1124 (Figure V-1), support the

Commission's findings that diesel fuel prices per gallon increased

during the first half of 2022, but then declined during the second half of

the POI, with some fluctuations.  Appx1347.

Moreover, the substantial increase in diesel fuel prices during

2021 -- from $2.44 per gallon in January 2021 to $3.36 per gallon in

December 2021, a 37.7 percent increase, *derived from* Appx1125 (Table

V-1) -- undercuts Ecuadorian Plaintiffs' efforts to characterize 2021 as

the "base year" in which the fishermen earned "record or near record

profits" because they were purportedly not affected by higher fuel

prices.  EcuPlBr at 18, 23.  Contrary to this argument, the EIA data

show that the fishermen faced increasing fuel prices in 2021, when they

were profitable, but generally declining or fluctuating fuel prices in

2023, when they suffered their worst operating ratio of the POI.

93

Appx1125 (CSR at Table V-1); Appx1348.  Indeed, the fact, emphasized by Ecuadorian Plaintiffs, that the fishermen had their best financial performance of the POI in 2021, EcuPlBr at 18, during a year of substantially increased fuel prices, undermines Ecuadorian Plaintiffs' contention that increased fuel oil prices entirely explain the U.S. fishermen's financial performance during the POI.  EcuPlBr at 3.

Moreover, in arguing that increased fuel costs were the "sole cause" of any injury to the fishermen, EcuPlBr at 3, 22-28, Ecuadorian Plaintiffs completely ignore the prices that fishermen received for their shrimp.  As a logical matter, increased fuel costs would not reduce the fishermen's profitability if they were covered by increased revenues. Here, as noted, the Commission found that the fishermen's prices were depressed by low-priced subject import competition, as reflected in their net sales AUVs declining 42.6 percent between 2021 and 2023. Appx1328-1329.  As the fishermen's net sales AUV declined more than the unit value of their fuel and oil expenses, the Commission found that the "spread" between the fishermen's net sales AUVs and their unit fuel and oil costs reached its lowest level of the POI in 2023, sharply declining from $2.63 per pound in 2021 to $1.87 per pound in 2022 and

94

$1.26 per pound in 2023.  Appx1348 (n.331); *see* Appx1258 (CSR at Table F-14).  Thus, the Commission reasonably found that the fishermen's injury was not caused by their fuel and oil expenses, which declined 21.1 percent from 2021 to 2023 and 27.2 percent from 2022 to 2023, but by their falling prices as a result of subject imports. Appx1347-1348.

Similarly misplaced is Ecuadorian Plaintiffs' contention that the Commission somehow failed to address the Ecuadorian and Indonesian Respondents' arguments regarding fuel costs.  EcuPlBr at 35-38.  To the contrary, the Commission thoroughly addressed those arguments, including citing the pages in the respondents' briefs where those arguments were made.  Appx1347-1348 (text & n.325).  As discussed above, the Commission reasonably explained that the fishermen's poor financial performance in 2023 (including their worst operating ratio of the POI) occurred despite the 27.2 percent decline in their fuel and oil costs from 2022 to 2023, belying respondents' argument that increased fuel costs drove the fishermen's performance.  Appx1347-1348.

95

**J.      The Commission Conducted an Adequate
          Investigation**

Ecuadorian and Vietnamese Plaintiffs argue that the Commission

erred by rejecting their requests, submitted in their comments on the

draft questionnaires, that the questionnaires include additional

requests for certain information, such as the volume of diesel fuel that

fishermen purchased during the POI.  EcuPlBr at 28-35; VnPlBr at 60-

62.  Contrary to these arguments, the Commission collected sufficient

data to analyze the issues raised by Plaintiffs, as evident from the

preceding sections and further discussed below.  Because the

Commission reasonably rejected Plaintiffs' requests for the collection of

additional information that was unnecessary and unduly burdensome,

the Court should find that the Commission collected sufficient

information for its investigations.

The Commission collected voluminous data in these investigations

from U.S. processors, fishermen, importers, purchasers, and foreign

producers, compiled into a 265-page staff report through the issuance of

detailed questionnaires.  Appx1000-1264.  In accordance with

Commission Rule 207.20(b), following the Commission's preliminary

determinations, the Commission circulated draft questionnaires to the

96

parties for comment on January 26, 2024.  Appx56828.  The Commission received six sets of comments on the draft questionnaires, containing over 50 pages of comments with dozens of requests by parties for additions and revisions to the draft questionnaires.  The Commission received three sets of comments from supporters of the petition -- Petitioner (Appx56999-57001), AHSTAC (Appx57004-57020) and the U.S. Shrimpers Coalition (Appx57191-57206) -- and three sets from opponents of the petition -- Ecuadorian Respondents (Appx57169-57181), Indian Respondents (Appx57207-57216), and Vietnamese Respondents (Appx57184-57188).  Ecuadorian Respondents provided 13 pages of comments with numerous suggested revisions to the draft questionnaires for U.S. processors, U.S. fishermen, U.S. purchasers, and U.S. importers.  Appx57169-57181.

After considering the parties' comments, the Commission issued the final phase questionnaires on June 26, 2024, having made numerous revisions to the draft questionnaires in response to the parties' comments.  Appx57225-57439.  The Commission made revisions in response to each party's set of comments, but in many cases, it accepted a party's proposed revision only in part, and in other cases, it

declined to accept a party's proposed revision at all.  In its Views, the Commission explained that in considering the parties' proposed revisions in their comments on the draft questionnaires, it had to "weigh the likely probative value of the information those requests would elicit against the burden that including those requests in the questionnaire would impose on responding parties" and "evaluate different, often conflicting, requests from the comments of other interested parties on the same issues."  Appx1350-1351.

The Commission collected sufficient data on the fuel costs of U.S. fishermen for purposes of its analysis of the issue.  As noted, the Commission collected publicly available EIA data on the price of diesel fuel in the Gulf Coast region and presented those data in the Staff Report.  Appx1351; Appx1124-1125 (CSR at V-1 to V-2).  In its final phase questionnaires, the Commission requested data from U.S. fishermen regarding their fuel and oil operating expenses in each year of the POI.  Appx1351; Appx57237 (U.S. Fishermen's Questionnaire at III-2).

The Commission reasonably declined to add an additional question to the Fishermen's questionnaire, proposed by Ecuadorian

98

Respondents in their comments, requesting that fishermen specify the number of gallons of fuel and oil they purchased during the period. Appx57177-57178. As the Commission explained, its collection of questionnaire data from U.S. fishermen concerning their costs of fuel and oil and available EIA data on the price of diesel fuel in the Gulf Coast region provided an adequate record in this issue. Appx1351. It further noted that Ecuadorian Respondents had been able to present their argument regarding diesel fuel costs based on this information presented in the prehearing report. Appx1351.

Ecuadorian Plaintiffs nevertheless argue that the Commission abused its discretion in not including this additional data request in the fishermen's questionnaire. EcuPlBr at 28-35. Ecuadorian Plaintiffs repeatedly emphasize that they had very modestly requested only "a single addition" ("just one" and "not more than one") to the fishermen's questionnaire (EcuPlBr at 14, 30, 34), without ever acknowledging that they in fact submitted *13 pages* of comments on the draft questionnaires to the Commission, Appx57169-57181, with numerous requests for revisions to the U.S. processors, purchasers and importers questionnaires.

Nor is it the case that the Commission was "biased against the Ecuadorian respondents," as Ecuadorian Plaintiffs allege, simply because the Commission made changes to the draft fishermen's questionnaire in response to comments by other parties but did not make the change Ecuadorian Plaintiffs requested.  EcuPlBr at 15-16, 31-32.  The Commission made numerous revisions to the questionnaires that were requested by the Ecuadorian Respondents,[18] belying Ecuadorian Plaintiffs' allegation of "bias."

---

[18] The Commission made many revisions to its final phase questionnaires in response to comments by the Ecuadorian Respondents, in many cases accepting their proposed revisions in part. *See* Appx1317-1318 (& n.196), Appx1350-1353.

In the U.S. Processors' Questionnaire (Appx57292-57349), it added pricing product 5 (III-2), and food processors as a channel of distribution (II-9); it requested firms' share of  shipments by region (III-10), shipments of raw, head on, shell on shrimp (II-10); and shipments of semi-block IQF frozen IQF (II-10); and descriptions and amounts of firms' largest capital expenditures (III-13b).

In the U.S. Importers' Questionnaire (Appx57350-57438), it added pricing product 5 (III-2), and food processors as a channel of distribution (II-9); it requested firms' share of shipments by region (III-10), and shipments of raw, head on, shell on shrimp (II-5c to II-14c).

In the U.S. Purchasers' Questionnaire (Appx57261-57291), it added additional categories of firm type (III-1), and specified different types of purchasers for a question on interchangeability (III-27).

Furthermore, the Commission appropriately weighed the further probative value of requesting the volume of diesel fuel purchased by fishermen against the burden such a request would impose on responding fishermen, particularly in light of the EIA fuel price data it obtained and the fishermen's fuel and oil expenses data it had already determined to collect. Burdensome additional data requests may affect the ability and willingness of parties (which, as is true of the fishermen, were mostly not parties to the investigations) to submit any response to the questionnaires at all. While Ecuadorian Plaintiffs are dismissive of the burden on fishermen in responding to the questionnaires, EcuPlBr at 30, the vast majority of the responding fishermen are much smaller enterprises than the U.S. processors, importers, purchasers, and foreign producers that responded to the Commission's questionnaires, with a more limited capability to complete lengthy and complex questionnaires. Thus, having collected the EIA fuel price data, the Commission reasonably requested in the questionnaire that fishermen provide their fuel and oil expense data, but did not burden them with a further request that they provide the specific volume of diesel fuel purchased during the POI in gallons. As this court has recognized:

101

"There is no statutorily designated minimum standard that requires a particular degree of thoroughness in the Commission's investigation. The Commission must collect the information that allows it to fulfill its statutory obligations." *LG Elecs., Inc. v. U.S. Int'l Trade Comm'n*, 38 CIT at 1562, 1572, 26 F. Supp. 3d 1338, 1348 (2014). That the Commission collected sufficient information on the fuel issue is clear from the substantial evidence supporting its analysis of this issue, as discussed in section III.I above.

Vietnamese Plaintiffs also fault the Commission's questionnaires, arguing that the Commission erred by failing to revise its U.S. purchaser questionnaire to include various non-price factors (*e.g.,* raw material, freezing type, availability of cooked shrimp, and count size) requested in their comments on the draft questionnaires. VnPlBr at 60-61. Contrary to this argument, however, the Commission did revise the purchaser questionnaire to add those factors, not once but twice, first in question III-25 (second through eighth factors), Appx57282, and also in question IV-3 (second through eighth factors), Appx57288, just as Vietnamese Respondents had requested in their comments. Appx57186. Vietnamese Plaintiffs now focus only on a third request

102

that these same factors also be added to a general question about the significance of differences other than price in purchasing decisions, VnPlBr at 61, but the Commission reasonably declined to change the standard language of question IV-2 (Appx57287) to add factors that were already specifically added in the revisions to two other questions. Thus, Vietnamese Plaintiffs' argument is without merit.

Vietnamese Plaintiffs also criticize the Commission for failing to adopt certain pricing products (including black tiger shrimp) proposed by Ecuadorian Respondents to demonstrate the limited supply of such products by the domestic industry. VnPlBr at 61. While adding one of the pricing products proposed by Ecuadorian Respondents, the Commission reasonably declined to add pricing products such as black tiger shrimp that were "niche" products produced domestically in only small quantities. Appx1317-1318 (n.196). As the Commission explained, the goal of the Commission's pricing product data is "to capture head-to-head competition between the domestic like product and subject imports, and thus including products for which there is limited domestic production would undermine this goal." Appx1317-1318 (n.196). Thus, the Commission reasonably declined to add

103

proposed pricing products that would not have yielded usable data for the Commission's pricing analysis. *See LG Elecs.,* 38 CIT at 1574-75, 26 F. Supp. 3d at 1350 (finding it reasonable for the Commission to collect pricing data for its underselling analysis only with respect to product models as to which both imports and domestic product competed, but not with respect to requested models for which there was no import competition). Thus, Vietnamese Plaintiffs' argument that the Commission should have added pricing products to demonstrate the *lack* of head-to-head competition, contrary to the purpose of collecting pricing product data, is without merit. VnPlBr at 61.

Fundamentally, the Ecuadorian and Vietnamese Plaintiffs' arguments are based on the false premise that the Commission was somehow required to collect the information they requested in their comments on the draft questionnaires. The Federal Circuit has stated that the Commission must make "active, reasonable efforts to obtain relevant data," *Allegheny Ludlum Corp. v. United States,* 287 F.3d 1365, 1373 (Fed. Cir. 2002), and must satisfy its obligation to conduct "investigative activities" pursuant to 19 C.F.R § 207.20 of its rules. *Full Member Subgroup*, 81 F.4th at 1257; *Hitachi Metals v. United States*,

949 F.3d 710, 718-19 (Fed. Cir. 2020).  The Federal Circuit has emphasized that "{t}he Commission does indeed enjoy discretion to conduct its investigation and gather data it deems relevant," *Full Member Subgroup*, 81 F.4th at 1257 (quoting *Allegheny Ludlum*, 287 F.3d at 1373), and clarified that there is no "statutorily designed minimum standard that requires a particular degree of thoroughness in the Commission's investigation." *Id.* (quoting *LG Elecs.*, 38 CIT at 1572, 26 F. Supp. 3d at 1348).

Here, the Commission conducted a thorough investigation and collected a voluminous record.  After taking into account the parties' comments on the draft questionnaires, the Commission issued detailed final phase questionnaires.[19]  The Commission received usable questionnaire responses from 388 U.S. fishermen, 20 U.S. processors, 66 U.S. importers, 20 U.S. purchasers, and 67 foreign producers. Appx1266-1267; Appx1027 (CSR at II-2).  In addition to the questionnaire data, the Commission collected numerous sources of

---

[19] The length of the final phase questionnaires that the Commission issued was 89 pages for U.S. importers, 58 pages for U.S. processors, 31 pages for U.S. purchasers, 20 pages for foreign producers/exporters, and 16 pages for U.S. fishermen.  Appx57225-57438.

publicly available data, including the EIA data. Appx1124-1125 (CSR at V-1 to V-2). The parties submitted prehearing briefs containing numerous exhibits with data for the Commission's analysis. *See, e.g.,* Appx44368-44925 (Indian Respondents' Prehearing Brief, containing over 550 pages of exhibits, including ION report); Appx57663-58033 (AHSTAC's Prehearing Brief, containing 370 pages of exhibits, including NOAA data). The Commission conducted a full-day hearing on October 22, 2024, in which the parties presented their arguments, and the Commissioners asked questions and made numerous data requests to the parties, resulting in a transcript of 267 pages. Appx58270-58537. The parties' posthearing briefs likewise contained responses to the Commission's questions with substantial additional data. *See, e.g.,* Appx45274-45637 (Petitioner's Posthearing Brief, which contained over 40 pages of responses to the Commission's questions, and over 300 pages of exhibits). Following the submission of posthearing briefs, the Commission issued a final staff report of 265 pages. Appx1000-1264. The extent of the record collected by the Commission with respect to the fishermen in particular is reflected in the 109-page index to the Administrative Record filed with this Court

106

on April 30, 2025, which contains over 670 entries relating to U.S. fishermen's questionnaire responses, reflecting the extraordinary work of Commission staff to process the numerous revisions, corrections, and correspondence in a limited time frame to reach the total of 388 usable questionnaire responses from U.S. fishermen.[20]  Thus, there can be no question that the Commission satisfied its obligation to conduct investigative activities, and made active, reasonable efforts to obtain relevant data.

In *Full Member Subgroup*, the Federal Circuit upheld the Commission's collection of bid data in its questionnaires for its pricing analysis in its investigation, and found that it was not obligated to collect certain additional data a party had requested that the Commission had found would be unhelpful to its investigation.  "Once the Commission satisfies its obligation to conduct investigative activities under 19 C.F.R. § 207.20(b)," the court stated, "a decision not to collect additional information does not alone render the Commission's final determination unsupported by substantial evidence."  81 F.4th at

---

[20] The Commission issued questionnaires to over 700 fishermen, and received 388 usable responses.  Appx1250 (CSR at F-3).

107

1257. The court went on to hold that "the Commission satisfied its obligation under 19 C.F.R. § 207.20(b) to conduct investigative activities and to collect data necessary to conduct its analysis under the statute. It issued questionnaires and sought comment and argument on the best method to evaluate the pricing of the domestic like product." *Id.* at 1258. The Court concluded that the Commission's decision not to seek out additional data requested by the party was "reasonable and supported by substantial evidence." *Id.; see also Hitachi Metals*, 949 F.3d at 718-19; *LG Elecs.,* 38 CIT at 1572, 26 F. Supp. 3d at 1348-50. This Court should likewise hold that the Commission satisfied its obligation to collect the information necessary for its analysis under the statute and reasonably rejected the Ecuadorian and Vietnamese Plaintiffs' requests for the collection of certain additional information as unnecessary and burdensome.

## IV. CONCLUSION

For the foregoing reasons, the Court should affirm the Commission determinations under review and dismiss the complaints of Ecuadorian Plaintiffs, Indian Plaintiffs, and Vietnamese Plaintiffs.

108

Respectfully Submitted,


Margaret D. Macdonald
General Counsel

*/s/  Karl von Schriltz*
Karl von Schriltz
Assistant General Counsel
for Litigation
Karl.vonSchriltz@usitc.gov

*/s/  John D. Henderson*
John D. Henderson
Attorney-Advisor
Office of the General Counsel
U.S. International Trade Commission
Telephone: (202) 205-2130
Facsimile: (202) 205-3111
john.henderson@usitc.gov

*Counsel for Defendant*
*U.S. International Trade Commission*


Dated:  November 24, 2025
Revised:  May 19, 2026

109

## <u>CERTIFICATE OF COMPLIANCE WITH TYPE-STYLE REQUIREMENTS AND WORD COUNT LIMITATIONS</u>

Pursuant to Chambers Procedures 2(B)(1) and (2) and with the Scheduling Order issued in the above-captioned cases, I hereby certify that the attached **DEFENDANT U.S. INTERNATIONAL TRADE COMMISSION'S NONCONFIDENTIAL MEMORANDUM IN OPPOSITION TO MOTIONS OF PLAINTIFFS FOR JUDGMENT ON THE AGENCY RECORD** contains 19,893 words, according to the word-count function of the word processing system used to prepare this brief (Microsoft Word 2010). This brief was prepared according to the type setting requirements as set forth in the CIT Rules, Chambers Procedures, as well as Judge Baker's Individual Practice Rules for preparation of briefs.

*/s/  John D. Henderson*

John D. Henderson
Attorney-Advisor
Office of the General Counsel
U.S. International Trade Commission
Telephone: (202) 205-2130
Facsimile: (202) 205-3111
john.henderson@usitc.gov

Dated:  November 24, 2025
Revised:  May 19, 2026

## CERTIFICATION OF COMPLIANCE WITH CONFIDENTIALITY AND ARTIFICAL INTELLIGENCE RULES

I hereby certify that **DEFENDANT U.S. INTERNATIONAL TRADE COMMISSION'S NONCONFIDENTIAL MEMORANDUM IN OPPOSITION TO MOTIONS OF PLAINTIFFS FOR JUDGMENT ON THE AGENCY RECORD** contains 5 unique words (including numbers) designated as confidential, and complies with the requirements of paragraph 5 of Judge Baker's Document Formatting and ECF Filing procedures (including Fed. Cir. Rule 25.1(d)(1)(A), (B), and (C)).

This brief was not prepared with the assistance of a generative artificial intelligence program.

/s/ *John D. Henderson*
John D. Henderson
Attorney-Advisor
Office of the General Counsel
U.S. International Trade Commission
Telephone: (202) 205-2130
Facsimile: (202) 205-3111
john.henderson@usitc.gov

Dated: November 24, 2025
Revised: May 19, 2026

111

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that, on this 19th day of May 2026, I provided true and correct electronic copies of the foregoing **DEFENDANT U.S. INTERNATIONAL TRADE COMMISSION'S REVISED NONCONFIDENTIAL MEMORANDUM IN OPPOSITION TO MOTIONS OF PLAINTIFFS FOR JUDGMENT ON THE AGENCY RECORD** to all counsel of record by filing it via the Court's CM/ECF system.

*/s/  John D. Henderson*
John D. Henderson
Attorney-Advisor
Office of the General Counsel
U.S. International Trade Commission
Telephone: (202) 205-2130
Facsimile: (202) 205-3111
john.henderson@usitc.gov